

MAX SCHOENING #324643
Qureshi Law PC
700 Flower Street, Suite 1000
Los Angeles, CA 90017
T: (213) 600-6096
F: (213) 277-8989
max@qureshi.law

*Counsel for Plaintiff*

RAMYA KRISHNAN, *pro hac vice*
ALEX ABDO, *pro hac vice*
JENNIFER JONES, *pro hac vice*
NICOLE MO, *pro hac vice*
Knight First Amendment Institute
  at Columbia University
475 Riverside Drive, Suite 302
New York, NY 10115
T: (646) 745-8500
F: (646) 661-3361
ramya.krishnan@knightcolumbia.org

*Counsel for Plaintiff*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

ETHAN ZUCKERMAN,

     Plaintiff,

    v.

META PLATFORMS, INC.,

     Defendants.

Case No. 3:24-cv-02596-JSC

**AMENDED COMPLAINT**

Deleted: *
Deleted: *
Deleted: *
Deleted: *
Deleted: *admitted *pro hac vice*
Deleted: *application forthcoming*
Deleted: OAKLAND/

**INTRODUCTION**

1.      Plaintiff Professor Ethan Zuckerman seeks to release a browser extension that would give Facebook users greater control over their platform experience, and enable them to join an academic research study exploring the impact of that increased control on user behavior and well-being. The tool, called Unfollow Everything 2.0, would allow users to unfollow their friends, groups, and pages, and, in doing so, to effectively turn off their newsfeed—the endless scroll of posts that users see when they log into Facebook. Users who download the tool would be free to use the platform without the feed, or to curate the feed by refollowing only those friends and groups whose posts they really want to see. Professor Zuckerman has not launched this project because, when another developer released a similar tool called Unfollow Everything, Defendant Meta Platforms, Inc. threatened that developer with legal action. Professor Zuckerman files this suit to obtain a judicial declaration that Unfollow Everything 2.0, as described below, is immunized from legal liability by Section 230 of the Communications Decency Act. In the alternative, he seeks a declaration that the tool does not violate Meta's Terms of Service, the Computer Fraud and Abuse Act, or California's Computer Data Access and Fraud Act.

2.      Ethan Zuckerman is the director of a research center that is dedicated to building a more civic-minded internet, and an associate professor at the University of Massachusetts Amherst. He has a longstanding interest in building tools that empower social media users to better control their online experiences. As Professor Zuckerman's scholarship observes, users today are locked in to a social media ecosystem dominated by a handful of for-profit companies that make their money by selling ads. The companies do this by collecting vast amounts of data about their users and using this information to make their platforms as engaging as possible. There is rising public concern that this business model undermines users' agency and harms public discourse. For example, many experts argue that the platforms' engagement-driven algorithms contribute to the spread of false, extreme, or polarizing content, while also stoking division and violence offline. Many users want more control over their social media experiences, but the companies have largely refused to give it to them. Professor Zuckerman believes that third-party tools that operate at the explicit direction of their users can help resolve this impasse. Such tools would enable users to

1  tailor what they see on social media to their own preferences—and to take back control over their

2  social media experiences.

3      3.    As a general matter, the social media companies may design their products as they

4  wish. Through Section 230 of the Communications Decency Act, however, Congress sought to

5  empower and encourage individuals, families, and schools to "self-police" the information they

6  receive online. *Batzel v. Smith*, 333 F.3d 1018, 1028 (9th Cir. 2003). Thus, Section 230(c)(2)(B)

7  immunizes from legal liability "a provider of software or enabling tools that filter, screen, allow,

8  or disallow content that the provider or user considers obscene, lewd, lascivious, filthy, excessively

9  violent, harassing, or otherwise objectionable." *Zango, Inc. v. Kaspersky Lab, Inc.*, 568 F.3d 1169,

10  1173 (9th Cir. 2009). Through this provision, Congress intended to promote the development of

11  filtering tools that enable users to curate their online experiences and avoid content they would

12  rather not see.

13      4.    Unfollow Everything 2.0 fits comfortably within this safe harbor: by allowing users

14  to turn off their newsfeed, it would enable them to block content they do not want to see, while

15  allowing them to stay connected with friends and family. That is because unfollowing friends,

16  groups, and pages has the effect of removing content generated by these sources from a user's

17  feed, but not from a user's directory. Users would remain free to navigate to their friends' profiles,

18  but without first being presented with a feed that Facebook has designed to maximize user

19  engagement. There are many reasons users might want to use Facebook without the newsfeed.

20  Many users want to reduce the amount of time they spend on the platform. Others object to the

21  way the feed is sorted, because they fear that an engagement-driven feed tends to promote content

22  that is sensationalist or inflammatory. Still others would like to curate their feed to show only

23  content they really want to see.

24      5.    Unfollow Everything 2.0 would work by automating a feature that Facebook itself

25  provides. Facebook allows users to manually unfollow friends, groups, and pages, but doing so for

26  hundreds or even thousands of friends, groups, and pages is cumbersome and time-consuming.

27  Unfollow Everything 2.0 streamlines the process, while protecting user privacy.

28

Case No. 3:24-cv-02596-JSC                 3                   AMENDED COMPLAINT

6.      Using Unfollow Everything 2.0, Professor Zuckerman plans to conduct an academic research study of how turning off the newsfeed affects users' Facebook experience. The study is opt-in—users may use the tool without participating in the study. Those who choose to participate will donate limited and anonymized data about their Facebook usage. The purpose of the study is to generate insights into the impact of the newsfeed on user behavior and well-being: for example, how does accessing Facebook without the newsfeed change users' experience? Do users experience Facebook as less "addictive"? Do they spend less time on the platform? Do they encounter a greater variety of other users on the platform? Answering these questions will help Professor Zuckerman, his team, and the public better understand user behavior online and the influence that platform design has on that behavior.

7.      The tool and study are nearly ready to launch. But Professor Zuckerman has not launched them because of the near certainty that Meta will pursue legal action against him for doing so. Unfollow Everything 2.0 is modeled on an earlier tool called Unfollow Everything, which also allowed users to automate the process of unfollowing their friends, groups, and pages to turn off their newsfeeds. In July 2021, Meta (then Facebook) sent the developer of Unfollow Everything a cease-and-desist letter threatening him with legal action unless he took the tool down, which the developer did. Professor Zuckerman is unwilling to risk being sued. As a result, he will not be able to launch Unfollow Everything 2.0 unless and until a court rules that the tool is protected by Section 230 of the Communications Decency Act, or that the tool does not violate Meta's Terms of Service, the Computer Fraud and Abuse Act, or California's Computer Data Access and Fraud Act.

## JURISDICTION AND VENUE

8.      This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1331 and 28 U.S.C. § 1367, because this Complaint asserts claims arising under the laws of the United States and the remaining state law claims form part of the same case or controversy under Article III of the U.S. Constitution. This Court may award Plaintiff declaratory relief pursuant to 28 U.S.C. §§ 2201–2202.

1    9.    This Court has personal jurisdiction over Defendant in this action because Meta's

2    corporate headquarters and principal place of business is within this judicial district, and Meta has

3    engaged in substantial business within this district.

4    10.    Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(1) because the only

5    named defendant is a resident of the state in which the district is located, and because Defendant's

6    Terms of Service, which are the subject of this suit, specify that "any claim, cause of action, or

7    dispute between us that arises out of or relates to [Meta's Terms of Service] or your access or use

8    of the Meta Products shall be resolved exclusively in the U.S. District Court for the Northern

9    District of California or a state court located in San Mateo County."

10                              **DIVISIONAL ASSIGNMENT**

11    11.    Pursuant to Civil Local Rule 3-2(d), this case will be assigned to the San Francisco

12    or Oakland division because this civil action arises in San Mateo County, where Meta is located.

