KRISTIN A. LINSLEY, SBN 154148
  klinsley@gibsondunn.com
WESLEY SZE, SBN 306715
  wsze@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
One Embarcadero Center, Suite 2600
San Francisco, CA  94111
Telephone:    415.393.8200

JACOB T. SPENCER (*pro hac vice*)
  jspencer@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, DC  20036
Telephone:    202.955.8500

*Attorneys for Defendant*
*Meta Platforms, Inc.*

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO DIVISION

| | |
|---|---|
| ETHAN ZUCKERMAN,<br><br>                   Plaintiff,<br><br>          v.<br><br>META PLATFORMS, INC.,<br><br>                   Defendant. | Case No. 3:24-CV-02596-JSC<br><br>**NOTICE OF MOTION AND MOTION OF DEFENDANT META PLATFORMS, INC. TO DISMISS AMENDED COMPLAINT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**<br><br>*[Declaration of Jacob T. Spencer and Exhibits 1 to 6 thereto; Request for Judicial Notice and Incorporation by Reference; and [Proposed] Order filed concurrently herewith]*<br><br>**<u>Hearing:</u>**<br>Date:          October 10, 2024<br>Time:          10:00 a.m.<br>Courtroom:  8, 19th Floor<br>Judge:        Hon. Jacqueline Scott Corley |

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## NOTICE OF MOTION AND MOTION

PLEASE TAKE NOTICE THAT, on October 10, 2024 at 10:00 a.m., or as soon thereafter as the matter may be heard, before the Honorable Jacqueline Scott Corley, in Courtroom 8, Floor 19, of the United States District Court, Northern District of California, located at 450 Golden Gate Avenue in San Francisco, California 94102, Defendant Meta Platforms, Inc. will, and hereby does, move this Court, under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6), for an order dismissing all of the claims in Plaintiff's Amended Complaint.

This Motion is based on this Notice of Motion and Motion, the memorandum of points and authorities submitted herewith, the Request for Judicial Notice and Incorporation by Reference and accompanying Declaration of Jacob T. Spencer, any reply memorandum or other papers submitted in connection with the Motion, the pleadings filed in this action, any matter of which this Court may properly take judicial notice, and any information presented at argument.

## STATEMENT OF ISSUES TO BE DECIDED

1.    Whether the Amended Complaint fails to present a justiciable controversy.

2.    Whether the Court should exercise its discretion to decline to entertain this action under the Declaratory Judgment Act.

3.    Whether the allegations in the Amended Complaint do not plausibly state a claim for relief under the Declaratory Judgment Act.

Dated: July 15, 2024                         GIBSON, DUNN & CRUTCHER LLP


By: */s/ Kristin A. Linsley*
        Kristin A. Linsley

*Attorneys for Defendant Meta Platforms, Inc.*

## TABLE OF CONTENTS

Page

I.  INTRODUCTION .................................................................................................1

II. SUMMARY OF ALLEGATIONS ........................................................................2

III. LEGAL STANDARD ...........................................................................................4

IV. ARGUMENT ........................................................................................................4

    A.  The Court Lacks, Or Should Decline To Exercise, Jurisdiction Over This Declaratory Judgment Action .................................................................4

        1.  The Amended Complaint Presents No Dispute That Is Ripe For Judicial Review.........................................................................................5

        2.  Plaintiff's Claims Do Not Warrant Discretionary Review Under The Declaratory Judgment Act.........................................................................11

    B.  Plaintiff's Allegations Do Not State A Claim For Relief .............................14

        1.  Unfollow Everything 2.0, Even As Hypothetically Alleged, Would Violate Meta's Terms Of Service .................................................14

        2.  Meta's Terms Of Service Are Not Void For Public Policy .............................17

        3.  Plaintiff's Allegations Do Not Establish That His Operation Of Unfollow Everything 2.0 Would Be Entitled To Section 230 Immunity ........21

        4.  The Amended Complaint Does Not State A Claim For Declaratory Relief Regarding The CFAA And CDAFA ......................................................24

V.  CONCLUSION....................................................................................................25

Gibson, Dunn &
Crutcher LLP

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Abbott Labs. v. Gardner*,
  387 U.S. 139 (1967) .................................................................................................9

*Adobe Sys. Inc. v. Kelora Sys. LLC*,
  2011 WL 6101545 (N.D. Cal. Dec. 7, 2011) ........................................................7

*Advanced Integrative Med. Sci. Inst., PLLC v. Garland*,
  24 F.4th 1249 (9th Cir. 2022) .................................................................................4

*Am. States Ins. Co. v. Kearns*,
  15 F.3d 142 (9th Cir. 1994) ...........................................................................4, 11

*Am.-Arab Anti-Discrimination Comm. v. Thornburgh*,
  970 F.2d 501 (9th Cir. 1991) ................................................................................10

*AMCO Ins. Co. v. W. Drug, Inc.*,
  2008 WL 4368929 (D. Ariz. Sept. 24, 2008) ......................................................12

*Ashcroft v. ACLU*,
  542 U.S. 656 (2004) ...............................................................................................19

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) .................................................................................................4

*Ass'n of Am. Med. Colls. v. United States*,
  217 F.3d 770 (9th Cir. 2000) ..................................................................................9

*Bank of Am., N.A. v. Cnty. of Maui*,
  2020 WL 7700098 (D. Haw. Dec. 28, 2020) ........................................12, 13, 14

*Barnes v. Yahoo!, Inc.*,
  570 F.3d 1096 (9th Cir. 2009) ..............................................................................21

*Bayer v. Neiman Marcus Grp., Inc.*,
  861 F.3d 853 (9th Cir. 2017) ..................................................................................5

*Berenson v. Twitter, Inc.*,
  2022 WL 1289049 (N.D. Cal. Apr. 29, 2022) .....................................................21

*Bova v. City of Medford*,
  564 F.3d 1093 (9th Cir. 2009) .......................................................................5, 7, 8

*Brillhart v. Excess Ins. Co.*,
  316 U.S. 491 (1942) ...........................................................................................4, 12

*Chandler v. State Farm Mut. Auto. Ins. Co.*,
  598 F.3d 1115 (9th Cir. 2010) ................................................................................4

*City & Cnty. of San Francisco v. U.S. Postal Serv.*,
  2009 WL 3756005 (N.D. Cal. Nov. 5, 2009) ........................................................6

*City of Johnstown v. Bankers Standard Ins. Co.*,
  877 F.2d 1146 (2d Cir. 1989)...................................................................................................19

*Clinton v. Acequia, Inc.*,
  94 F.3d 568 (9th Cir. 1996)........................................................................................................6

*In re Coleman*,
  560 F.3d 1000 (9th Cir. 2009).....................................................................................................9

*Colwell v. Dep't of Health & Human Servs.*,
  558 F.3d 1112 (9th Cir. 2009).....................................................................................................5

*Combs v. Int'l Ins. Co.*,
  354 F.3d 568 (6th Cir. 2004)......................................................................................................19

*Cont. Cas. Co. v. Robsac Indus.*,
  947 F.2d 1367 (9th Cir. 1991)....................................................................................................13

*Dunkin v. Boskey*,
  82 Cal. App. 4th 171 (2000).......................................................................................................17

*eBioscience Corp. v. Invitrogen Corp.*,
  2009 WL 10671320 (S.D. Cal. Apr. 20, 2009) ........................................................................7, 8

*Eddy v. Citizenhawk, Inc.*,
  2013 WL 12114488 (S.D. Cal. Nov. 19, 2013) .........................................................................8, 9

*Enhanced Athlete Inc. v. Google LLC*,
  479 F. Supp. 3d 824 (N.D. Cal. 2020) .......................................................................................21

*Enigma Software Grp. USA, LLC v. Malwarebytes, Inc.*,
  946 F.3d 1040 (9th Cir. 2019).....................................................................................................22

*Facebook, Inc. v. BrandTotal Ltd.*,
  2021 WL 662168 (N.D. Cal. Feb. 19, 2021)..............................................................................16

*Fidelity Nat'l Fin., Inc. v. Ousley*,
  2006 WL 2053498 (N.D. Cal. July 21, 2006)..............................................................................9

*Foster v. Am. Home Prod. Corp.*,
  29 F.3d 165 (4th Cir. 1994).........................................................................................................19

*In re Gilead Scis. Sec. Litig.*,
  536 F.3d 1049 (9th Cir. 2008)......................................................................................................4

*Golden Gate Way LLC v. Enercon Servs., Inc.*,
  572 F. Supp. 3d 797 (N.D. Cal. 2021) .......................................................................................17

*Gov't Emps. Ins. Co. v. Dizol*,
  133 F.3d 1220 (9th Cir. 1998)............................................................................................4, 12, 13

*Hameid v. Nat'l Fire Ins. of Hartford*,
  31 Cal. 4th 16 (2003) ..................................................................................................................15

DEFENDANT META PLATFORMS, INC.'S NOTICE OF MOTION AND
MOTION TO DISMISS AMENDED COMPLAINT
CASE NO. 3:24-CV-02596-JSC

*Himonic, LLC v. Chow*,
   2018 WL 11267138 (D. Nev. Aug. 6, 2018) ...........................................................14

*Hollister Ranch Owners Ass'n v. Becerra*,
   2020 WL 5047903 (C.D. Cal. May 18, 2020) ...........................................................7

*Holomaxx Techs. v. Microsoft Corp.*,
   783 F. Supp. 2d 1097 (N.D. Cal. 2011) ...........................................................22

*Khoja v. Orexigen Therapeutics, Inc.*,
   899 F.3d 988 (9th Cir. 2018).......................................................................15

*Kim v. Tesoro Refining & Mktg. Co. LLC*,
   2017 WL 11680958 (C.D. Cal. Dec. 13, 2017) ...........................................................7

*McGowan v. Weinstein*,
   505 F. Supp. 3d 1000 (C.D. Cal. 2020)................................................................25

*MedImmune, Inc. v. Genentech, Inc.*,
   549 U.S. 118 (2007) ...................................................................................5

