# EXHIBIT 4

*"UNFOLLOW EVERYTHING" —*

# Professor sues Meta to allow release of feed-killing tool for Facebook

Section 230 immunity isn't just for Big Tech companies, lawsuit says.

ASHLEY BELANGER - 5/9/2024, 4:00 AM



Enlarge

126

Ethan Zuckerman wants to release a tool that would allow Facebook users to control what appears in their newsfeeds. His privacy-friendly browser extension, Unfollow Everything 2.0, is designed to essentially give users a switch to turn the newsfeed on and off whenever they want, providing a way to eliminate or curate the feed.

The tool is nearly ready to be released, Zuckerman told Ars, but the University of Massachusetts Amherst associate professor is afraid that Facebook owner Meta might threaten legal action if he goes ahead. And his fears appear well-founded. In 2021, Meta sent a cease-and-desist letter to the creator of the original Unfollow Everything, Louis Barclay, leading that developer to shut down his tool after thousands of Facebook users had eagerly downloaded it.

ADVERTISING

Case 3:24-cv-02596-JSC   Document 31-5   Filed 07/15/24   Page 3 of 10

release a tool allowing Facebook users to "unfollow everything." (Photo by Lorrie LeJeune)

Zuckerman is suing Meta, asking a US district court in California to invalidate Meta's past arguments against developers like Barclay and rule that Meta would have no grounds to sue if he released his tool.

Zuckerman insists that he's "suing Facebook to make it better." In picking this unusual legal fight with Meta, the professor—seemingly for the first time ever—is attempting to tip Section 230's shield away from Big Tech and instead protect third-party developers from giant social media platforms.

To do this, Zuckerman is asking the court to consider a novel Section 230 argument relating to an overlooked provision of the law that Zuckerman believes protects the development of third-party tools that allow users to curate their newsfeeds to avoid objectionable content. His complaint cited case law and argued:

*ARS VIDEO*
How Scientists Respond to Science Deniers

> Section 230(c)(2)(B) immunizes from legal liability "a provider of software or enabling tools that filter, screen, allow, or disallow content that the provider or user considers obscene, lewd, lascivious, filthy, excessively violent, harassing, or otherwise objectionable." Through this provision, Congress intended to promote the development of filtering tools that enable users to curate their online experiences and avoid content they would rather not see.

Unfollow Everything 2.0 falls in this "safe harbor," Zuckerman argues, partly because "the purpose of the tool is to allow users who find the newsfeed objectionable, or who find the specific sequencing of posts within their newsfeed objectionable, to effectively turn off the feed."

Ramya Krishnan, a senior staff attorney at the Knight Institute who helped draft Zuckerman's complaint, told Ars that some Facebook users are concerned that the newsfeed "prioritizes inflammatory and sensational speech," and they "may not want to see that kind of content." By turning off the feed, Facebook users could choose to use the platform the way it was originally designed, avoiding being served objectionable content by blanking the newsfeed and manually navigating to only the content they want to see.

"Users don't have to accept Facebook as it's given to them," Krishnan said in a press release provided to Ars. "The same statute that immunizes Meta from liability for the speech of its users gives users the right to decide what they see on the platform."

Zuckerman, who considers himself "old to the Internet," uses Facebook daily and even reconnected with and began dating his now-wife on the platform. He has a "soft spot" in his heart for Facebook and still finds the platform useful to keep in touch with friends and family.

But while he's "never been in the 'burn it all down' camp," he has watched social media evolve to give users less control over their feeds and believes "that the dominance of a small number of social media companies tends to create the illusion that the business model adopted by them is inevitable," his complaint said.

As an alternative, Zuckerman considers third-party tools like Unfollow Everything 2.0 that "operate at the explicit direction of social media users" as "a particularly promising avenue for improving online experiences." Not only would these tools, also known as middleware, provide users with more options, but they could also reduce the burden on large platforms like Facebook that cannot possibly "do all the things society is asking them to do," Zuckerman told Ars.

So far, Meta has not responded to Ars' request to comment, but the Facebook owner has 21 days to respond to Zuckerman's complaint.

Because Zuckerman's complaint is so unusual, there's no telling how the court will react to his filing. Legal experts told Techdirt that some of the most interesting questions raised by his case may not even be considered if the court rejects the case as an untested legal theory unworthy of the court's time or as having no standing because Meta has not sued Zuckerman.