13                                        **PARTIES**

14    12.    Plaintiff Ethan Zuckerman is the director of the Initiative for Digital Public

15    Infrastructure and an associate professor of public policy, information, and communication at the

16    University of Massachusetts Amherst. His research focuses on the use of media as a tool for social

17    change, the use of new media technologies by activists, and alternative business and governance

18    models for the internet. Professor Zuckerman brings this action in his individual capacity.

19    13.    Defendant Meta Platforms, Inc., formerly known as Facebook, Inc., is a Delaware

20    corporation with its principal place of business in Menlo Park, California. Meta operates, among

21    other services, Facebook, a social media platform with nearly 3 billion users worldwide.

22                                **FACTUAL ALLEGATIONS**

23    **I.  A handful of companies dominate the social media ecosystem, with far-reaching**

24        **implications for public discourse and society.**

25    14.    A small number of companies dominate the social media ecosystem, giving them

26    outsized power over the digital public sphere and society.

27    15.    The largest of these companies—Meta and Google—each has billions of users

28    worldwide who use the companies' platforms to stay in touch with family and friends, read the

1   news, and participate in public and political life. The companies' platforms are the infrastructure

2   for much of the speech that is important to our democracy. According to a recent study conducted

3   by the Pew Research Center, roughly seven in ten Americans use social media. YouTube and

4   Facebook dominate the landscape, with 81% and 69% of Americans, respectively, using those

5   sites. Most of those users visit the sites frequently. For example, seven in ten Facebook users visit

6   the site daily, including 49% who say they visit the site several times a day. Forty three percent

7   say they regularly get news from Facebook.

8        16.    The dominant social media companies are in the business of selling ads. They

9   attract users to their platforms with a variety of content and features, and then they market their

10  users' attention to advertisers. On Facebook, for example, advertisers can pay to have their

11  products or political messages appear, or appear more prominently, in the newsfeeds of the

12  platform's users. Facebook allows its advertisers to target their ads very precisely—for example,

13  by displaying the ads to individual users based on the thousands of characteristics that Facebook

14  infers about those users. This business has been enormously lucrative. Last year, Meta, which owns

15  Facebook and Instagram, made over 134 billion dollars, with close to 98% of that revenue coming

16  from the sale of ads. In the same period, Google generated over 237 billion dollars from ads.

17       17.    The social media companies have been so successful because they are exceptionally

18  good at keeping their users on their platforms. They do so by making the platforms as engaging as

19  possible. And they make their platforms engaging by individualizing the experience of each user.

20  The platforms conduct pervasive surveillance of their users, and they use the data they collect to

21  train machine-learning algorithms to predict which content is most likely to attract and keep the

22  attention of their users. The process is continuous, with users spending more time on the platforms

23  and, as a result, generating more data that the platforms capture and use to refine their engagement-

24  maximizing algorithmic predictions.

25       18.    There is increasing public concern that this business model is having deleterious

26  consequences for public discourse and society. Researchers hypothesize, for example, that the

27  companies' platforms have fueled the spread of misinformation and hate speech, produced

28  ideological feedback loops that push users to more extreme and sensational content, exacerbated

1   political polarization, and incited real-world violence. There is also mounting evidence that

2   companies' thirst for user engagement produces misaligned incentives. For example, in 2021, Meta

3   whistleblower Frances Haugen testified to Congress that, although the company's own research

4   shows that Facebook users gravitate to harmful content, the company's feed-ranking algorithm

5   continues to prioritize whatever keeps users on the platform, at the expense of user safety.

6         19.    Despite widespread concern over the harms caused by the dominant companies'

7   business model, alternative social media platforms struggle to compete. One reason for this is the

8   "network effect"—the phenomenon by which the value of a product or service increases as more

9   people use it. Social media platforms benefit from the network effect because users generally

10   prefer to use the platforms their friends and family use. This preference creates a positive feedback

11   loop where the more users a platform has, the more users it is likely to attract.

12         20.    High "switching costs" also favor the dominant social media companies by making

13   it more costly for users to switch between platforms. The companies drive up these costs in several

14   ways. For example, they incentivize users to entrust more and more of their personal data to them

15   without allowing users to easily transfer that data elsewhere. They also restrict the ability of users

16   and competitor services to "interoperate" with their platforms. Third-party developers are

17   generally unable to programmatically access the data and functionality necessary to create services

18   that would allow users of one platform to interact with users of another. And developers that

19   attempt to do so outside the limited bounds of permissioned access that some companies provide

20   face legal threats. The result is that users are generally unable to leave a platform without losing

21   the communities, connections, and content they forged there.

22   **II. Despite the centrality of the dominant social media platforms to our lives, users have**

23       **little agency on them.**

24         21.    Platform users have little control over their online social media experiences because

25   the companies generally don't give users much control. Instead, the companies retain for

26   themselves control over the key features of their platforms. They decide, for example, who can

27   join, what can be said, and what will be heard. They decide what the interfaces look like, what

28   kinds of experiences to encourage, and what kinds of experiences to discourage. They decide

Case No. 3:24-cv-02596-JSC        7       AMENDED COMPLAINT

1   whether and where to place ads, whether to promote sensational content or informative content,

2   whether to nudge their users into ideological silos or to expose them to the plurality of society.

3      22.    Crucial to the companies' control over their users' experiences is their reliance on

4   algorithms to rank content in each user's feed. To a very significant degree, these ranking

5   algorithms determine what content users see and interact with on the platforms. In a 2018

6   interview, the director of analytics for Facebook's newsfeed estimated that the average user has

7   about 2,000 stories in their feed every day but scrolls through only about the first 200 of them.

8   Facebook decides which stories its users see, because Facebook decides the order in which they

9   appear. The other dominant social media companies similarly decide what their users see.

10      23.    The companies use their ranking algorithms to make their platforms more engaging

11   and to keep users on the platforms for longer. Again, Facebook is a case in point. Meta's own

12   studies have shown that users spend less time on the site, and log in less often, when the algorithms

13   that rank each user's feed are turned off. A recent independent study that investigated the effects

14   of Facebook's and Instagram's algorithms during the 2020 U.S. election confirms these findings.

15   The paper, published in 2023 in the journal *Science*, compared time spent on the platform while

16   using the default ranking algorithm to time spent on the platform while using a reverse

17   chronological feed, and found that users with a reverse chronological feed spent "dramatically

18   less" time on Facebook and Instagram.

19      24.    Despite the importance of the companies' ranking algorithms, many users do not

20   understand the role they play in shaping their online lives. For example, a study conducted by the

21   Pew Research Center in 2018 found that over half of U.S. adults who use Facebook say they do

22   not understand why certain posts but not others are included in their feed, with over 20% saying

23   they do not understand the feed at all. Reinforcing this conclusion, a Pew survey published the

24   next year found that 74% of U.S. adult users did not know that the platform categorized their

25   interests and traits, and roughly half were uncomfortable with Facebook compiling this

26   information. This lack of understanding deprives users of the opportunity to make informed

27   choices about their use of social media.