*Meta Platforms, Inc. v. BrandTotal Ltd.*,
   605 F. Supp. 3d 1218 (N.D. Cal. 2022) ...........................................15, 16, 18, 19, 20

*Moody v. NetChoice, LLC*,
   – S. Ct. —, 2024 WL 3237685 (2024)...............................................................20

*Murphy v. Twitter, Inc.*,
   60 Cal. App. 5th 12 (2021)...........................................................................21

*Muschany v. United States*,
   324 U.S. 49 (1945)....................................................................................17

*Navigators Specialty Ins. Co. v. CHSI of Cal., Inc.*,
   2013 WL 435944 (S.D. Cal. Feb. 4, 2013) ...........................................................13

*Nelson v. PFS Corp.*,
   2021 WL 3468145 (C.D. Cal. May 10, 2021) .....................................................6, 10

*O'Handley v. Padilla*,
   579 F. Supp. 3d 1163 (N.D. Cal. 2022) ...........................................................20

*Oasis W. Realty, LLC v. Goldman*,
   51 Cal. 4th 811 (2011) ...............................................................................14

*Portman v. Cnty. of Santa Clara*,
   995 F.2d 898 (9th Cir. 1993)........................................................................11

*Prager Univ. v. Google LLC*,
   85 Cal. App. 5th 1022 (2022)........................................................................21

*R.R. Street & Co. Inc. v. Transp. Ins. Co.*,
   656 F.3d 966 (9th Cir. 2011).......................................................................12

*Reno v. ACLU*,
   521 U.S. 844 (1997) ........................................................................................................19

*Salzman v. N. Light Specialty Ins. Co.*,
   2023 WL 3273114 (C.D. Cal. Mar. 28, 2023) ...............................................................7

*Sheppard, Mullin, Richter & Hampton, LLP v. J-M Mfg. Co.*,
   6 Cal. 5th 59 (2018) ......................................................................................................19

*Societe de Conditionnement en Aluminium v. Hunter Eng'g, Co.*,
   655 F.2d 938 (9th Cir. 1981) ..........................................................................................7

*Spokane Indian Tribe v. United States*,
   972 F.2d 1090 (9th Cir. 1992) ........................................................................................6

*Stackla, Inc. v. Facebook Inc.*,
   2019 WL 4738288 (N.D. Cal. Sept. 27, 2019) .............................................................18

*T-Mobile W. Corp. v. Site Mgmt. Sols.*,
   2011 WL 13217942 (C.D. Cal. May 4, 2011) ..............................................................13

*T.H. v. Novartis Pharms. Corp.*,
   4 Cal. 5th 145 (2017) ....................................................................................................19

*Thomas v. Anchorage Equal Rights Comm'n*,
   220 F.3d 1134 (9th Cir. 2000) ...................................................................5, 8, 9, 10, 11

*TIBCO Software Inc. v. GatherSmart LLC*,
   2021 WL 4477902 (N.D. Cal. Mar. 5, 2021) .................................................................7

*Trump v. New York*,
   592 U.S. 125 (2020) ........................................................................................................5

*United States v. Braren*,
   338 F.3d 971 (9th Cir. 2003) ..........................................................................................9

*United States v. Playboy Ent. Grp., Inc.*,
   529 U.S. 803 (2000) ......................................................................................................19

*United States v. Ritchie*,
   342 F.3d 903 (9th Cir. 2003) ........................................................................................15

*Van Buren v. United States*,
   593 U.S. 374 (2021) ......................................................................................................10

*Xerox Corp. v. Apple Comput., Inc.*,
   734 F. Supp. 1542 (N.D. Cal. 1990) ..............................................................................8

*Zango, Inc. v. Kaspersky Lab, Inc.*,
   569 F.3d 1169 (9th Cir. 2009) .................................................................................22, 23

**Statutes**

18 U.S.C. § 1030 ...................................................................................................................2

Gibson, Dunn &
Crutcher LLP

vii

DEFENDANT META PLATFORMS, INC.'S NOTICE OF MOTION AND
MOTION TO DISMISS AMENDED COMPLAINT
CASE NO. 3:24-CV-02596-JSC

18 U.S.C. § 1030(a)(2)(C) ..................................................................................................24

28 U.S.C. § 2201 ...............................................................................................................1

28 U.S.C. § 2201(a) ......................................................................................................4, 12

47 U.S.C. § 230(a)(4) .......................................................................................................20

47 U.S.C. § 230(b)(2) .......................................................................................................20

47 U.S.C. § 230(c)(2)(A) ..................................................................................................24

47 U.S.C. § 230(c)(2)(B) .............................................................................................23, 24

47 U.S.C. § 230(f)(2) ........................................................................................................22

47 U.S.C. § 230(f)(4) ........................................................................................................22

Cal. Civ. Code § 1798.140(h) ...........................................................................................18

Cal. Code Regs. tit. 11, § 7004(h) .....................................................................................18

Cal. Penal Code § 502 ...................................................................................................2, 25

**Other Authorities**

Ethan Zuckerman, *I Love Facebook. That's Why I'm Suing Meta.*, N.Y. Times
   (May 5, 2024) ..............................................................................................................1

Ethan Zuckerman, *Zuckerman vs. Meta Platforms*, Ethan Zuckerman Blog (May 2,
   2024), https://ethanzuckerman.com/2024/05/02/zuckerman-vs-meta-platforms/; ...........1

Nick Clegg, *New Tools to Support Independent Research*, Meta Newsroom (Nov. 21,
   2023), https://about.fb.com/news/2023/11/new-tools-to-support-independent-
   research/ ...................................................................................................................11

Our Approach, Facebook Open Research & Transparency,
   https://fort.fb.com/approach .....................................................................................3, 11

Research Tools and Data Sets, Meta Transparency Center,
   https://transparency.meta.com/en-gb/researchtools/; ......................................................3

**Rules**

Fed. R. Evid. 201(b) .........................................................................................................15

**Treatises**

Restatement (Second) of Contracts § 178 (1981) ..............................................................17

Gibson, Dunn &
Crutcher LLP

viii

DEFENDANT META PLATFORMS, INC.'S NOTICE OF MOTION AND
MOTION TO DISMISS AMENDED COMPLAINT
CASE NO. 3:24-CV-02596-JSC

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.    INTRODUCTION

Plaintiff Ethan Zuckerman asks this Court to prejudge a hypothetical dispute about a posited browser extension—what he calls "Unfollow Everything 2.0"—that he has not yet created or released. According to Plaintiff, Unfollow Everything 2.0 would enable users to automate Facebook's features for "following" and "unfollowing" friends, pages, and groups on their Feed.  Besides bald assertions about how Plaintiff intends Unfollow Everything 2.0 to work and what he plans to do with it, there are no concrete facts that would enable this Court to adjudicate potential legal claims regarding this tool—which, at present, does not even operate in the real world.

The Court should decline Plaintiff's request to invoke this Court's limited jurisdiction to issue an advisory opinion about a non-existent tool.  Plaintiff's claims—which are contingent on facts that cannot be known until after he has created and released Unfollow Everything 2.0 and Meta has had an opportunity to evaluate how the tool actually works—are not ripe for review under either Article III of the Constitution or the Declaratory Judgment Act, 28 U.S.C. § 2201.  Even if the claims were ripe, jurisdiction under the Act remains discretionary, and there are a host of prudential reasons why exercising jurisdiction would not make sense here.  Adjudicating Plaintiff's claims would require needless rulings on hypothetical applications of California law, would likely result in duplicative litigation, and would encourage forum shopping.  Nor is it clear that Plaintiff has a bona fide plan to launch this tool.  He has widely spoken about this case in the media, going so far as to characterize it as an opportunity for courts to "shap[e] policy."[1]  The Court should reject Plaintiff's invitation to issue such an advisory opinion and follow the more prudent course of declining jurisdiction.

Should the Court nonetheless determine that it would be appropriate to entertain this action now, Plaintiff's claims should be dismissed:

---

[1] Spencer Decl., Ex. 2 Ethan Zuckerman, *Zuckerman vs. Meta Platforms*, Ethan Zuckerman Blog (May 2, 2024), https://ethanzuckerman.com/2024/05/02/zuckerman-vs-meta-platforms/; *see also id.*, Ex. 3 Ethan Zuckerman, *I Love Facebook. That's Why I'm Suing Meta.*, N.Y. Times (May 5, 2024), https://www.nytimes.com/2024/05/05/opinion/facebook-court-internet-meta.html (discussing "bigger purpose" of "create[ing] a more civic-minded internet").  As explained in Meta's concurrently filed Request for Judicial Notice, these statements by Plaintiff are judicially noticeable and properly considered on a Rule 12(b)(1) motion without converting the motion into one for summary judgment.

*First*, use of Unfollow Everything 2.0's anticipated automation of Facebook processes would violate Meta's Terms of Service ("Terms"), which prohibit accessing or collecting data from Facebook "using automated means."

*Second*, Plaintiff does not and cannot meet his significant burden of demonstrating that the relevant provisions of the Terms are void for public policy.  He cites no federal or state statute prohibiting such provisions, and does not even try to address the obvious ways in which the Terms advance important objectives, including ensuring the integrity of Facebook's and Meta's ability to regulate its services to ensure the protection of user privacy.

*Third*, Plaintiff's invocation of section 230(c)(2)(B) of the Communications Decency Act, 47 U.S.C. § 230 *et seq.*, is without merit, as (1) section 230(c)(2)(B) does not immunize Plaintiff from his contractual obligations under Meta's Terms as a matter of law; (2) it is highly unlikely from Plaintiff's allegations that he would qualify as an "interactive computer service" provider; and (3) the allegations do not show that Plaintiff's tool would "restrict *access*" (rather than "restrict *availability*") of content.

*Fourth*, there is no need for the Court to resolve whether Unfollow Everything 2.0 would violate the Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. § 1030, or California's Computer Data Access and Fraud Act ("CDAFA"), Cal. Penal Code § 502, because Plaintiff's allegations do not establish that it is inevitable that Meta would assert such claims against Plaintiff, and because these claims are inadequately pled in any event.