Santa Clara University Internet law professor Eric Goldman told Ars that "most likely, a court will say that Zuckerman's fears of possible

future legal liability are currently insufficient for him to initiate a legal battle."

Krishnan, the attorney who helped draft Zuckerman's complaint, disagreed, telling Ars that "an individual doesn't have to 'bet the farm' and risk litigation before they can seek a judicial declaration of their rights. It's enough that a person have a real and reasonable fear that they will be subject to legal action. Zuckerman easily satisfies that test because Meta has threatened legal action against similar tools in the past, including, of course, the nearly identical Unfollow Everything."

Barclay, the creator of the original Unfollow Everything, in a Substack post, said Meta pursued him for "nearly a year" after sending the cease-and-desist letter. So although he only expects that Zuckerman's "suit might cause a mild frown" from Facebook exec Nick Clegg "for approximately 1.3 seconds," Barclay said he is "over the moon" and "insanely grateful" that Zuckerman is "taking on this huge burden" to stop Big Tech companies from bullying developers "building great software."

"I'm one of probably hundreds of people who have received cease-and-desists from Big Tech for building something in the public interest," Barclay wrote. "But I'm one of the vanishingly rare cases where the substance of the cease-and-desist might end up being challenged in court."

Barclay told Ars that "sadly, Zuckerman's US suit won't change anything legally for me in the UK—but if he wins, I hope US developers will pick up the baton and make a ton more software to give users more power over big tech, with the space that would open up."

## Sparking a movement around middleware

Zuckerman and Barclay aren't the only developers who have feared legal action over tools intended to research and change the online experience of platform users.

His complaint points to a web browser called Friendly that "allowed users to search their Facebook newsfeeds by keyword, reorder their feeds chronologically, and customize the display of their Facebook pages." There was also a browser extension called "Ad Observer" that collected information on Facebook ads served to users.

Meta threatened those developers with legal action, alleging violations of its terms of service and laws like the Computer Fraud and Abuse Act (CFAA) and California's Computer Data Access and Fraud Act (CDAFA).

Zuckerman hopes the court will agree that Unfollow Everything 2.0 wouldn't be guilty of any of these violations, mostly because the

tool would only give users more control over functionality that Facebook itself provides, and it doesn't require any improper access to Meta's servers or sensitive user data. It was also designed to steadily unfollow in intervals so it wouldn't overburden Facebook's servers by requesting a ton of unfollows at once.

But Barclay noted on Substack that his efforts in 2021 failed to convince Facebook that his motivations for developing Unfollow Everything were purely to help people increasingly concerned about their overuse of social media. "They could not have cared less," Barclay wrote, and they "banned me without warning."

Barclay confirmed he has no regrets that he responded to what he said was Facebook's "bullying" by retreating into his "shell like a tortoise" instead of filing his own lawsuit. Zuckerman told Ars that as a tenured professor, he is "highly privileged" to raise his lawsuit, but Barclay said he simply couldn't afford the risk of paying the costs of Facebook's lawyers if he lost.

"I'd have to first find a billionaire to foot the bill and convince them to put aside essentially unlimited funds because I wouldn't even know how much Facebook's lawyers would cost until later in the proceedings (which is why crowdfunding wouldn't work—once you know how much you have to raise, your risk is too high if you fail)," Barclay wrote.

Barclay criticized Facebook for "using their trillion-dollar might to bully a solo developer." There's no way to know how popular the original Unfollow Everything might have been, but Zuckerman told Ars that if Unfollow Everything was "wildly successful," he estimates Meta could lose perhaps tens of thousands of dollars if about a thousand users suddenly stopped engaging with the

newsfeed (in 2023, Statista estimated that Meta earned approximately $40 in revenue per user).

Meta may have other concerns about middleware like Unfollow Everything 2.0, Zuckerman noted. On top of losing engagement, Facebook might be viewed as less "delightful" without a newsfeed, perhaps harming the brand. Meta might also be suing developers out of an abundance of caution to stop bad actors from exporting Facebook data in a damaging way, Zuckerman told Ars.

But those genuine concerns don't mean Meta should be able to "invoke Cambridge Analytica" causing "lots of unauthorized data collection" as an "excuse" to come for "apps that clearly are not behaving badly," Zuckerman said.