28

25.     A growing body of research has found that users want more agency over their social media experiences. Users who lack this agency report feeling dissatisfaction and even a sense of injustice. For example, a 2021 study of YouTube found that features like autoplay and recommendations undermined users' sense of agency by "prompt[ing] or pressur[ing] [them] with suggestions that were difficult to decline." Participants expressed frustration at existing customization settings and said they "wanted more opportunities to make active choices, rather than respond to a set of choices proposed by the app."

26.     Studies of Facebook users have similarly found that users want more control over their experiences. For example, more than half the participants in one recent study stated that Facebook's feed "did not give them what they wanted, and they desired easy ways to filter, limit, and turn it off." The study noted that, although some participants had tried customizing their feeds, they found "Facebook's means of doing so tedious and ineffective." A survey conducted by Pew Research in 2018 echoes these findings: the survey found that only 14% of Facebook users believe ordinary users have a lot of control over the content that appears there, and twice that number (28%) feel they have no control.

27.     Evidence suggests that a lack of agency over their social media experiences may lead to concrete harms in users' lives. For example, the *Wall Street Journal* has reported that researchers on Facebook's well-being team found that one in eight users reported "engaging in compulsive use of social media that impacts their sleep, work, parenting or relationships." These problems include "a loss of productivity when people stop completing tasks in their lives to check Facebook frequently, a loss of sleep when they stay up late scrolling through the app and the degradation of in-person relationships when people replace time together with time online."

28.     Though many large platforms claim to provide tools that empower users, these tools often fail to afford users meaningful control, and in some cases even induce users to act against their own interests. For example, a recent study by Simply Secure described YouTube's user controls as a "maze of loops, deadends, and never-ending paths," raising the concern that some of the company's design choices were "intentionally deceptive." The problems the study identified were legion: there was nothing users could control on the "settings" page; controls were "reactive

1  and not proactive, leaving users to catch-up to the recommendation engine rather than designing

2  what they want to see"; accessing controls was convoluted; options for teaching the algorithm were

3  limited; and the words used to describe the outcome of each step a user could take were vague. A

4  study by Mozilla of over 30,000 users confirmed that users were generally not satisfied with

5  YouTube's user controls; many were left feeling frustrated and confused.

6  **III. Third-party tools are crucial to increasing user agency on the platforms, but the**

7  **companies continue to frustrate their creation.**

8      29.    Historically, one important way in which users have taken back control over their

9  online experiences is through third-party tools that operate solely at the users' behest and in their

10  interest. These tools have allowed users to tailor their online experiences to their preferences and

11  to break out of the walled gardens of any particular online service.

12      30.    Many of the browser and application features we now take for granted started with

13  third-party tools. For example, before major browsers allowed users to enable HTTPS-only mode,

14  a browser extension called HTTPS Everywhere enabled users to automatically default to the

15  HTTPS version of a website, making their browsing more secure. When websites became overrun

16  with pop-up ads, pop-up blocker tools like Pop-Up Stopper and AdBlock emerged to help users

17  block the ads. As instant messaging exploded, a chat technology called ICQ surfaced to connect

18  users of different proprietary chat clients. And as users' accumulated more online accounts,

19  password managers provided a way to collect and save user passwords to later automatically enter

20  and submit.

21      31.    Today, third-party tools continue to enhance users' online experiences. Email

22  clients have enabled users to customize their inboxes and block spam and other unwanted content.

23  Money management apps have allowed users to connect to bank and credit card accounts from

24  other providers and manage their personal finances in one place. Parental control tools allow

25  parents to restrict their children's access to inappropriate or explicit content. Self-control tools help

26  users manage how much time they spend online by blocking or limiting their access to distracting

27  websites. Accessibility tools have improved the online reading experiences of people with visual

28  impairments. There are also transparency tools that help users better understand their online

Case No. 3:24-cv-02596-JSC      10      AMENDED COMPLAINT

1   environment. For instance, *The Markup*'s Blacklight tool automatically scans websites to notify

2   users what user-tracking technologies are operating on any given website. And there are a number

3   of third-party services that automatically scan websites to ensure that they are not vectors for

4   phishing attacks or other kinds of fraud.

5       32.     Third-party tools in this model are crucial to increasing user agency on social

6   media. One can easily imagine tools that would empower users to curate their existing feeds

7   according to alternative ranking, labeling, and content-moderation rules, for example, or tools that

8   would allow users to access all of their social media feeds in one place.

9       33.     Most of the major social media companies, however, have obstructed the creation

10  of such tools. For example, they have tightly restricted the data that their users can access through

11  "APIs"; they have adopted terms of service and developer policies that discourage accessing data

12  outside these limited official channels; and they have sent legal threats to developers, even when

13  those developers access user data only at their users' explicit direction.

14      34.     Even companies that were previously more open to third-party interoperation no

15  longer are. For example, in 2023, X Corp., formerly known as Twitter, updated its developer terms

16  to ban app makers from creating their own "clients"—like Twitterrific and Tweetbot—which had

17  allowed users to customize their platform experience. Then, the company ended access to its free

18  API, replacing it with a prohibitively expensive pricing model that collapsed the once thriving

19  ecosystem of third-party apps and tools that relied on it. Among the most prominent casualties was

20  "Block Party," a popular anti-harassment service that helped users avoid harassing content on the

21  platform.

22  **IV. Plaintiff Ethan Zuckerman has a longstanding interest in empowering and informing**

23          **users of online platforms.**

24      35.     Professor Zuckerman is a media scholar, software developer, and policy advocate

25  who has dedicated his career to studying the civic and social roles of internet platforms. He is

26  currently an associate professor at the University of Massachusetts Amherst, a faculty associate at

27  Harvard's Berkman Klein Center for Internet and Society, and the director of the Initiative for

28  Digital Public Infrastructure ("IDPI"), which he founded in 2021.

36.     Prior to joining the University of Massachusetts Amherst, Professor Zuckerman was the director of the Center for Civic Media at the Massachusetts Institute of Technology ("MIT") and an associate professor of the Practice of Media Arts and Sciences at the MIT Media Lab. He is the author of two books, *Mistrust: Why Losing Faith in Institutions Provides the Tools to Transform Them* (WW. Norton & Company, 2021) and *Rewire: Digital Cosmopolitans in the Age of Connection* (WW. Norton & Company, 2013).

37.     Professor Zuckerman's recent research has focused on exploring alternative business and governance models for the internet. He believes that the dominance of a small number of social media companies tends to create the illusion that the business model adopted by them is inevitable. By exploring different ways social media might work, Professor Zuckerman hopes to broaden our collective imagination about the range of possible interventions.

38.     Professor Zuckerman believes that third-party tools that operate at the explicit direction of social media users are a particularly promising avenue for improving online experiences. By employing such tools, users could exercise more control over their digital lives— controlling how information is presented to them on the platforms and what information about them is collected. For example, users could employ third-party tools to customize a platform's interface, to block content the platforms allow but that users would prefer not to see, and to automatically update their privacy settings. Tools in this model would function like pop-up ad blockers or instant messaging aggregators. In other words, they would carry out their users' wishes, operating as extensions or "agents" of the user.

39.     Professor Zuckerman has helped build such tools before. For example, while he was at MIT Media Lab's Center for Civic Media, he was part of a small team that built "Gobo," a tool that allowed users to combine feeds from multiple social media accounts and decide which posts to see. The team built Gobo to give users more control over their social media experiences— instead of needing to access platforms individually, via the algorithms and user experiences that the platforms provided, Gobo allowed users to compile their feeds from those platforms in one place, and to impose their own rules and filters. For example, users could filter out content based

on certain criteria: seriousness, rudeness, virality, gender, and brands. Using a "politics" slider, they could also filter in more posts from news outlets they did not read every day.[1]

40.     Gobo showed users why each post was included in their feed and invited them to explore content that was filtered out by their current settings. Gobo was also designed to protect user privacy; it avoided unnecessary data tracking and always asked for consent for the data it had to collect. A pilot study the Gobo team conducted in 2019 received positive feedback from users, suggesting that Gobo had potential to enhance user control, transparency, and explainability in social media.