Meta respectfully requests that the Court dismiss this action.

## II.     SUMMARY OF ALLEGATIONS

Plaintiff alleges that he wants to build and release a browser extension that he calls "Unfollow Everything 2.0."  Dkt. 29 ("Am. Compl.") ¶¶ 1, 45.  According to Plaintiff, Unfollow Everything 2.0 would "enable[] users to automatically unfollow all of their friends, groups, and pages" by automating Facebook's unfollow function.  *Id.* ¶¶ 71–73.  After a user would log into Facebook and activate Unfollow Everything 2.0, the tool would "cause the user's browser to send a request to Meta's servers to retrieve the user's list of friends, groups, and pages."  *Id.* ¶ 73.  Unfollow Everything 2.0 would then "iterate through the 'followed list'" and "cause the user's browser to send a request to Meta's servers to unfollow each friend, group, or page" until the list is exhausted.  *Id.*  At the end of this process, the

DEFENDANT META PLATFORMS, INC.'S NOTICE OF MOTION AND
MOTION TO DISMISS AMENDED COMPLAINT
CASE NO. 3:24-CV-02596-JSC

tool would communicate whether all friends, groups, and pages have been successfully unfollowed with a "yes" or a "no." *Id.* Plaintiff speculates that the tool would "not . . . interfere with the normal operation of Facebook." *Id.* ¶ 76.

Plaintiff alleges that, using Unfollow Everything 2.0, he plans to track users' interactions with Facebook and collect that data to conduct an "optional research study" exploring the "how the [Feed] affects users' experience of Facebook." Am. Compl. ¶ 78. For users that opt in to his study, the tool would "log the amount of time" users spend on Facebook and "the number of unique accounts" viewed by users when toggled between "feed off" and "feed on" conditions. *Id.* ¶ 80.[2]

Plaintiff has not yet built Unfollow Everything 2.0. Am. Compl. ¶ 85. Although Plaintiff says his tool is "nearly ready to launch," all he currently has is "pseudocode"—*i.e.*, not actual computer code but rather a general "blueprint" about the potential "architecture and function" of the tool. *Id.* Plaintiff alleges he has "assembled a team of engineers to code the tool," and estimates that it may take six weeks to build. *Id.* But Plaintiff does not allege that the tool can actually be built as designed; and although he believes it would work based on the unfollowing functionality on Facebook's *current* interface, *see id.* ¶¶ 53–59, he concedes that the "process for unfollowing has changed over time and will likely continue to change," *id.* ¶ 53.

Plaintiff asserts that he has not yet built or released Unfollow Everything 2.0 because he is "concerned that doing so will expose him to legal liability." Am. Compl. ¶ 43. Although Plaintiff is a Facebook user, *see id.* ¶ 45, he does not allege that he has received any communications from Meta regarding his proposed plug-in tool. Rather, he "fears legal action" because (he alleges) Meta sent cease-and-desist letters to the creators of other browser extensions in the past, including to the creator of a browser extension (what Plaintiff calls "Unfollow Everything 1.0") that allegedly also automated "Facebook's [then-]existing unfollowing process" and that was taken down in 2021. *Id.* ¶¶ 87, 90–91.

---

[2] Meta supports rigorous and independent research into the potential impact social media services like Facebook may have on the world, and it makes available tools and processes to help researchers gain access to information and analytical capabilities to support their research through a privacy-protective approach. *See*, *e.g.*, Research Tools and Data Sets, Meta Transparency Center, https://transparency.meta.com/en-gb/researchtools/; Our Approach, Facebook Open Research & Transparency, https://fort.fb.com/approach. Plaintiff does not indicate whether he has considered using these tools or why his research could not be conducted through them.

### III.    LEGAL STANDARD

A complaint should be dismissed under Federal Rule of Civil Procedure 12(b)(1) for lack of subject-matter jurisdiction where it fails to establish there is a case or controversy that is ripe for review. *Chandler v. State Farm Mut. Auto. Ins. Co.*, 598 F.3d 1115, 1122 (9th Cir. 2010). Because federal courts are presumed to lack jurisdiction, it is the plaintiff—as the party invoking the Court's jurisdiction—who has the burden to establish subject-matter jurisdiction. *Advanced Integrative Med. Sci. Inst., PLLC v. Garland*, 24 F.4th 1249, 1256 (9th Cir. 2022).

A complaint should be dismissed under Federal Rule of Civil Procedure 12(b)(6) if it fails to state a claim upon which relief can be granted. To survive Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "Threadbare recitals" of the elements of a claim, supported by "mere conclusory statements," do not suffice. *Id.* Nor must the Court accept "a legal conclusion couched as a factual allegation," *id.*, or allegations based on "unwarranted deductions of fact[] or unreasonable inferences," *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008).

### IV.    ARGUMENT

#### A.    The Court Lacks, Or Should Decline To Exercise, Jurisdiction Over This Declaratory Judgment Action

The Declaratory Judgment Act states that "[i]n a case of actual controversy within its jurisdiction," a court may "declare the rights and other legal relations of any interested party." 28 U.S.C. § 2201(a). The Act thus requires a two-step analysis to determine whether an action for declaratory judgment is proper. First, the Court should "inquire whether there is a case of actual controversy within its jurisdiction." *Am. States Ins. Co. v. Kearns*, 15 F.3d 142, 143 (9th Cir. 1994). Second, if so, the Court should then "decide whether it would be appropriate to exercise that jurisdiction" by balancing discretionary considerations including "judicial administration, comity, and fairness to the litigants." *Id.* at 144 (citing *Brillhart v. Excess Ins. Co.*, 316 U.S. 491 (1942)); *see also Gov't Emps. Ins. Co. v. Dizol*, 133 F.3d 1220, 1225 n.5 (9th Cir. 1998) (*Brillhart* factors are "not exhaustive").

Plaintiff's suit does not meet either requirement.  There is no ripe case or controversy because Unfollow Everything 2.0 does not exist and there are no concrete facts upon which to adjudicate Plaintiff's claims.  And even if Plaintiff's claims were ripe as a constitutional matter, the Court should decline to exercise jurisdiction as a discretionary matter because resolving Plaintiff's claims would require needless determination of complex California law, may result in unnecessary litigation about questions that could prove irrelevant, would improperly require litigation without a factual record, would not settle all aspects of the controversy or clarify the legal relations at issue, and would force Meta to litigate any potential claims before it could possibly know its damages.

1.      **The Amended Complaint Presents No Dispute That Is Ripe For Judicial Review**

In the Ninth Circuit, "the ripeness inquiry contains both a constitutional and a prudential component."  *Thomas v. Anchorage Equal Rights Comm'n*, 220 F.3d 1134, 1138 (9th Cir. 2000).  A case is constitutionally ripe under Article III only if it sets forth "concrete legal issues, presented in actual cases, not abstractions."  *Colwell v. Dep't of Health & Human Servs.*, 558 F.3d 1112, 1123 (9th Cir. 2009) (quotation omitted).  And even if a case is constitutionally ripe, the prudential component asks whether the issues are fit for judicial consideration and whether there would be a more-than-minimal hardship to the parties from withholding consideration.  *Thomas*, 220 F.3d at 1141.  Because the answer to both questions is no, Plaintiff's claims satisfy neither component of the ripeness analysis.

a.      **Plaintiff's Claims Are Not Constitutionally Ripe**

To satisfy the constitutional ripeness inquiry, "the facts alleged, under all the circumstances, [must] show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment."  *Bayer v. Neiman Marcus Grp., Inc.*, 861 F.3d 853, 867 (9th Cir. 2017) (quoting *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 127 (2007)).  Courts consider "whether the plaintiffs face 'a realistic danger of sustaining a direct injury . . . ,' or whether the alleged injury is too 'imaginary' or 'speculative' to support jurisdiction."  *Thomas*, 220 F.3d at 1139.  A case is not ripe where the existence of the dispute itself depends on "contingent future events that may not occur as anticipated, or indeed may not occur at all."  *Trump v. New York*, 592 U.S. 125, 131 (2020) (citation omitted); *see also Bova v. City of Medford*, 564 F.3d 1093, 1097 (9th Cir. 2009) (where an injury has not occurred but is instead contingent upon

5

multiple events, there is no injury "concrete and particularized enough to survive the standing/ripeness inquiry"). For several reasons, the Amended Complaint does not present a dispute that meets the Constitution's ripeness requirement.

*First* and most fundamentally, there is no "substantial controversy" for the Court to resolve because Unfollow Everything 2.0 does not yet exist. This entire alleged dispute is therefore "contingent [upon] future events that may not occur as anticipated, or indeed may not occur at all." *Clinton v. Acequia, Inc.*, 94 F.3d 568, 572 (9th Cir. 1996). Plaintiff's claims depend upon his actually developing and releasing the tool and the tool operating as he predicts it would. Although the Amended Complaint summarizes how the tool would work based on Plaintiff's "pseudocode" blueprint, it remains to be seen whether the tool actually would be able to be "built to the specifications in the design." Am. Compl. ¶¶ 70–77, 85. For example, Plaintiff has explained publicly that *Unfollow Everything 1.0* "would log into Facebook on your behalf, and, well, unfollow everything." Spencer Decl., Ex. 6. But the Amended Complaint alleges that *Unfollow Everything 2.0* operates only "[w]hen a *user* logs into Facebook on their web browser and activates the Unfollow Everything 2.0 plug-in." Am. Compl. ¶ 73 (emphasis added). And it is unclear whether Unfollow Everything 2.0 would interface with Facebook as Plaintiff anticipates it might. As Plaintiff acknowledges, Facebook is constantly evolving, and Facebook's "unfollow" feature has changed and "will likely continue to change" in the future. *Id.* ¶ 53.