If Zuckerman wins his lawsuit, he's hoping to finally give third-party tool developers the necessary legal clarity that could spark a "movement around middleware" and lead to a future where users can customize the interfaces of various social platforms. His complaint noted that "one can easily imagine tools that would empower users to curate their existing feeds according to alternative ranking, labeling, and content-moderation rules, for example, or tools that would allow users to access all of their social media feeds in one place." Barclay told Ars that tools testing social media interventions that he once proposed to effectively reduce online harms could "flourish."

Krishnan told Ars that "it's hard to know how big that universe is" of potential tools for social media users, "in part because of the chilling effect of the cease-and-desist letters and other threats of legal action that Meta and the other companies have sent the developers that have tried to create these tools."

Goldman told Ars that Zuckerman's case might have been more readily entertained by the court if it were a little less ambitious.

"If the only question in the lawsuit was whether it was legal to release a tool that helped Facebook users automatically unfollow other users, the case would not raise as many thorny policy questions," Goldman said. The case also seems to neglect to answer a key question of whether "Facebook could still block the tool or prevent users from using the tool, even if Zuckerman got a complete win in court."

"In other words, if the case resolves Zuckerman's legal questions but Facebook can still exercise 'self-help' to protect its interests, what exactly would the case accomplish?" Goldman asked.

Barclay said that even if the court rejects Zuckerman's case, "the fact that it's been launched will give Meta (and others) pause for thought every time they send out a spurious cease-and-desist, especially against developers building in the public interest."

7/2/24, 3:34 PM
Professor sues Meta to allow release of feed-killing tool for Facebook | Ars Technica
Case 3:24-cv-02596-JSC   Document 31-5   Filed 07/15/24   Page 9 of 10

Zuckerman told Ars that if the court rules he has no legal standing, he could "go ahead and develop the tool." Then, if Facebook deletes his accounts or threatens legal action, his legal team "could go back to a court and say, 'OK, you told us to wait for a complaint. Now we got a complaint.'"

## A big fan of Section 230

The Knight Institute described Zuckerman as "a media scholar, software developer, and policy advocate who has dedicated his career to studying the civic and social roles of Internet platforms." For the past few years, Unfollow Everything 2.0 has been Zuckerman's "side quest" while he taught and pursued other research. But if the tool is allowed to go forward, Zuckerman plans to launch it in six weeks, with an accompanying study where users of the tool could opt into shedding more light on user behavior online.

Users opting into the study, which Zuckerman warned would be "intrusive," would agree to allow the tool to randomly put them in groups where their newsfeeds will either be turned off or on, changing how they interact with the platform and measuring how using the tool impacts their behavior.

Zuckerman hopes to test four hypotheses with this research: investigating whether Unfollow Everything 2.0 users spend less time on Facebook, feel more control, remain satisfied with Facebook, and are ultimately exposed to less content from friends.

Before Zuckerman became a scholar, he started his career running research and development for a company called Tripod.com, which hosted a lot of user-generated content (UGC). This was in the days

before Section 230 shielded websites from liability for UGC, and Zuckerman was actually tasked with inventing the first pop-up ad online to address advertiser complaints about ads appearing next to undesirable UGC.

"Mine was not nearly as evil as many of the ones that we see these days," Zuckerman told Ars in defense of his pop-up ad design that started them all.

Partly due to his history of asking questions that Section 230 now answers, Zuckerman has always been a "huge fan" of Section 230. He recalled to Ars how he closely read the law and later taught his students that under Section 230—because lawmakers wanted to make room for tools like firewalls and adult content filters—"it's not just platforms that are going to control what's on the Internet, there's lots and lots of room for users to choose tools to shape their Internet experience."

Zuckerman told Ars that even though online users expect their browser to block pop-ups or their email to filter out spam by default, people have "gotten out of the habit" of demanding similar controls on social media.

"We've ceded enormous amounts of control to platform companies," Zuckerman warned, while his complaint noted that "there is increasing public concern that" Facebook's current "business model is having deleterious consequences for public discourse and society."

Third-party tools could put control back in users' hands, Zuckerman's complaint said, but platforms "continue to frustrate their creation."

With a declaratory judgment from the court that Section 230 shields developers of such tools, though, "we think this may open up a channel for developing a category of software" that "users can install to have greater control over their social media experience," Zuckerman said.

READER COMMENTS    126

**ASHLEY BELANGER**

Ashley is a senior policy reporter for Ars Technica, dedicated to tracking social impacts of emerging policies and new technologies. She is a Chicago-based journalist with 20 years of experience.