41.     Gobo is just one of the many projects Professor Zuckerman has undertaken in his efforts to broaden society's collective imagination about solutions to the challenges presented by our current online ecosystem. In 2020, Professor Zuckerman also led a team in building the special purpose platform "Smalltown." It is a free, open-source platform (based on and compatible with Mastodon) that allows communities to create their own spaces for small-scale civic discussions. By making it easy to experiment with moderation tools and online spaces, Smalltown also puts control in the hands of individuals, letting community members customize the features of their online spaces without needing to know how to code.

42.     Professor Zuckerman has also developed tools to enable other researchers to study the news and social media ecosystems. For example, in 2009, he co-founded Media Cloud, an open-source platform for analyzing the content of online media. Media Cloud allows researchers to map different topic areas across the internet, analyzing the level of influence pieces of media have, how they are discussed, and where they circulate. It has helped researchers study a range of issues, including natural disasters, elections, and the #MeToo movement.

**V. Professor Zuckerman has designed a tool that would empower and inform users of Facebook, but has not released the tool due to fears of legal liability.**

43.     As a natural extension of this work, Professor Zuckerman has designed a tool that would increase users' control over their Facebook experience, by allowing them to turn off their

---

[1] Gobo retrieved posts through platform-provided APIs; because Facebook's API was particularly limited, Gobo accessed only public page content from that platform.

1   newsfeed—the endless stream of posts that users see when they log into the site. Professor

2   Zuckerman has also designed a research study that would allow him to investigate the impact of

3   using the tool on user behavior and well-being. Professor Zuckerman has not released the tool,

4   however, because he is concerned that doing so will expose him to legal liability, as Meta has

5   threatened the developer of a nearly identical tool in the past.

6                                                  **Facebook**

7          44.     Before describing Zuckerman's proposed tool and research, it is helpful to explain

8   how Facebook works.

9          45.     Facebook is a social media platform that connects users with other users ("friends"),

10  groups, and pages. With over two billion daily active users, it is reported to be the most widely

11  used social media platform worldwide. (Professor Zuckerman is among Facebook's many users.

12  He joined the platform in 2007 and often notes that he and his wife were old friends who connected

13  on Facebook in 2016 before dating.)

14         46.     The newsfeed is the first thing that Facebook presents to its users when they log

15  into the site. It is the constantly updating list of posts in the middle of a user's homepage.

16  Interspersed among these posts are ads, which look like ordinary posts, but are marked as

17  "sponsored." Ads are also located in a sidebar to the right of the feed.

18         47.     According to Facebook's Transparency Center, Facebook personalizes the

19  newsfeed of each of its users using a machine-learning-powered system to rank content. The

20  ranking system works in four basic steps:

21              a.  To start, it gathers a user's "recent inventory"—all potential new posts, or posts

22                  with new activity, that a user could see when opening Facebook. This includes all

23                  posts from sources that a user has "followed"—that is, friends a user has added,

24                  pages the user has liked, and groups the user has joined—excluding content that

25                  has been flagged for violating Facebook's community standards.

26              b.  Then, for each post, the system considers "thousands of 'signals' to make

27                  predictions about what [a user] will find most interesting." These signals include

28                  what and whom a user has followed, liked, and engaged with recently, as well as

Case No. 3:24-cv-02596-JSC              14                  AMENDED COMPLAINT

interests and traits that have been inferred based on actions the user has taken on the platform and off.[2]

c. Next, the system "use[s] these signals to make a series of personalized predictions about which content [users will] find most relevant and valuable." For example, it predicts how likely it is that a user will comment on a post, that a user's friends will comment on a post if the user shares it, or that a post will result in a back-and-forth discussion. It also predicts whether a piece of content is "problematic and should receive reduced distribution."

d. Finally, the system uses all of these predictions to develop a "relevance score" for each post. This score is meant to reflect how interested a user is likely to be in a post. The system then ranks the posts by that score, and intersperses the posts with ads as well as recommended content from accounts that a user does not follow.

48. Today the newsfeed is central to Facebook, but it represented a seismic change in how users experienced social media when it was introduced in 2006. Previously, users navigated social media platforms manually, by explicitly choosing which friends and groups to connect with, and which posts and photos and news stories to seek out. Facebook is illustrative. It functioned as a directory of individual user profiles—users could update and personalize their own profiles, but, to see their friends' updates, they had to search for their friends' profiles.

49. The newsfeed changed this by automatically presenting to each Facebook user a stream of information in one central location. This had two major effects: first, no two users saw the same thing when they visited Facebook. (Although the newsfeed was initially ranked in reverse chronological order rather than algorithmically curated, each feed was unique because each user had a different set of friends, and so saw a different set of updates.) Second, the experience of users on Facebook became more passive, because users now encountered content primarily by scrolling

---

[2] Facebook tracks both its users and nonusers on other websites and apps using tracking technologies like Facebook Pixel. For example, a *New York Times* article reported that one user discovered the platform was tracking his activities on cancer treatment websites, collecting private details about his possible treatment options. Natasha Singer, *What You Don't Know About how Facebook Uses Your Data*, *N.Y. Times* (Apr. 11, 2018), https://perma.cc/C9AM-YYRQ.

1   through feeds that Facebook compiled, rather than by seeking out content on their own. Though

2   the introduction of the newsfeed initially provoked a backlash from users—many found it

3   overwhelming and invasive—page views doubled, and engagement reached new heights. In fact,

4   the newsfeed was so successful in boosting Facebook's popularity that centralized feeds are now

5   widely used across the internet, from X and TikTok to LinkedIn and Venmo.

6       50.   Although Meta purports to give users the ability to control what they see in the

7   newsfeed, in reality it is difficult for users to tailor the feed to their preferences. For example, in

8   2022, Facebook introduced an alternative "Feeds" tab where users can access a reverse

9   chronological feed that excludes recommended posts. Users cannot make this feed their default,

10  however. Closing and re-opening the Facebook webpage or app will return users to their

11  algorithmically ranked feeds, and even if a user selects the chronological feed in one Facebook

12  session (like the mobile app), the user's other sessions will still show the algorithmically ranked

13  feed. It is therefore exceedingly difficult to opt out of Facebook's algorithmically ranked feed.

14      51.   Users also cannot easily opt out of Meta's collection and use of data about their

15  interactions with the newsfeed. According to Meta's data policy, it collects detailed information

16  about users' Facebook usage, including "the types of content and ads that [users] view or engage

17  with," "the actions [users] take" (for example, whether they shared, commented on, or liked a

18  post), and the "time, frequency, and duration of [users'] activities" (for example, how long a user

19  spent on a post compared with other posts they have lingered on in their feed). Meta uses this data

20  to, among other things, construct profiles of users and determine what content to show in their

21  feeds. Facebook's privacy settings do not enable users to opt out of this collection and use.

22                          **How "Unfollowing" Works**

23      52.   One important way in which Facebook users can limit which posts appear in their

24  newsfeeds is to "unfollow" a friend, page, or group. Just as "following" a friend, page, or group

25  results in their posts being included in the pool of content that may be featured in a user's newsfeed,

26  "unfollowing" removes their posts from this pool. As explained below, unfollowing is not the same

27  as "unfriending," because a user remains connected to friends, pages, or groups even after

28  unfollowing them.