Although Plaintiff may "like more certainty than he currently has" in his plans to build and launch Unfollow Everything 2.0, "that uncertainty is insufficient to satisfy his burden" to demonstrate a ripe dispute—especially when the facts about the tool "are not . . . entrenched" and the facts may very well change if and when the tool is actually built. *Nelson v. PFS Corp.*, 2021 WL 3468145, at *3 (C.D. Cal. May 10, 2021) (case deemed unripe where "[p]laintiff seeks an advisory opinion more than a year before [d]efendant might breach an agreement").

*Second*, Plaintiff's claims are contingent on a hypothetical dispute between Plaintiff and Meta regarding his proposed plug-in tool. Plaintiff has alleged no facts giving rise to a "real and reasonable apprehension that he will be subject to liability" or that there is a threat of imminent litigation. *City & Cnty. of San Francisco v. U.S. Postal Serv.*, 2009 WL 3756005, at *3 (N.D. Cal. Nov. 5, 2009) (quoting *Spokane Indian Tribe v. United States*, 972 F.2d 1090, 1092 (9th Cir. 1992)).

1    Of course, when and if Plaintiff releases Unfollow 2.0, the actual, concrete facts about how it

2    works in practice may prove problematic, necessitating a response from Meta.  But the nature of that

3    response would depend on technical details about what the tool does, how users might respond to such

4    a tool, and the tool's impact on Meta's services.  Until those details materialize, it is necessarily unclear

5    whether, when, and how Meta would respond.  And courts routinely dismiss cases as unripe when they

6    are based on speculation about the declaratory judgment defendant's response.[3]

7    Plaintiff does not and cannot allege that there have been *any* prior interactions between himself

8    and Meta that would suggest that "adverse positions have crystallized and the conflict of interests is

9    real and immediate."  *Societe de Conditionnement en Aluminium v. Hunter Eng'g, Co.*, 655 F.2d 938,

10   943 (9th Cir. 1981) (citation omitted).  Where there is no "direct interaction between plaintiff and

11   defendant prior to the filing of an action for declaratory judgment" and the defendant has "taken no

12   action directed toward[] Plaintiff at all," there is no actual controversy.  *eBioscience Corp. v. Invitrogen*

13   *Corp.*, 2009 WL 10671320, at *3–4 (S.D. Cal. Apr. 20, 2009) (finding no Article III controversy where

14   there was no interaction between the parties prior to filing suit); *see also Adobe Sys. Inc. v. Kelora Sys.*

15   *LLC*, 2011 WL 6101545, at *4 (N.D. Cal. Dec. 7, 2011) (finding no actual controversy where plaintiff

16   did not allege that defendant "communicated with [plaintiff] at all before" filing suit).

17   This case is thus no different than *Bova v. City of Medford*, 564 F.3d 1093, 1096–97 (9th Cir.

18   2009).  There, employees of the City sought a declaratory judgment concerning the lawfulness of a

19   City retirement plan even though the plaintiffs had not retired or been denied benefits.  *Id.* at 1095.

20

21   [3] *See*, *e.g.*, *Salzman v. N. Light Specialty Ins. Co.*, 2023 WL 3273114, at *3 (C.D. Cal. Mar. 28, 2023)

22   (declaratory judgment claims unripe where "allegations only support a future injury contingent on conduct that has not yet occurred, i.e., Defendants cancelling [Plaintiffs' insurance] policy"); *Hollister*

23   *Ranch Owners Ass'n v. Becerra*, 2020 WL 5047903, at *8 (C.D. Cal. May 18, 2020) (claim unripe where it was contingent upon two events, "Plaintiff ha[d] not yet been told by Defendants that Plaintiff

24   has engaged in any prohibited acts," and it was "unknown whether any offensive action will be taken");

25   *TIBCO Software Inc. v. GatherSmart LLC*, 2021 WL 4477902, at *4–5 (N.D. Cal. Mar. 5, 2021) (declaratory counterclaims unripe because counterclaimant had not yet filed a statement with the

26   USPTO and, even if it could file, it "rest[ed] on the assumption" that USPTO would react as counterclaimant predicted); *Kim v. Tesoro Refining & Mktg. Co. LLC*, 2017 WL 11680958, at *3 (C.D.

27   Cal. Dec. 13, 2017) (claim unripe were "Defendants have taken no actions against [plaintiffs] with respect to" agreed upon terms and "[a]ny consequences stemming from [the terms] depend on

28   Defendants actually terminating the franchise agreements").

7

Because the alleged injury was contingent upon both plaintiffs' retirement and the City's denial of benefits, and it was "possible that neither of the two events will occur," neither plaintiff had "suffered an injury that [wa]s concrete and particularized enough to survive the standing/ripeness inquiry." *Id.* at 1096–97.  The Ninth Circuit recognized that, by the time the plaintiffs retired, the City may have abandoned its current plan, "mooting the substantive questions at issue." *Id.*  The same analysis applies here.  Plaintiff's claims are contingent upon two events: (1) Plaintiff's building and releasing the tool and (2) Meta's evaluation and decision to take whatever actions it deems appropriate.  It is possible that neither of these events will occur.

*Third*, the mere fact that Meta has asserted its position in cease-and-desist letters from its counsel to *other* individuals concerning *different* tools that had been actually built and released, *see* Am. Compl. ¶¶ 90–91, does not "give rise to a threat of imminent harm" sufficient to raise a controversy here with respect to Plaintiff's tool that he has neither built nor released, *eBioscience Corp.*, 2009 WL 10671320, at *3–4.  A "generalized threat of prosecution" does not "satisf[y] the 'case or controversy' requirement." *Thomas*, 220 F.3d at 1139.  Likewise, threatened or actual litigation against third parties does not give rise to an imminent threat against a declaratory judgment plaintiff where there is no relationship between the plaintiff and the third parties, and the defendants have taken no action specifically against the plaintiff seeking a declaratory judgment.  *See eBioscience Corp.*, 2009 WL 10671320, at *3–4 ("the fact that Defendants have sued a third party . . . does not give rise to a threat of imminent harm to Plaintiff" where the defendants "have taken no action directed towards Plaintiff at all"); *Xerox Corp. v. Apple Comput., Inc.*, 734 F. Supp. 1542, 1547 (N.D. Cal. 1990) (litigation against third parties with whom the plaintiff had "no relationship" could not be "construed as threats of imminent litigation" against plaintiff).

Even if the Court were to consider the cease-and-desist letter Meta's counsel sent to the developer of the original "Unfollow Everything 1.0" tool, that letter contained "no indication of an imminent threat to litigate" and instead showed a clear intent to try to resolve the matter without litigation. *Eddy v. Citizenhawk, Inc.*, 2013 WL 12114488, at *3 (S.D. Cal. Nov. 19, 2013); *see* Dkts. 1-1, 1-2 (Am. Compl., Exs. A–B).  Although the letter reserved "Meta's rights or remedies," courts consistently find that such a reservation, standing alone, is insufficient to establish an "imminent threat

8

DEFENDANT META PLATFORMS, INC.'S NOTICE OF MOTION AND
MOTION TO DISMISS AMENDED COMPLAINT
CASE NO. 3:24-CV-02596-JSC

to litigate." *Eddy*, 2013 WL 12114488, at *3 (cease-and-desist letter reserving right "to take all appropriate legal action" did not demonstrate ripe case or controversy); *see also Fidelity Nat'l Fin., Inc. v. Ousley*, 2006 WL 2053498, at *4–5 (N.D. Cal. July 21, 2006) ("[A] single demand letter making no threat of legal action and receiving no response is insufficient to create an actual controversy."). And the Unfollow Everything 1.0 cease-and-desist letter does not mention the CFAA or CDAFA—a fact that confirms the speculative nature of Plaintiff's claims for relief here, as he seeks a declaratory judgment regarding CFAA and CDAFA claims that Meta did not invoke with respect to Unfollow Everything 1.0.[4]

### b.    <u>Plaintiff's Claims Are Not Prudentially Ripe</u>

Even if an action is constitutionally ripe, a court still must determine whether it is prudentially ripe.  Prudential ripeness considers "the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." *Thomas*, 220 F.3d at 1141 (quoting *Abbott Labs. v. Gardner*, 387 U.S. 139, 149 (1967)).  "A claim is fit for decision if the issues raised are primarily legal [and] do not require further factual development." *United States v. Braren*, 338 F.3d 971, 975 (9th Cir. 2003) (quotation omitted).  The hardship element considers whether the challenged action "requires an immediate and significant change in the plaintiffs' conduct of their affairs with serious penalties attached to noncompliance." *Ass'n of Am. Med. Colls. v. United States*, 217 F.3d 770, 783 (9th Cir. 2000) (cleaned up).  Plaintiff's claims fail both elements of the prudential ripeness inquiry.

*1. Plaintiff's Claims Require Further Factual Development.*  Plaintiff's claims are unfit for judicial decision because the facts are not fully developed.  "The purpose of the 'fitness' test . . . is to delay consideration of the issue until the pertinent facts have been well-developed in cases where further factual development would aid the court's consideration." *In re Coleman*, 560 F.3d 1000, 1009 (9th Cir. 2009).  Claims that are contingent upon hypothetical facts are not "purely legal" and require "an adequately developed factual record to render [the claims] ripe for [] review." *Thomas*, 220 F.3d at 1142.

---

[4] Plaintiff's reliance on cease-and-desist letters Meta sent to developers of other tools (like "Friendly" and "Ad Observer") has even less bearing on how Meta may react to Unfollow Everything 2.0.  *See* Am. Compl. ¶¶ 90–91.  Neither "Friendly" nor "Ad Observer" are alleged to operate in the same way Plaintiff suggests Unfollow Everything 2.0 may operate.