Case No. 3:24-cv-02596-JSC           16          AMENDED COMPLAINT

53.     The process for unfollowing a friend, group, or page on Facebook is time-consuming because Facebook allows users to unfollow each friend, page, or group only manually, one at a time. The process for unfollowing has changed over time and will likely continue to change; however, it has remained burdensome, complex, and inconvenient in each iteration. At the time of filing, unfollowing can be accomplished in the following ways.

54.     First, users can unfollow from their newsfeed by selecting the three-dot icon in the corner of each post in the feed, and then selecting "Unfollow" for the friend, group, or page that generated the post.



*Figure 1. Unfollowing a friend through the newsfeed.*

1      55.    Second, users can unfollow through Facebook's menu system. The process is

2  different for each category of content. To unfollow friends through Facebook's menu system, users

3  can select "Friends," then "All friends," to access a list of their friends, and then they can select

4  the three-dot icon for each friend and select "Unfollow." Users can also unfollow by navigating

5  directly to a friend's page and selecting "Friends" and then "Unfollow."



*Figure 2. Unfollowing a friend through the menu system.*

56.     To unfollow groups through Facebook's menu system, users can select "Groups," and then "Your groups," to access list of their groups. The user can then unfollow each group, one by one, by selecting "View group" to pull up the group page, selecting the "Joined" dropdown menu at the top of the page, and then selecting "Unfollow group."



*Figure 3. Unfollowing a group through the menu system.*

57.     To unfollow a page through Facebook's menu system, users can select "Pages," and then "Liked Pages." The user can then unfollow each page, one by one, by selecting the three-dot icon next to the name of each liked page, then "Follow settings," then "Unfollow this Page," and then "Update" to save the setting.



*Figure 4. Unfollowing a page through the menu system.*

58.     Third, and finally, Facebook appears to be testing a feature that would allow users to unfollow a small group of friends, groups, and pages in a more streamlined way. To access this feature, a user can click their thumbnail photo in the top-right corner of their Facebook homepage, then "Settings & privacy," then "Feed," and then "Unfollow people and groups." This will bring up a limited list of friends, groups, and pages, which appear to be among those the user has recently followed. The user can unfollow each by clicking a blue button to the right of the friend, group, or page's name. However, this feature appears to give the user the ability to unfollow only a handful of recently followed friends, groups, and pages.



*Figure 5. Unfollowing a limited list of friends, groups, and pages.*

59.     Unfollowing friends and groups works essentially the same way on both the web browser and the mobile app, though the names of certain menu items differ.

60.     Unfollowing a friend, group, or page stops their posts and other activity from appearing in the newsfeed, but otherwise leaves the user's relationship with that friend, group, or page unaffected. A user who has "unfollowed everything" can still exchange messages and interact with the people and groups they have unfollowed, visit their pages, and see their posts.

61.     Unfollowing all friends, pages, and groups leaves the user's newsfeed blank, or close to blank. Users can then choose to use Facebook without a newsfeed, navigating to the profiles and pages they want to see, or they can re-follow select accounts to build a newsfeed that is better tailored to their needs.

62.     To re-follow, a user navigates to the relevant page and reverses the last few clicks in the unfollowing process.

**Unfollow Everything 1.0**

63.     In 2020, one Facebook user, Louis Barclay, decided to unfollow all of his friends, pages, and groups in an effort to avoid the allure of Facebook's "infinite feed." Barclay spent days using Facebook's cumbersome interface to do so. According to an op-ed Barclay published in 2021, the effect of unfollowing everything was "near-miraculous." His use of Facebook declined dramatically "overnight," and he decided to develop a tool that would make the unfollowing process easier so that others could similarly take greater control of their newsfeeds. Barclay published the tool, called "Unfollow Everything," on the Google Chrome store, where users could download it for free. Thousands of people downloaded the tool.

64.     Unfollow Everything worked by automating Facebook's existing unfollowing process. After downloading the plug-in, a user would log into Facebook using their Chrome browser. The tool would then automatically unfollow the user's friends, groups, and pages. The tool would start by causing the user's Chrome browser to retrieve a list of the user's friends, groups, and pages. The tool would then iterate through the list, causing the user's browser to send requests to Facebook to unfollow each friend, group, and page. Once Facebook confirmed that a friend, group, or page had successfully been unfollowed, the tool would move on to the next entry

1   on the list. All of this activity was controlled by the user's browser. To ensure that the tool worked

2   as intended, Barclay programmed it to report back to his own server a single piece of information:

3   the ratio of followed profiles to total profiles, which would be "0" for users of the tool who had

4   successfully unfollowed everything.

5       65.   Unfollow Everything also had a public-interest research component. After users

6   started adopting the tool, Barclay worked with academics at the University of Neuchatel in

7   Switzerland to develop an optional research study concerning the impact of the newsfeed on the

8   amount of time spent on Facebook and the happiness of the platform's users. The academics

9   recruited two groups of Facebook users to participate in their study: one group of participants who

10  had used Unfollow Everything to eliminate their newsfeeds, and a control group of participants

11  who had left their feeds as is. Participants consented to sharing certain "limited and anonymous

12  information," specifically, "the amount of time they spent on Facebook, the number of times they

13  visited the site, and the number of friends, groups, and pages they were following and not

14  following, in total, and broken down by category."

15      66.   Meta eventually forced Barclay to shut down Unfollow Everything and the

16  associated research study. In July of 2021, Meta (then Facebook) retained outside counsel at a

17  major law firm to send Barclay a cease-and-desist letter threatening him with legal action unless

18  he took the tool down. The letter informed him that his Facebook and Instagram accounts had been

19  permanently disabled and demanded that he never again create a tool that interacts with Meta's

20  products in any way. Fearing legal action, Barclay complied.

21                      **Unfollow Everything 2.0**

22      67.   In the fall of 2021, Professor Zuckerman learned about Unfollow Everything and

23  decided to recreate the tool to give users more control over their newsfeeds, and to research the

24  impact of this change on users' experience of Facebook.

25      68.   Professor Zuckerman viewed the tool as fundamentally consistent with the

26  approach to social media he had studied and advocated for elsewhere. Specifically, it operated at

27  the explicit direction of its users to tailor their online experiences to their interests, rather than the

28

1   interests of the platforms. The tool also allowed users to participate in public-interest research that

2   would illuminate the effects of user control on their experiences of social media.

3       69.     The tool—called "Unfollow Everything 2.0"—and research study that Professor

4   Zuckerman plans to conduct using the tool are both nearly ready to launch. As explained further

5   below, however, he has not launched either due to fear of legal action by Meta.

6                                    The Tool

7       70.     Professor Zuckerman believes that users who wish to use Facebook without the

8   newsfeed—including because they wish to spend less time on the platform—should be able to do

9   so. The goal of Unfollow Everything 2.0 is to give users this increased control.

10      71.     Like the original Unfollow Everything tool developed by Barclay, Unfollow

11  Everything 2.0 will be a browser extension that enables users to automatically unfollow all of their

12  friends, groups, and pages. The effect of this unfollowing is to empty out a user's newsfeed, by

13  removing posts generated by the user's friends, groups, and pages from the feed, as well as the ads

14  and recommended content that would otherwise be interspersed among these posts.