DEFENDANT META PLATFORMS, INC.'S NOTICE OF MOTION AND
MOTION TO DISMISS AMENDED COMPLAINT
CASE NO. 3:24-CV-02596-JSC

Gibson, Dunn &
Crutcher LLP

Plaintiff's allegations do not provide an adequate factual record.  As discussed above with respect to the constitutional ripeness inquiry, Plaintiff's claims depend on a series of future hypotheticals, including whether Plaintiff would succeed in building Unfollow Everything 2.0, how it would operate, including whether it would work as designed, and whether Meta would take any action in response.  *See supra*, pp. 6–9.  Where, as here, there are "many unknown facts," the "exercise of jurisdiction without proper factual development is inappropriate."  *Am.-Arab Anti-Discrimination Comm. v. Thornburgh*, 970 F.2d 501, 511 (9th Cir. 1991) (case was prudentially unripe where it came "upon a sketchy record and with many unknown facts"); *see also Thomas*, 220 F.3d at 1141 (case was prudentially unripe where the record was "remarkably thin and sketchy" and plaintiff-landlords' claims "rest[ed] upon hypothetical situations with hypothetical tenants").  Those concerns are especially heightened here, where Plaintiff seeks judicial declarations about complex statutory schemes regarding computer access and internet services—including CFAA, CDAFA, and the Communications Decency Act—the application of which would necessarily depend on details about the technical operations of Plaintiff's proposed tool, including how it would interact with servers, what commands or functions it would execute, and its impact on Meta's systems.  *Cf. Van Buren v. United States*, 593 U.S. 374, 387–88 (2021) (noting that "technical meanings . . . matter[] when interpreting a statute about computers").

**2.  *Declining Jurisdiction Poses Minimal Hardship To Plaintiff.***  The second component of the prudential ripeness inquiry—hardship to Plaintiff in withholding consideration—also counsels against exercising jurisdiction here.  The Ninth Circuit has held that the hardship analysis "dovetails" with constitutional ripeness, and "the absence of any real or imminent threat of enforcement . . . seriously undermines any claim of hardship" to the plaintiff.  *Thomas*, 220 F.3d at 1142.

Dismissing this action at this stage poses minimal hardship to Plaintiff because he would have the opportunity to seek relief if and after an actual controversy has arisen.  *See Am.-Arab Anti-Discrim. Comm.*, 970 F.2d at 511 (no hardship where appellees would "have the opportunity to present their constitutional challenges to a court" in the event of government action).  Plaintiff's desire for certainty cannot turn hypothetical facts about his proposed plug-in tool into a ripe dispute.  *See Nelson*, 2021 WL 3468145, at *3.  The Amended Complaint alleges no facts about the cost Plaintiff would incur to build the tool or why he cannot do so now—indeed, he has stated publicly that he could develop the

10

software to create a ripe dispute and is "willing to consider" doing so.  Spencer Decl., Ex. 4 (Plaintiff explaining that if he has no standing, he could "go ahead and develop the tool" and then come to the court saying "[n]ow we got a complaint"); *id.*, Ex. 6 (reporting that "[i]f a judge denies Zuckerman a preemptive ruling," he said "he's willing to consider releasing the software anyway and then take his chances.").  Nor does the Amended Complaint indicate that Plaintiff has considered whether his research goals could be accomplished through tools that Meta already offers to qualified researchers, including access to "privacy-protected data sets and APIs to serve the academic community" and help it "understand social media's impact on society."[5]  The fact that Plaintiff describes this lawsuit as a way to "shap[e] policy" suggests he sees this case as a platform to spread a particular viewpoint, rather than as a way to resolve an actual controversy.  *Id.*, Ex. 2 (Plaintiff stating he is in the "privileged position of being able to be a part of a case like this" since "courts can be as important as legislatures for shaping policy").

By contrast, forcing Meta to defend Plaintiff's curated claims based solely on Plaintiff's own assertions about what he plans to do with his proposed tool—without any actual tool or objective facts to assess—would cause Meta hardship.  Meta could not fairly test the veracity of Plaintiff's self-serving statements about his intentions, and there would not be a full and fair opportunity to develop "an adequate record upon which to base effective review."  *Portman v. Cnty. of Santa Clara*, 995 F.2d 898, 903 (9th Cir. 1993); *see Thomas*, 220 F.3d at 1142 (finding city would be harmed by "being forced to defend the housing laws in a vacuum").

Because the factual record is undeveloped, there is no harm to Plaintiff in delaying consideration, and Meta will be harmed by premature determination, the Court should dismiss this case as prudentially unripe.

### 2.   Plaintiff's Claims Do Not Warrant Discretionary Review Under The Declaratory Judgment Act

Even if Plaintiff's claims were ripe, the Court should not take this case up now.  The Declaratory Judgment Act "gives discretion to courts in deciding whether to entertain declaratory judgments."  *Am.*

---

[5] Our Approach, Facebook Open Research & Transparency, https://fort.fb.com/approach; *see also* Nick Clegg, *New Tools to Support Independent Research*, Meta Newsroom (Nov. 21, 2023), https://about.fb.com/news/2023/11/new-tools-to-support-independent-research/.

*States Ins. Co.*, 15 F.3d at 144; 28 U.S.C. § 2201(a) (the court "*may* declare the rights . . . of any interested party" (emphasis added)).   In determining whether to exercise its discretion, the Court should: (1) "avoid needless determination of state law issues"; (2) "avoid duplicative litigation"; and (3) "discourage litigants from filing declaratory actions as a means of forum shopping."  *Gov't Emps. Ins. Co.*, 133 F.3d at 1225 (citing *Brillhart*, 316 U.S. at 495).  The Court also may consider (4) whether the action "will settle all aspects of the controversy" and "serve a useful purpose in clarifying the legal relations at issue," and (5) "the convenience of the parties, and the availability and relative convenience of other remedies."  *Gov't Emps. Ins. Co.*, 133 F.3d at 1225 n.5.  These factors all weigh in favor of declining jurisdiction over this action.

*First*, Plaintiff's claims would require needless determination of state law, a problem that "alone" supports declining jurisdiction.  *R.R. Street & Co. Inc. v. Transp. Ins. Co.*, 656 F.3d 966, 975 (9th Cir. 2011).  Plaintiff seeks declaratory judgment under the CDAFA, California contract law, and California public policy.  Am. Compl. ¶¶ 5–7, 11–13, 17.  But because Unfollow Everything 2.0 has not been built or released, the nature of whether, when, how, and why Meta might respond is speculative, and prematurely deciding the state-law issues that Plaintiff selectively invokes "may prove entirely superfluous."  *Bank of Am., N.A. v. Cnty. of Maui*, 2020 WL 7700098, at *6 (D. Haw. Dec. 28, 2020); *see AMCO Ins. Co. v. W. Drug, Inc.*, 2008 WL 4368929, at *3 (D. Ariz. Sept. 24, 2008) (dismissing declaratory judgment action where "action involves issues of [state] law that need not be determined if . . . [the defendant] refrains from filing suit").

*Second*, resolution of this action now presents a risk of duplicative litigation later.  Because Unfollow Everything 2.0 does not exist and Meta has not taken any action, the questions that Plaintiff "asks the court to decide may ultimately prove irrelevant to resolving the underlying dispute."  *Bank of Am.*, 2020 WL 7700098, at *1, *7.  Given that Plaintiff has not even built his planned tool and acknowledges that Facebook's "unfollow" function has evolved and "will likely continue to change," Am. Compl. ¶ 53, the tool might not work as intended and might not interact with Facebook as Plaintiff has alleged.  If so, any determinations made in this suit would be moot and this or another court would need to re-adjudicate the parties' claims and defenses based on the tool as actually released.  Declining

to entertain this action therefore avoids adjudication of claims that may not ultimately be at issue, prevents duplicative litigation, and conserves judicial resources.

*Third*, declining to hear this action would discourage forum shopping. Courts should decline jurisdiction under this factor where "a declaratory judgment suit is defensive or reactive," *T-Mobile W. Corp. v. Site Mgmt. Sols.*, 2011 WL 13217942, at *5 (C.D. Cal. May 4, 2011) (quoting *Cont. Cas. Co. v. Robsac Indus.*, 947 F.2d 1367, 1371 (9th Cir. 1991)), *overruled on other grounds by Gov't Emps. Ins. Co.*, 133 F.3d at 1224), or attempts to gain an "improper advantage" by litigating defenses "on the basis of a barren record," *Navigators Specialty Ins. Co. v. CHSI of Cal., Inc.*, 2013 WL 435944, at *8 (S.D. Cal. Feb. 4, 2013). Both factors exist here. In the first instance, it is unclear whether Meta would choose to take any action in response to Plaintiff's tool if and when it is released, but Plaintiff seeks to litigate his defenses on the assumption that Meta would file suit on those particular bases. Am. Compl. ¶¶ 92–93. Plaintiff's attempt to litigate its defenses "on the basis of a barren record" also confirm that Plaintiff perceives a procedural advantage by seeking declaratory relief based on nothing more than his own self-serving allegations about what he intends to do with a tool he has not yet built. *Navigators Specialty Ins.*, 2013 WL 435944, at *8.

*Fourth*, deciding Plaintiff's claims may not "settle all aspects of the controversy" or "serve a useful purpose in clarifying the legal relations at issue." *Gov't Emps. Ins. Co.*, 133 F.3d at 1225 n.5. If Meta decides to take any action in response to Unfollow Everything 2.0—assuming it is released— it may not bring the same claims as to which Plaintiff now seeks declaratory judgment. *See Bank of Am.*, 2020 WL 7700098, at *1 (this factor weighed in favor of dismissal where declaratory judgment action was based "entirely on [plaintiff's] own conjecture about the claims the County might eventually bring"). For example, the Amended Complaint includes no consideration of claims Meta might have for trademark infringement (a potential claim mentioned in the Unfollow Everything 1.0 letters) or a host of other claims that would not be decided in this action. *See* Dkt. 1-1 (Am. Compl., Ex. A) at 1. And Meta's Terms may be different at such time as Plaintiff's tool is released, requiring re-adjudication of whether the as-released tool violates those Terms and whether the Terms contravene public policy. *See* Am. Compl. ¶¶ 5–13. With a hypothetical tool and a hypothetical reaction from Meta, "the precise

13

1   nature of the controversy is unknown," and adjudicating the claims now would only waste judicial time

2   and resources.  *Bank of Am.*, 2020 WL 7700098, at *7.