15      72.     The extension will be available to download for free from both the Chrome and

16  Firefox stores. Users will be able to review a privacy policy explaining how Unfollow Everything

17  2.0 processes personal data before downloading the tool.

18      73.     Much like the original Unfollow Everything tool, Unfollow Everything 2.0 will

19  work by automating a feature that Facebook already provides: the unfollow function. When a user

20  logs into Facebook on their web browser and activates the Unfollow Everything 2.0 plug-in,

21  Unfollow Everything 2.0 will cause the user's browser to send a request to Meta's servers to

22  retrieve the user's list of friends, groups, and pages, and record whether those friends, groups, and

23  pages are followed or unfollowed. The tool will then iterate through the "followed" list, causing

24  the user's browser to send a request to Meta's servers to unfollow each friend, group, or page on

25  the list, until it has exhausted the list. At the end of this process, the tool will confirm whether all

26  friends, groups, and pages have been successfully unfollowed by communicating a "yes" or a "no"

27  to the Unfollow Everything 2.0 server.

28

Case No. 3:24-cv-02596-JSC          24          AMENDED COMPLAINT

---

**Deleted:** is to put users in control of what they see in their newsfeeds

**Deleted:** Facebook

**Deleted:** Facebook

**Deleted:** Finally, t

**Deleted:** he tool

**Deleted:**

**Deleted:**

**Deleted:**

**Deleted:** successfully

1    74.   Unfollow Everything 2.0 has been designed to prioritize user control and privacy.

2  The tool will allow users to select friends, groups, and pages to manually re-follow, or to keep

3  their newsfeeds blank and view only content that they actively seek out. It will also encrypt each

4  user's "followed" list before saving it locally on the user's device, to allow the user to

5  automatically reverse the unfollowing process, at their convenience. Should a user elect to reverse

6  the process, the tool will decrypt the list, and cause the user's browser to send a request to Meta's

7  servers to re-follow each friend, group, and page on the list. Unfollow Everything 2.0 will store

8  each user's "followed" list only on the user's device—not on the cloud or anywhere external to

9  the device. Users can also choose to uninstall the tool at any time. The tool will operate only for

10  the user's account; it will not run if another person accesses Facebook using a different account on

11  the user's computer.

12    75.   Unfollow Everything 2.0 collects only users' own data. Meta has repeatedly stated

13  publicly that users own the data that they share with Facebook, and are permitted to download this

14  information and take it to another platform. Meta's account-information page also confirms that

15  users own the data that Unfollow Everything 2.0 would collect. Specifically, the list of information

16

17

18

19

20

21

22

23

24

25

26

27

28

Case No. 3:24-cv-02596-JSC          25          AMENDED COMPLAINT

**Deleted:** Facebook

users see when they navigate to "Access your information" includes "Your friends," "Your pages,"

and "Your groups," as well as "Who you've followed."



*Figure 6. List of information shown when a user selects "Connections" on the "Access your information" page.*

76.     Unfollow Everything 2.0 has also been developed so as to not interfere with the

normal operation of Facebook. Once activated, the tool will send unfollow requests at controlled

intervals, to complete unfollowing without burdening Meta's servers. The same is true of re-follow

requests, should a user elect to reverse the unfollowing process.

77.     Unfollow Everything 2.0 will receive updates via the Internet as necessary to ensure

that it continues to operate as designed. Depending on the user's browser, the tool will receive

updates either from Google's servers, Mozilla's servers, or the Unfollow Everything 2.0 server.

(By default, most browsers will update extensions such as Unfollow Everything 2.0 automatically,

although users may elect to update their extensions manually instead.)

### The Unfollow Everything 2.0 Study

78.     Professor Zuckerman will conduct an optional research study to accompany

Unfollow Everything 2.0, exploring how the newsfeed affects users' experience of Facebook.

Users who choose to opt in will donate limited and anonymized data about their Facebook usage.

---

Deleted: 's platform

Deleted: Facebook's

Deleted: <#>Although users typically have the option to update extensions manually, most browers will by default update Unfollow Everything 2.0, as with other extensions, automatically.

They will also be asked to provide qualitative survey data about using Facebook without the newsfeed. The purpose of the study will be to the examine the impact of turning off the feed on user behavior and well-being. The study will run for six weeks.

79.     Professor Zuckerman plans to test four research hypotheses: (1) that users who access Facebook without the newsfeed will spend less time on Facebook, (2) that they will report a subjective feeling of increased control over their Facebook usage, (3) that they will not report a subjective feeling of decreased satisfaction in using Facebook, and (4) that they will be exposed to content from fewer friends in a browsing session and fewer friends overall. Even if these hypotheses turn out to be incorrect (and perhaps especially if they turn out to be incorrect), the study will help Professor Zuckerman, his team, and the public to understand critical aspects of user behavior online.

80.     To test the study's research hypotheses, the Unfollow Everything 2.0 tool will switch participants between "feed off" and "feed on" conditions on a weekly basis. In the "feed off" condition, the tool will unfollow everything and leave users with a blank feed. In the "feed on" condition, the tool will re-follow all previously followed friends, groups, and pages to reinstate the user's newsfeed. The tool will log the amount of time each user spends on Facebook, as well as the number of unique accounts that a user views content from, for the duration of the study.

81.     This information will be collected from the user's browser—not Meta's servers. To track the amount of time a participant spends on Facebook, the tool will distinguish between browser tabs that are in focus and not in focus, and will log the amount of time that Facebook is in focus. The tool will then send the amount of time spent during each session to the Unfollow Everything 2.0 server. To track the number of unique accounts from which a user encounters content, the tool will assign a unique, randomized number to each account whose posts the user encounters in their browser, and it will store that number in a table on the user's computer. At the end of each session, the tool will tally the number of unique accounts encountered and send only an aggregate count to the Unfollow Everything 2.0 server. By comparing user behavior under the "feed on" and "feed off" conditions, Professor Zuckerman will be able to test whether the first and fourth hypotheses are true.

Deleted: Facebook

Deleted: for

Deleted: Professor Zuckerman's

Deleted: study

82.     Participants will also be asked to complete qualitative surveys, including at the end of the study, answering questions like, "Do you prefer using Facebook after unfollowing everything?"; "Do you think you are spending less time on Facebook after unfollowing everything?"; "Do you wish you spent more or less time on Facebook?"; "Do you think you are encountering posts from more or fewers users after unfollowing everything?"; "Would you prefer to encounter posts from more or fewer users when using Facebook?"; and "Should Meta provide similar functionality to this tool to all users of Facebook?" By reviewing participants' answers to questions like these, Professor Zuckerman will be able to test whether the second and third hypotheses are true.

83.     Like Unfollow Everything 2.0 itself, the research study has been designed to preserve user privacy. First, Unfollow Everything 2.0 will collect only a small amount of fully anonymized data from those who volunteer to participate in the study. Participants will be assigned a random identifier, so that they cannot be identified from study data. No Facebook usernames, IP addresses, or any other personally identifying information will be collected. Second, the tool will collect this anonymized data only from study participants; if another person accesses Facebook using a different account on a participant's computer, their data will not be collected. The study will also exclude anyone under the age of 18. Third, the tool will not transmit any additional information about participants' friends, groups, or pages, including their names or their content.

84.     Professor Zuckerman plans to develop the results of the study into a research paper to be published in a peer reviewed open access journal, meaning that its results will be available to all study participants, to Meta, and to other scholars of social media. The study data will only be used for non-commercial, public-interest purposes.