3       *Finally*, fairness to the litigants counsels in favor of declining jurisdiction.  Permitting Plaintiff

4   to proceed with this action—before he has even built or released the proposed tool, and before anyone

5   knows the impact such a tool might have on Meta—would force Meta to litigate any potential claims

6   before it could even know "the full extent of [its] damages."  *Himonic, LLC v. Chow*, 2018 WL

7   11267138, at *3 (D. Nev. Aug. 6, 2018) (quotation omitted).

8       **B.**   <u>**Plaintiff's Allegations Do Not State A Claim For Relief**</u>

9       Even if the Court were inclined to exercise jurisdiction over this action, dismissal still would

10  be warranted because Plaintiff fails to state a claim on which relief can be granted.  Plaintiff's request

11  for a declaration that operation of the undeveloped and unreleased Unfollow Everything 2.0 tool would

12  not breach any contract with Meta fails because, on the hypothetical facts alleged, operation of the tool

13  would constitute a clear breach of current Terms of Service.  The Court also should decline Plaintiff's

14  invitation to declare Meta's Terms of Service void for public policy because Plaintiff articulates no

15  public policy that would justify invalidating the clear terms of a contract—particularly a contract that

16  protects the strong public interest in safeguarding user data from data-scraping by *all* third parties.

17  Plaintiffs' allegations also do not establish that he would be entitled to protection under section

18  230(c)(2)(B) or that he is entitled to relief under the CFAA or CDAFA.

19      **1.**   <u>**Unfollow Everything 2.0, Even As Hypothetically Alleged, Would Violate Meta's
        Terms Of Service**</u>

20
        Plaintiff seeks a declaration that operation of Unfollow Everything 2.0 would not violate "any
21
    of Meta's Terms of Service" and thus would "not breach any contract between" Plaintiff and Meta.
22
    Am. Compl. at p. 32 & ¶ 6.  A breach of contract claim requires "(1) the existence of the contract,
23
    (2) plaintiff's performance or excuse for nonperformance, (3) defendant's breach, and (4) the resulting
24
    damages to the plaintiff."  *Oasis W. Realty, LLC v. Goldman*, 51 Cal. 4th 811, 821 (2011).   In
25

26

27

28

interpreting the text of a contract to discern a breach, the contractual language governs if it is "clear and explicit." *Hameid v. Nat'l Fire Ins. of Hartford*, 31 Cal. 4th 16, 21 (2003).[6]

This claim for declaratory relief should be dismissed because Plaintiff has not plausibly alleged that Unfollow Everything 2.0 would not violate Meta's current Terms. *See* Spencer Decl., Ex. 1.[7]  In fact, Plaintiff has apparently conceded that his proposed tool would violate Meta's Terms, publicly stating that "[t]he most popular networks [including] Facebook . . . prohibit tools like ours." *Id.*, Ex. 6. Even a cursory comparison of the Terms and Plaintiff's allegations about Unfollow Everything 2.0 demonstrates that it would violate the "clear and explicit" language of Facebook's Terms, including:

- not to "engage" in certain prohibited activities on Facebook "or to facilitate or support others in doing so," Spencer Decl., Ex. 1, § 3.2; and

- not to "access or collect data from [Facebook] using *automated* means," *id.* § 3.2.3 (emphasis added).

The operation of the yet-to-be-created Unfollow Everything 2.0, at least as currently alleged, would patently violate these Terms. For example, Plaintiff alleges that "Unfollow Everything 2.0 will work by *automating* . . . the unfollow function." Am. Compl. ¶ 73 (emphasis added). For users that opt in to his study, the tool would automatically toggle between "feed off" and "feed on" conditions, which entails the automatic unfollowing and re-following of all friends, groups, and pages on a weekly basis. *Id.* ¶ 80. The hypothetical tool would also allow the user to "*automatically* reverse the unfollowing process, at their convenience." *Id.* ¶ 74 (emphasis added). And for study participants, the tool would automatically "log the amount of time each user spends on Facebook, as well as the number of unique accounts that a user views content from." *Id.* ¶ 80. All of these allegations about how

---

[6] Plaintiff does not appear to dispute the existence of a valid contract between Meta and Plaintiff. Compl. at 32 ¶¶ 5–6. Plaintiff is a Facebook user, Am. Compl. ¶ 45, and his status as a Facebook user demonstrates the existence of a contract between Plaintiff and Meta. *Meta Platforms, Inc. v. BrandTotal Ltd.*, 605 F. Supp. 3d 1218, 1257 (N.D. Cal. 2022) ("all users who create accounts indicate that they agree to Meta's terms of use"). Nor does Plaintiff appear to dispute that Meta could state the other elements of a breach of contract claim.

[7] As explained in the accompanying Request for Judicial Notice, Meta's Terms are incorporated by reference into the Amended Complaint because "the document forms the basis of the plaintiff's claim." *United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003). Plaintiff's Count II seeks a declaration on whether his actions violate the Terms of Service, Am. Compl. at 32 ¶¶ 6–7, and he refers to the Terms as "the subject of this suit," *id.* ¶ 10. Further, the publicly posted and available Terms are subject to judicial notice because they are "not subject to reasonable dispute" and their "accuracy cannot reasonably be questioned." *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 999 (9th Cir. 2018) (quoting Fed. R. Evid. 201(b)(1)–(2)).

Gibson, Dunn & Crutcher LLP

DEFENDANT META PLATFORMS, INC.'S NOTICE OF MOTION AND
MOTION TO DISMISS AMENDED COMPLAINT
CASE NO. 3:24-CV-02596-JSC

Plaintiff's tool might someday work would involve accessing data from Facebook "using automated means." Spencer Decl., Ex. 1 § 3.2.3.

Plaintiff's efforts to plead around these violations of the Terms are unsuccessful and instead describe conduct that also would be precluded by the Terms. Plaintiff says that *he* would not be "engag[ing]" in prohibited activities because Facebook *users* would operate his tool, and Plaintiff himself would "not be logged into his Facebook account to operate the tool." Am. Compl. at p. 32 & ¶ 7. But the Terms prohibit any user from "facilitat[ing] or support[ing] others" in violating the provisions of Section 3.2. Spencer Decl., Ex. 1 § 3.2. Indeed, in a very similar case also involving Section 3.2 of Facebook's Terms, the court noted that the record showed a breach where a browser extension that the defendant released had "accessed and collected data from Facebook and Instagram using automated means through its various consumer products installed by *users*." *BrandTotal Ltd.*, 605 F. Supp. 3d at 1258 (emphasis added). Plaintiff's hypothetical tool also apparently would operate by standing in the shoes of its users—the Amended Complaint itself states that "[w]hen a user logs into Facebook on their web browser and activates the Unfollow Everything 2.0 plug-in, Unfollow Everything 2.0 will cause the user's browser to send a request to Meta's servers." Am. Compl. ¶ 73. So even under his own allegations, Plaintiff would be using Facebook through his proposed tool or facilitating use by others in a way that violates the Terms.

Plaintiff next argues that Unfollow Everything 2.0 would allow users—or Plaintiff acting as their agent—to collect only their own data, which the Terms allow them to collect. *See* Am. Compl. at pp. 32–33 ¶ 7. But the Terms explicitly bar users from accessing data "using automated means," even when they otherwise have permission to access it. Spencer Decl., Ex. 1 § 3.2.3; *cf. Facebook, Inc. v. BrandTotal Ltd.*, 2021 WL 662168, at *11 (N.D. Cal. Feb. 19, 2021) (explaining "no [Facebook] user could reasonably rely on broad statements regarding ownership of data as allowing the use of automated *means* to collect that data, when the same terms of use on which BrandTotal relies specifically *prohibit* using such means without Facebook's permission"). In other words, the clear text of the Terms bars the means of access and collection proposed for Unfollow Everything 2.0, even in cases involving a user's own personal data.

Finally, Plaintiff asserts that Unfollow Everything 2.0 will "merely make[] existing Facebook functionality more convenient." Am. Compl. at p. 33 ¶ 7. But he does not suggest how this aspiration for his yet-developed tool overcomes the Terms' ban on automated access to and collection of data.

Because Unfollow Everything 2.0, as alleged, would clearly violate Meta's Terms, Plaintiff has not stated a plausible claim for relief on his breach of contract claim.

## 2. <u>Meta's Terms Of Service Are Not Void For Public Policy</u>

Apparently acknowledging that his proposed tool would likely violate the Terms, Plaintiff's Amended Complaint quickly pivots to asking this Court to declare the Terms "void for public policy." Am. Compl. at p. 33 ¶ 8. There is no basis to support such a drastic ruling—even if the request were not clearly unripe. As the Supreme Court has cautioned, "the term 'public policy' is vague," so invalidating a contract on that ground requires some "definite indications in the law of the sovereignty" creating the policy in question—normally, a duly enacted statute. *Muschany v. United States*, 324 U.S. 49, 66 (1945); *Golden Gate Way LLC v. Enercon Servs., Inc.*, 572 F. Supp. 3d 797, 816 (N.D. Cal. 2021) ("The power of the courts to declare a contract void for being in contravention of sound public policy is a very delicate and undefined power, and . . . should be exercised only in cases free from doubt."). Where, as here, the plaintiff has not identified *any* statute explicitly prohibiting the contractual provisions at issue, courts will invalidate a contractual term only where "the interest in its enforcement is *clearly outweighed* in the circumstances by a public policy against the enforcement of such terms." Restatement (Second) of Contracts § 178 (1981) (emphasis added); *see also Dunkin v. Boskey*, 82 Cal. App. 4th 171, 184 (2000) ("unless it is entirely plain that a contract is violative of sound public policy, a court will never so declare"). It is Plaintiff's burden "to show that [the contract's] enforcement would be in violation of the settled public policy of this state, or injurious to the morals of its people." *Dunkin*, 82 Cal. App. 4th at 184 (internal quotations omitted). "Public policy is to be ascertained by reference to the laws and legal precedents and not from general considerations of supposed public interests." *Muschany*, 324 U.S. at 66.