85.     The Unfollow Everything 2.0 tool and accompanying research study are nearly ready to launch. Professor Zuckerman has developed a detailed design for the tool in the form of pseudocode—a blueprint addressing key questions of architecture and function that is used by software developers as an immediate precursor to coding. And an academic cybersecurity expert has reviewed the design and confirmed that the tool, if built to the specifications in the design, will perform as expected and preserve the privacy of the tool's users. Professor Zuckerman has also

Case No. 3:24-cv-02596-JSC          28          AMENDED COMPLAINT

developed the design of the associated research study. Before actually launching Unfollow Everything 2.0, Professor Zuckerman must build the tool as designed and obtain approval for the research study from his university's institutional review board. Professor Zuckerman has assembled a team of engineers to code the tool. He has also applied for institutional review board review, and fully expects to receive approval. He anticipates being able to complete the tool within six weeks of a determination from this Court that it would be lawful for him to launch the tool.

Fears of Legal Action

86.     Professor Zuckerman has not actually launched Unfollow Everything 2.0 or the associated research study because of the near certainty that doing so would put him at risk of legal action. Professor Zuckerman fears legal action because Meta has a history of shutting down research projects and tools like Unfollow Everything 2.0, including the tool on which Unfollow Everything 2.0 is based.

87.     As noted above, Meta (then Facebook) retained outside counsel at a major law firm to send a cease-and-desist letter to the creator of the original Unfollow Everything tool. A redacted copy of the letter, which the tool's creator, Louis Barclay, made public on October 7, 2021, is attached as Exhibit A. The letter claimed that Unfollow Everything "violate[d] Facebook's terms" by "automat[ing] actions on Facebook, including mass following and unfollowing of Friends, Pages, and Groups." The letter informed Barclay that he had been permanently banned from Facebook and Instagram. It stated that any further activity by Barclay on those products would be treated as "intentional and unauthorized access to its protected computer networks." It also demanded that Barclay immediately shut down the tool, delete any Facebook data associated with it, and promise never again to create a tool that interacts with Facebook or Instagram.

88.     The letter threatened Barclay with legal action if he did not agree to the company's demands. Specifically, the letter stated that, if Barclay continued to operate the tool, Meta would "take whatever measures it believes are necessary to enforce its rights." The letter also reserved the company's legal rights and remedies under "applicable domestic and foreign laws." Meta

1   demanded a response from Barclay within 48 hours. Faced with the threat of serious legal action,

2   Barclay took down the tool.

3       89.    Meta's lawyers then sent Barclay another letter. A redacted copy of that letter,

4   which Barclay also made public on October 7, 2021, is attached as Exhibit B. The letter informed

5   Barclay that he could request reinstatement of his Facebook and Instagram accounts if he

6   countersigned the agreement set out therein. Under the terms of this new agreement, Barclay would

7   be required not only to abide by Facebook's and Instagram's terms of service, but also to never

8   "again provide, market, publish, distribute, and/or offer any software code [he] had developed or

9   used to interact with the Facebook and Instagram websites and/or services . . . to any third-parties."

10  Meta would be entitled to recover not less than $30,000, as well as reasonable attorney's fees, in

11  the event of a breach. The letter stated that it "[wa]s not intended by [Meta], and should not be

12  construed by [Barclay], as a waiver or relinquishment of any of [Meta]'s rights and remedies in

13  this matter." Barclay declined to countersign the new terms.

14      90.    Meta has also issued legal threats to the developers of other similar browser tools

15  and research studies. For example, in the summer of 2020, Meta issued a cease-and-desist letter to

16  the operators of the popular web browser "Friendly," which allowed users to search their Facebook

17  newsfeeds by keyword, reorder their feeds chronologically, and customize the display of their

18  Facebook pages. Although Friendly has stated that its browser did not collect any personal

19  information from users or interact with Meta's servers, Meta's letter threatened Friendly with legal

20  action for allegedly violating its terms of service, the Computer Fraud and Abuse Act ("CFAA"),

21  and California's Computer Data Access and Fraud Act ("CDAFA").

22      91.    In late 2020, Meta also issued a cease-and-desist letter to New York University

23  researchers Laura Edelson and Damon McCoy in response to "Ad Observer," a browser extension

24  they created to study disinformation on Facebook's platform. The extension collects the ads that

25  Facebook shows to users, along with limited and anonymous information about how advertisers

26  targeted the ads. Using this data, Edelson and McCoy have conducted important research into the

27  spread of disinformation through ads and other forms of paid promotion on Facebook. In August

28

**Deleted:** Facebook's

**Deleted:** the platform's

**Deleted:** 's platform.

2021, however, Meta suspended Edelson's and McCoy's Facebook accounts in response to their failure to shut down the tool.

92.     Because Meta has threatened enforcement against Unfollow Everything and many other tools like it, it is all but certain that Meta would send Professor Zuckerman a cease-and-desist letter if he released Unfollow Everything 2.0, and that such a letter would threaten legal action. It is also likely that Meta would likely sue him for breach of contract and violations of the CFAA and California's CDAFA if he did not shut down the tool.

93.     Professor Zuckerman is unwilling to subject himself and his team to the risk of legal action. As such, he will not be able to launch Unfollow Everything 2.0 unless and until a court rules that doing so would not violate Meta's Terms of Service, the CFAA, and California's CDAFA.

**CAUSES OF ACTION**

**Count I**
**(Communications Decency Act, 47 U.S.C. § 230)**

1.     As relevant here, Section 230(c)(2)(B) of the Communications Decency Act ("CDA") provides immunity from civil suit (1) to any "provider or user of an interactive computer service," (2) for "any action taken to enable or make available . . . the technical means to restrict access to material" that either "the provider or user considers to be . . . objectionable." 47 U.S.C. § 230(c)(2)(B).

2.     This provision would immunize Professor Zuckerman from civil liability for designing, releasing, and operating Unfollow Everything 2.0.

3.     First, in operating Unfollow Everything 2.0, Professor Zuckerman would qualify as a "provider . . . of an interactive computer service." The CDA defines the term "interactive computer service" to include, among other things, an "access software provider that provides or enables computer access by multiple users to a computer server," *id.* § 230(f)(2), and it defines the term "access software provider" to include providers of software and tools used to "filter, screen, allow, or disallow content." Professor Zuckerman would qualify as an "access software provider" because Unfollow Everything 2.0 enables the filtering of Facebook content—namely, posts that

Case No. 3:24-cv-02596-JSC               31                    AMENDED COMPLAINT

Deleted: Facebook's

Deleted: t

Deleted: s

Deleted: . . .

would otherwise appear in the feed on a user's homepage. And he would "provide[] or enable[] computer access by multiple users to a computer server" by allowing users who download Unfollow Everything 2.0 to automatically unfollow and re-follow friends, groups, and pages, which involves communicating with Meta's servers; by verifying that users who run the tool have successfully unfollowed all of their friends, groups, and pages, which involves communicating with the Unfollow Everything 2.0 server; by allowing users who opt into the research study to voluntarily donate certain data for research purposes, which also involves communicating with the Unfollow Everything 2.0 server; and by offering online updates to the tool, which involves communicating with Google's servers, Mozilla's servers, or the Unfollow Everything 2.0 server. (Professor Zuckerman independently qualifies as a "user of an interactive computer service" because he is a user of Facebook.)

> **Deleted:** a user has

> **Deleted:** .