None of Plaintiffs' claimed sources of public policy—"California privacy law," "the First Amendment," or "Section 230," Am. Compl. at pp. 33–34 ¶¶ 9–11—bars enforcement of Meta's Terms.

DEFENDANT META PLATFORMS, INC.'S NOTICE OF MOTION AND MOTION TO DISMISS AMENDED COMPLAINT CASE NO. 3:24-CV-02596-JSC

*a. California Privacy Law.*  Plaintiff's argument that Section 3.2.3 of the Terms—Meta's prohibition on automated access and data collection—violates the California Consumer Privacy Act ("CCPA") or California Privacy Rights Act ("CPRA") is baseless.  Am. Compl. at pp. 33–34 ¶ 11.  In rejecting a similar challenge to Section 3.2.3 of Meta's Terms in *BrandTotal*, the court rejected the argument that California law "espous[es] a principle of user control of data sufficient to invalidate" Facebook's prohibition on automated access.  605 F. Supp. 3d at 1245.  In particular, the court found the plaintiff failed to identify "any substantive, codified provision of the [CCPA or the] CPRA that prevents Meta from enforcing" its ban on automated access, especially given the explicit "balancing" of business and user interests in the CPRA.  *Id.* at 1245–46.  For example, the court found it significant that voters "did not enact any law governing the [specific] conduct at issue" or "expanding the means by which users can interact with social media platforms" despite enacting specific "substantive law establishing a variety of specific rights, obligations, and procedures" with respect to other consumer rights.  *Id.* at 1246–47.  And although Plaintiff cites general provisions about user control over their "personal information," Am. Compl. at pp. 33–34 ¶ 11 (citing CPRA § 3(A)(2), § 3(A)(4)), the contractual prohibition on automated access in Meta's Terms has nothing to do with user control over their "personal information."  *See BrandTotal*, 605 F. Supp. 3d at 1252 (Section 3.2.3 of Meta's Terms "does not govern the publication or use of information once obtained; it prohibits some forms of access to Meta's servers").  Similarly, Plaintiff's reference to regulations relating to the use of "dark patterns" and user consent, *see id.* (citing Cal. Code Regs. tit. 11, § 7004(h), Cal. Civ. Code § 1798.140(h)), does not speak to any supposed California public policy against prohibitions on automated access to systems.

As other courts have recognized, Meta's prohibition on automated access *protects* the strong public interest in safeguarding user data from scraping and other automated means of harvesting data.  Meta's ability to "decisively police the integrity" of its services is a countervailing consideration that is "without question a pressing public interest."  *Stackla, Inc. v. Facebook Inc.*, 2019 WL 4738288, at *6 (N.D. Cal. Sept. 27, 2019).  The public "has a strong interest in the integrity of Facebook's platforms, Facebook's policing of those platforms for abuses, and Facebook's protection of its users' privacy."  *Id.*  It is therefore far from "straightforward" that generalized interests in "user control" mean that social media services cannot restrict automated access to their services, and such "'questions of public policy

18

are primarily for the legislative department to determine'" in any event.  *BrandTotal*, 605 F. Supp. 3d at 1247 (quoting *Sheppard, Mullin, Richter & Hampton, LLP v. J-M Mfg. Co.*, 6 Cal. 5th 59, 73 (2018)).

Were there any doubt, federalism concerns counsel against adopting a novel and unprecedented extension of state law.  "Federal courts sitting in diversity are 'extremely cautious' about recognizing innovative theories under state law and are bound to 'apply the applicable state law as it now exists.'" *T.H. v. Novartis Pharms. Corp.*, 4 Cal. 5th 145, 178 (2017) (first quoting *Combs v. Int'l Ins. Co.*, 354 F.3d 568, 578 (6th Cir. 2004); and then quoting *Foster v. Am. Home Prod. Corp.*, 29 F.3d 165, 171 (4th Cir. 1994)); *see also City of Johnstown v. Bankers Standard Ins. Co.*, 877 F.2d 1146, 1153 (2d Cir. 1989) (role of a federal court sitting in diversity is to "construe and apply state law as we believe the state's highest court would, not to adopt innovative theories that may distort established state law" (citations omitted)).  Particularly in the context of a hypothetical dispute, this Court should not extend state law to invalidate Facebook's Terms under the public policy doctrine.

**b. The First Amendment.**  Plaintiff's invocation of the First Amendment also fails to show any strong public interest that outweighs enforcement of the Terms.  Plaintiff cites several cases (without identifying a particular quotation or passage) discussing a general First Amendment interest in expressive communication free from *government* regulation.  Am. Compl. at p. 33 ¶ 10 (citing *Reno v. ACLU*, 521 U.S. 844, 877 (1997) (narrowing scope of Communications Decency Act due to potential impacts on private speech); *United States v. Playboy Ent. Grp., Inc.*, 529 U.S. 803 (2000) (enjoining FCC regulation requiring scrambling of pornographic television content); *Ashcroft v. ACLU*, 542 U.S. 656 (2004) (enjoining enforcement of Child Online Protection Act on First Amendment grounds)).  But those cases are beside the point, as this dispute involves private parties, not the government.

Plaintiff's cases also do not establish an interest in control of user data that could override a private contract that merely governs the means parties use to access that data and does not jeopardize their ability to control it.  As the court reasoned in *BrandTotal*, Section 3.2.3 of Meta's Terms of Service "does not govern the publication or use of information once obtained; it prohibits some forms of access to Meta's servers."  605 F. Supp. 3d at 1252.  Plaintiff's alleged "general interest in free flow of information is defined too vaguely to support setting aside a contract regarding means of access without a showing that the courts or legislature have determined that interest outweighs the competing interest

in enforceability of contracts under comparable circumstances." *Id.* Plaintiff cites no case invalidating a contractual term based on this interest in user control of their own information.

Nor does Plaintiff explain how a purported interest in "user control"—even if such a right had been recognized by a court or legislature—could displace *Meta's* First Amendment rights to decide "which third-party content [the Feed] will display, or how the display will be ordered and organized"— all of which are "expressive choices" that "receive First Amendment Protection." *Moody v. NetChoice, LLC*, – S. Ct. —, 2024 WL 3237685, at *15 (2024); *see also O'Handley v. Padilla*, 579 F. Supp. 3d 1163, 1186–87 (N.D. Cal. 2022), *aff'd sub nom. O'Handley v. Weber*, 62 F.4th 1145 (9th Cir. 2023) ("Like a newspaper or a news network, [Meta] makes decisions about what content to include, exclude, moderate, filter, label, restrict, or promote, and those decisions are protected by the First Amendment.").

As courts have repeatedly made clear, Meta is a private actor that possesses First Amendment rights, not a government actor that is bound by the First Amendment vis-à-vis other parties. *Moody*, 2024 WL 3237685, at *16. Given Meta's First Amendment rights to editorial discretion and control that are protected by its Terms' restrictions on disruptive user conduct, there is no conceivable legal basis for saying those privately agreed-to Terms could somehow be invalidated on the basis of someone else's First Amendment rights.

*c. Section 230.* Finally, Plaintiff argues that Section 230 of the Communications Decency Act itself articulates a public policy that clearly outweighs contractual terms governing how a consumer retrieves data from a website. Am. Compl. at p. 33 ¶ 9. This argument fails for the same reasons as Plaintiff's arguments under California law: (1) it draws on the generic policy portion of the relevant statute, (2) the statute does not prohibit the contractual provision at issue here, and (3) that provision is justified by a strong public interest in preventing automated harvesting of Facebook user information. Plaintiff's argument also ignores the findings in Section 230 that interactive computer services like Facebook have flourished "with a minimum of government regulation" and the policy of the United States to preserve the free market on the Internet "unfettered by Federal or State regulation." 47 U.S.C. § 230(a)(4), (b)(2). This goal is not furthered by refusing to honor the clear contractual language here,

DEFENDANT META PLATFORMS, INC.'S NOTICE OF MOTION AND
MOTION TO DISMISS AMENDED COMPLAINT
CASE NO. 3:24-CV-02596-JSC

especially where this provision serves to protect user data from those trying to retrieve it using unauthorized means.  The Court should decline Plaintiff's invitation to declare Meta's Terms void.

**3.      Plaintiff's Allegations Do Not Establish That His Operation Of Unfollow Everything 2.0 Would Be Entitled To Section 230 Immunity**

There is also no basis to grant Plaintiff's request for a declaration that he is "immun[e] . . . from civil liability for designing, releasing, and operating Unfollow Everything 2.0" under section 230(c)(2)(B) of the Communications Decency Act.  Am. Compl. at p. 31 ¶ 1.  To the extent the factual allegations are even discernible at this stage, they do not adequately plead an entitlement to immunity under section 230(c)(2)(B).

**a.      Section 230(c)(2)(B) Does Not Cover Contractual Breach Of Meta's Terms**

As an initial matter, even if Plaintiff could otherwise invoke the protections of section 230(c)(2)(B), it would not entitle him to violate his voluntary contractual obligation not to violate Facebook's Terms.  As Judge Alsup explained in *Berenson v. Twitter, Inc.*, 2022 WL 1289049 (N.D. Cal. Apr. 29, 2022), section 230(c)(2)'s protection against being "held liable" does not apply where the claim is based on one's status "as the counter-party to a contract," or, in other words, "as a promisor who has breached."  *Id.* at *2 (allowing breach of contract claims "to go forward despite Section 230, so long as they are properly pleaded under state law"); *see also Enhanced Athlete Inc. v. Google LLC*, 479 F. Supp. 3d 824, 831 (N.D. Cal. 2020) ("Section 230(c)(2) does not preclude liability . . . [when] the duty the defendant allegedly violated springs from a contract—an enforceable promise—not from any non-contractual conduct or capacity of the defendant." (citing *Barnes v. Yahoo!, Inc.*, 570 F.3d 1096, 1107 (9th Cir. 2009)); *Prager Univ. v. Google LLC*, 85 Cal. App. 5th 1022, 1036 (2022) (same)). Although the Ninth Circuit has recognized that contractual claims may be barred under section 230(c)(1) when they seek to hold someone liable as a "publisher or speaker" of content, *see Barnes*, 570 F.3d at 1102; *Murphy v. Twitter, Inc.*, 60 Cal. App. 5th 12, 28–29 (2021), Plaintiff has *not* invoked section 230(c)(1) here, and the contractual claim at issue—that Unfollow Everything 2.0 would violate the prohibition on automated access under Meta's Terms—would not be based on holding Plaintiff liable as a "publisher or speaker" of content.