4.     Second, Unfollow Everything 2.0 would enable Facebook users who download it to restrict access to material they (and Zuckerman) find "objectionable." *Id.* § 230(c)(2)(A). The purpose of the tool is to allow users who find the newsfeed objectionable, or who find the specific sequencing of posts within their newsfeed objectionable, to effectively turn off the feed.

### Count II

### (Breach of Contract)

5.     Meta has taken the position that the original Unfollow Everything tool—a tool that is materially similar to Unfollow Everything 2.0—violates the company's Terms of Service, including the Terms' prohibitions on: collecting data from Meta's products using automated means, interfering with the integrity or operation of its services, and facilitating or encouraging others to violate the Terms.

6.     Unfollow Everything 2.0 would not, however, violate any of Meta's Terms of Service, and so it would not breach any contract between Professor Zuckerman and Meta.

7.     First, Meta's Terms apply only to a user's "use of Facebook," that is, activities the user undertakes while logged in, but Professor Zuckerman will not be logged into his Facebook account to operate the tool—users of the tool will. Second, Unfollow Everything 2.0 allows only users of the tool—not Professor Zuckerman—to access their Facebook data, access which Meta's

Terms permit. Third, even if Professor Zuckerman could be said to be accessing users' Facebook data, he would be doing so as the users' "agent." *See* Cal. Civ. Code § 2295. That is, he would be acting with users' permission, at their direction, and in their interest, and, again, Meta's Terms allow users to collect their own data. Finally, Unfollow Everything 2.0 merely makes existing Facebook functionality more convenient: it does not allow users to collect data they are not authorized to collect, it does not allow users to take any other action they are not permitted to take, and it does not materially interfere with the intended operation of Facebook.

**Count III**

**(Public Policy)**

8.     To the extent Meta's Terms of Service prohibit the operation of Unfollow Everything 2.0, they are void for public policy because they violate federal and state public policy favoring user control over their platform experience.

9.     Section 230 of the CDA declares that it is "the policy of the United States" "to encourage the development of technologies which maximize user control over what information is received by individuals, families, and schools who use the internet and other interactive computer services"; and "to remove disincentives for the development and utilization of blocking and filtering technologies that empower parents to restrict their children's access to objectionable or inappropriate online material." 47 U.S.C. § 230(b)(3)–(4).

10.     This policy preference for user control is also reflected in the Supreme Court's First Amendment cases, which have treated user control as a less-restrictive alternative to direct government regulation of online content. *See, e.g.*, *Reno v. Am. C.L. Union,* 521 U.S. 844, 877 (1997); *United States v. Playboy Entm't Group, Inc.*, 529 U.S. 803 (2000); *Ashcroft v. Am. C.L. Union*, 542 U.S. 656 (2004).

11.     California privacy law also reflects a policy in favor of user control, by codifying users' right to control the personal information that businesses collect about them, including how that information is used to shape their platform experience. Specifically, the California Consumer Privacy Act ("CCPA"), as amended by the California Privacy Rights Act ("CPRA"), and the CCPA's implementing regulations reflect a recognition that users should have "meaningful

Case No. 3:24-cv-02596-JSC                33                AMENDED COMPLAINT

1   options" over how their personal information is "collected, used, and disclosed," CPRA § 3(A)(2);

2   that users and their "authorized agents" should be able to exercise these options "through easily

3   accessible self-serve tools," including third-party browser plug-ins or extensions, *id.* § 3(A)(4);

4   and that platforms should not adopt design features that "subvert[] or impair[]" user control over

5   their data, Cal. Code Regs. tit. 11, § 7004(c); *see also* Cal. Civ. Code § 1798.140(h).

6       12.   Unfollow Everything 2.0 promotes federal and state public policy favoring

7   increased user control over the platform experience. By allowing users to turn off their newsfeeds,

8   it would allow them to block content they would rather not see. It would also restrict Meta's ability

9   to use the data it would otherwise gather from users' feeds to keep users on the platform for longer.

10       13.   To the extent Meta's Terms prohibit Unfollow Everything 2.0, the Terms violate

11   federal and state public policy because Meta's interest in enforcing the Terms are clearly

12   outweighed in the circumstances by the public policy against enforcement of the Terms.

13                          **Count IV**

14              **(Computer Fraud and Abuse Act, 18 U.S.C. § 1030)**

15       14.   Operating Unfollowing Everything 2.0 also would not violate the CFAA, which

16   prohibits "intentionally access[ing] a computer without authorization or exceed[ing] authorized

17   access, and thereby obtain[ing] information from any computer." 18 U.S.C. § 1030(a)(2)(C).

18       15.   If Unfollow Everything 2.0 permits anyone to "access" Meta's computers, it is

19   users of the tool, not Professor Zuckerman. Users who download the tool would do so for the

20   express purpose of taking advantage of the tool's functionality—that is, to turn off or curate their

21   newsfeeds, or to contribute to public-interest research about the platform and its effect on user

22   behavior and well-being. The tool is designed to run on users' computers, and it would

23   communicate with Meta's computers only at users' explicit direction.

24       16.   Even if Professor Zuckerman could be said to be accessing Meta's computers

25   through the tool, he would be doing so "with authorization." He would be accessing only data that

26   users themselves are permitted to access, and he would be doing so as the users' "agent." *See* Cal.

27   Civ. Code § 2295. That is, he would be acting with users' permission, at their direction, and in

28

Case No. 3:24-cv-02596-JSC            34            AMENDED COMPLAINT

1 their interest, and the CFAA does not prohibit a person from collecting information to which they

2 have lawful access, even if the specific method of collection is prohibited by the terms of use.

3 **Count V**

4 **(Computer Data Access and Fraud Act, Cal. Penal Code § 502)**

5     17.    Operating Unfollow Everything 2.0 would not violate California's CDAFA for the

6 same reasons that it would not violate the CFAA. Unfollow Everything 2.0 permits users to access

7 and use their own data; it does not allow users to access any Facebook data they are not entitled to

8 access. It also acts only as users' agent.

9 **PRAYER FOR RELIEF**

10     Plaintiff respectfully requests that this Court:

11     A.    Declare that Section 230(c)(2)(B) of the CDA immunizes Plaintiff from all civil

12         claims and liability under breach of contract, the CFAA, and CDAFA in relation to

13         Unfollow Everything 2.0;

14     B.    In the alternative, declare that:

15         a.   The tool does not violate Meta's Terms of Service, or Meta's Terms are void

16            for public policy as applied;

17         b.   The tool does not violate the CFAA; and

18         c.   The tool does not violate the CDAFA;

19     C.    Permanently enjoin Meta from bringing claims against Plaintiff under breach of

20         contract, the CFAA, and CDAFA in relation to the tool; and

21     D.    Grant such other and further relief as the Court may deem just and proper.

22

23 DATED: May 31, 2024           Respectfully submitted,

24   /s/ Max Schoening             /s/ Ramya Krishnan

25   Max Schoening #324643        Ramya Krishnan, *pro hac vice*
  Qureshi Law PC              Alex Abdo, *pro hac vice*

26   700 Flower Street, Suite 1000     Jennifer Jones, *pro hac vice*
  Los Angeles, CA 90017        Nicole Mo, *pro hac vice*

27   T: (213) 600-6096            Knight First Amendment Institute
  F: (213) 277-8989              at Columbia University

28   max@qureshi.law            475 Riverside Drive, Suite 302

*Counsel for Plaintiff*

New York, NY 10115
T: (646) 745-8500
F: (646) 661-3361
ramya.krishnan@knightcolumbia.org

*Counsel for Plaintiff*

**Deleted:** *admitted pro hac vice* application forthcoming