Gibson, Dunn &
Crutcher LLP

**b.**   **Insufficient Allegations That Plaintiff Is An "Interactive Computer Service" Provider**

In any event, section 230(c)(2) protects only providers or users of "an interactive computer service."  But Plaintiff's allegations do not establish that Unfollow Everything 2.0 would constitute an "interactive computer service."  That term is defined as an "information service, system, or access software provider that provides or enables computer access by multiple users to a computer server." 47 U.S.C. § 230(f)(2).  In turn, an "access software provider" is "a provider of software . . . or enabling tools that . . . filter, screen, allow, or disallow content." *Id.* § 230(f)(4).

Plaintiff suggests that he "would qualify as an 'access software provider' because Unfollow Everything 2.0 enables the *filtering* of Facebook content—namely, posts that would otherwise appear in the feed on a user's homepage."  Am. Compl. at p. 31 ¶ 3 (emphasis added).  But the Amended Complaint lacks any factual allegation that Unfollow Everything 2.0 would actually "filter" content. Rather, it appears that the tool would simply "cause the user's browser to send a request to Meta's servers." *Id.* ¶ 73.  Even after using the tool, a user could "still . . . interact with the people and groups they have unfollowed, visit their pages, and see their posts," and it is *users* that can filter their own feeds by "re-follow[ing] select accounts to build" a customized Feed. *Id.* ¶¶ 60–61.  The Amended Complaint does not establish that the tool would have any "filtering" function, making it materially different from the types of programs that courts have found to qualify as an "access software provider," such as software that directly blocks content from being loaded to a computer.[8]

Nor has Plaintiff established that Unfollow Everything 2.0 would "provide[] or enable[] computer access by multiple users to a computer server"—another necessary requirement to qualify as an "interactive computer service."  Although the Amended Complaint refers to certain servers, including "Meta's servers," "Google's" servers, "Mozilla's" servers, and the "Unfollow Everything 2.0 server," *see* Am. Compl. ¶¶ 73, 77; *id.* at 31–32 ¶ 3, it does not indicate how these servers would

---

[8] *See, e.g., Zango, Inc. v. Kaspersky Lab, Inc.*, 569 F.3d 1169, 1171 (9th Cir. 2009) (software that "filter[s] and block[s] malicious software"); *Holomaxx Techs. v. Microsoft Corp.*, 783 F. Supp. 2d 1097, 1101 (N.D. Cal. 2011) (email software that "employs . . . filtering technologies," like spam filters, "that identify and reject harmful communications"); *Enigma Software Grp. USA, LLC v. Malwarebytes, Inc.*, 946 F.3d 1040, 1047 (9th Cir. 2019) (software that directly "stop[s] the download and block[s] the potentially threatening content").

DEFENDANT META PLATFORMS, INC.'S NOTICE OF MOTION AND
MOTION TO DISMISS AMENDED COMPLAINT
CASE NO. 3:24-CV-02596-JSC

Gibson, Dunn &
Crutcher LLP

interact and whether or how Unfollow Everything 2.0 would "provide[] or enable[] computer access by multiple users to a computer server."  For example, Plaintiff alleges that the "tool [would] receive updates either from Google's servers, Mozilla's servers, or the Unfollow Everything 2.0 server." *Id.* ¶ 77.  This says nothing about how the *tool's* receipt of an update would constitute access "by multiple *users* to a server."[9]  To make things more confusing, Plaintiff alleges that "most *browsers* [would] update extensions such as Unfollow Everything 2.0 automatically," *id.*—suggesting that it is the "browsers" (and not Unfollow Everything 2.0 or its users) that would be accessing a server.  Likewise, if Plaintiff is proceeding under the theory that Unfollow Everything 2.0 would enable access to *Meta's* servers, it appears to be the user's browser—and not the user themselves—that would be accessing those servers.  *See* Am. Compl. ¶ 73 ("Unfollow Everything 2.0 will cause the *user's browser* to send a request to Meta's servers . . . ." (emphasis added)).

To the extent the Court is unsure whether and how the operation of Unfollow Everything 2.0 would satisfy the statutory requirements for section 230(c)(2)(B) immunity, that is because the tool does not yet exist.  Until Plaintiff actually develops and launches the tool, it will remain difficult to assess whether what the tool does as a technical matter qualifies for protection under the Communications Decency Act.  The difficulty of making technical determinations about statutory fit in the absence of any real facts only underscores why the Court should decline jurisdiction—but if the Court does address the section 230 claim, it should hold that Plaintiff does not allege facts sufficient to show that it would protect his proposed conduct here.

### c.   <u>No Allegations That Unfollow Everything 2.0 Restricts "Access" To Objectionable Material</u>

Finally, the Amended Complaint does not establish that Unfollow Everything 2.0 would "enable or make available . . . the technical means to restrict *access*" to material.  47 U.S.C. § 230(c)(2)(B) (emphasis added).  As noted above, even after the tool is used, the pages, friends, or groups that have been "unfollowed" can still be "access[ed]" by the user, Am. Compl. ¶ 60, suggesting

---

[9] By contrast, in *Kaspersky*, the Ninth Circuit held that software that "provid[ed] *its customers* with online access *to* its update servers" qualified as an interactive computer service since the software enabled its customers to access the defendant's server.  568 F.3d at 1175.  Here, the Amended Complaint does not allege how Unfollow Everything 2.0 would enable access by multiple users to a server.

the tool would not "restrict access" at all.  At most, the tool might restrict the *availability* of the "unfollowed" content (which would not appear in the user's Feed), but "availability" and "access" are different concepts under the Communications Decency Act.  *Compare* 47 U.S.C. § 230(c)(2)(A) ("restrict access to or availability of"), *with id.* § 230(c)(2)(B) ("restrict access to").  Conduct that restricts "availability" is protected under section 230(c)(2)(A)—and section 230(c)(1)—but Plaintiff has not invoked those protections here.

### 4.        The Amended Complaint Does Not State A Claim For Declaratory Relief Regarding The CFAA And CDAFA

Finally, the Court need not—and should not—reach the merits of whether Plaintiff might violate the CFAA and CDAFA.  As noted above, Plaintiff alleges no facts suggesting a likelihood "that Meta would likely sue him for . . . violations of the CFAA and California's CDAFA if he did not shut down the tool."  Am. Compl. ¶ 92.  His reliance on the cease-and-desist letter that Meta previously sent to the developer of the original "Unfollow Everything 1.0" only underscores the speculative nature of these claims.  That cease-and-desist letter did *not* invoke the CFAA or CDAFA.  *See* Dkts. 1-1, 1-2 (Exs. A–B).  Thus, even accepting for the sake of argument Plaintiff's contention that Meta's prior "threatened enforcement against Unfollow Everything" is relevant as to what Meta might do in the event that Plaintiff actually builds and releases Unfollow Everything 2.0, this alleged history undermines Plaintiff's argument that it is likely or inevitable that Meta would invoke the CFAA and CDAFA against him.

There are other problems with Plaintiff's half-baked allegations about the CFAA and CDAFA.  As for the CFAA, the Amended Complaint cites just one subsection, 18 U.S.C. § 1030(a)(2)(C), which states that it is unlawful to "intentionally access a computer without authorization or exceed authorized access, and thereby obtain information from any computer."  The Amended Complaint does not reference any other provision of the CFAA or explain why they might or might not apply, making Plaintiff's requested declaratory judgment ruling too narrow to be useful.

These pleading deficiencies are even more significant for the CDAFA claim, which consists of just one conclusory paragraph that gives this Court almost nothing to adjudicate.  *See* Am. Compl. at p. 35 ¶ 17.  Plaintiff does not say which of the CDAFA's fourteen enumerated acts he believes should

be adjudicated.  *See* Cal. Penal Code § 502(c)(1)–(14).  Nor are his allegations tied to any element or defense in the statute, which is not even cited in the allegations.  Because the Amended Complaint's barebones reference to CDAFA "lacks a short and plain statement" of the claim, it "does not meet the minimal notice pleading requirements of Rule 8(a)(2)" and should be dismissed on that basis. *McGowan v. Weinstein*, 505 F. Supp. 3d 1000, 1020 n.13 (C.D. Cal. 2020) (dismissing CDAFA claim under Rule 8 for failure to identify specific provision upon which the plaintiff was relying).

## V.    CONCLUSION

Plaintiff's Amended Complaint does not present a justiciable dispute that is ripe for this Court's adjudication, as the claims are based on nothing more than hypothetical facts about a yet-to-be-created tool that Meta has had no opportunity even to evaluate.  Even if the Court believes the allegations do offer something to adjudicate, Plaintiff has not stated a claim for relief under the Declaratory Judgment Act with respect to a breach of Meta's Terms, section 230(c)(2)(B) of the Communications Decency Act, or the CFAA and CDAFA.  Meta respectfully requests that the Court dismiss this action.

Dated: July 15, 2024                          GIBSON, DUNN & CRUTCHER LLP


                                              By: */s/ Kristin A. Linsley*
                                                  Kristin A. Linsley

                                              *Attorneys for Defendant Meta Platforms, Inc.*

Gibson, Dunn & Crutcher LLP

DEFENDANT META PLATFORMS, INC.'S NOTICE OF MOTION AND
MOTION TO DISMISS AMENDED COMPLAINT
CASE NO. 3:24-CV-02596-JSC