# EXHIBIT 5

# Columbia Journalism Review.

THE MEDIA TODAY

# A professor is suing Facebook over its recommendation algorithms

MAY 16, 2024

By **MATHEW INGRAM**



Photo by Avishek Das / SOPA Images/Sipa USA) (Sipa via AP Images)







Facebook users are probably aware that what they see in their news feeds is determined by the company's recommendation algorithms. (Well, most users.) Many are accustomed to this fact, but some believe that there are alternatives to this kind of centralized control. Ethan Zuckerman is among them—and that's why he and the Knight First Amendment Institute at Columbia recently filed a lawsuit against Meta, Facebook's parent company, asking a court to empower users to employ third-party tools to filter their news feeds. The suit relies on a novel interpretation of Section 230 of the Communications Decency Act, which was initially designed to protect digital platforms from legal liability for content posted by users.

Zuckerman is not just any Facebook user. He is an associate professor of public policy at the University of Massachusetts Amherst and the director of the school's Initiative for Digital Public Infrastructure; previously, he led the Center for Civic Media at the Massachusetts Institute of Technology and was a fellow at the Berkman Klein Center for Internet and Society at Harvard. In a *New York Times* op-ed published last week, Zuckerman wrote that the Facebook algorithm "forgets friends I want to hear from, becomes obsessed with people to whom I'm only loosely connected, and generally feels like an obstacle to how I'd like to connect with my friends." But his lawsuit is about more than that, he says. If it succeeds, he argues, "we can decide how social media works for us and for our children through

tools we can control," instead of being at the mercy of The Algorithm.

Zuckerman told me this week that he got the idea for the lawsuit after Louis Barclay, a British software developer, came up with a browser extension called Unfollow Everything, which allowed users to undo some of the workings of Facebook's algorithm. Meta blocked the extension, describing it as a breach of its terms of service, and banned Barclay from the platform permanently. The more he looked into the decision, the more Zuckerman felt that it was wrong —not only ethically, but legally. Barclay "produced something genuinely helpful," Zuckerman said, "and I felt there should be a legal argument about whether he could do that or not."

Zuckerman's "aha moment" came while he was teaching a class about Section 230, in which he asked his students to go through the text of the law line by line. One section in particular jumped out at him, in which the law states that electronic platforms will not be held liable for "any action taken to enable or make available to information content providers or others the technical means to restrict access to" certain kinds of material. For Zuckerman—and some of the legal experts he later consulted at the Knight First Amendment Institute—this language opened the door to protect third-party software (sometimes called "middleware") that would allow users to control their Facebook feeds based on their own criteria.

Section 230 goes on to state that one of its goals is to "encourage the development of technologies which maximize user control over what information is received" by individuals using the internet.

Zuckerman argues in his *Times* op-ed that by including these clauses, Congress clearly intended to promote the development of tools that would enable users to curate their online experiences. If software such as Unfollow Everything is allowed, Zuckerman wrote, "we could have better control over what we see on social media," which in turn might help create "a more civic-minded internet." Giving users more control, he added, is a way to establish "more of an equilibrium in an online world that is increasingly out of kilter." (Zuckerman wrote for CJR about building a more honest internet back in 2019.)

Zuckerman told me that he has designed a program similar to Unfollow Everything that allows users to control their Facebook feeds and to opt in to a research program designed by Zuckerman that will use their browsing data to study how their behavior changes when Facebook's algorithms are removed. In addition to banning third-party software like the extension designed by Barclay, Meta has, in the past, taken similar action against researchers who have tried to use software to study what happens on Facebook: in 2021, the company not only blocked a program that Laura Edelson, a professor at New York University, and colleagues were using to study behavior on the platform, but also suspended the personal Facebook accounts of some of the researchers, as I wrote for CJR at the time.

## Sign up for **CJR**'s daily email

Email address                                   SUBSCRIBE

Zuckerman's lawsuit is essentially a gambit to preempt this type of antagonistic response. He and the Knight First Amendment Institute are asking the court to rule that software like Zuckerman's version of Unfollow Everything is legal so that Meta can't block it, ban Zuckerman from the platform personally, or use a law such as the federal Computer Fraud and Abuse Act to sue him for offering software that breaches their terms of service.

He concedes that it is impossible to know whether the suit will succeed. "I just don't know," he told me. "I'm pretty sure we're right on matters of law, but obviously it could go differently once we get to court." When he first proposed the idea, Zuckerman said, a lot of people thought he was unlikely to succeed—but some observers have since come around to his way of thinking. "This is not a stunt," he said. "We're planning on winning this." If a judge denies Zuckerman a preemptive ruling protecting him from Meta's wrath, he says, he said he's willing to consider releasing the software anyway and then take his chances. (Meta has yet to comment on Zuckerman's suit.)

Zuckerman isn't alone in his impression of legal viability. Mike Masnick, of *Techdirt*, wrote that the case seemed to take much of the legal community by surprise but that several of his legal sources have come to believe that it makes some sense, after initially dismissing it as a "crazy legal theory." Others echoed Zuckerman's inability to predict what might happen in court. Jeff Kosseff, a professor at the Naval Academy and author of a book on Section 230, told the *Washington Post* that Zuckerman's case relies on an interpretation of the law that has yet to be tested, and said that he isn't aware of anyone having

used clauses in the law to win a preemptive declaration from a court before a case is even launched. Kosseff said he couldn't even hazard a guess as to how this case might end.

Sophia Cope, a staff attorney at the Electronic Frontier Foundation, a digital rights group, told *Wired* that most of Section 230 has been clarified in the courts, but that not many cases have dealt with the part of the law on which Zuckerman's lawsuit is based. Meta has argued that third-party software such as Unfollow Everything raises security and privacy concerns. But Daphne Keller, director of the Program on Platform Regulation at Stanford's Cyber Policy Center, told *Wired* that Zuckerman's tool is unlikely to run into this problem because it simply unfollows Facebook users, an act that shouldn't pose any privacy or security issues.

According to Masnick, Zuckerman's case embodies a principle that some have called "adversarial interoperability," or the idea that new online services should be allowed to interoperate with existing ones —even if the companies that run the latter haven't explicitly allowed them to do so—provided that they

serve the needs of users. If the court buys Zuckerman's interpretation of Section 230, Masnick argues, then it could "make the open Web a lot more open, while chipping away at the centralized control of the biggest tech companies." And a win might even make up for the fact that Zuckerman was responsible for a scourge of the early internet: the pop-up ad.

**Other notable stories:**

- Yesterday, Robert Fico, the prime minister of Slovakia, was shot and rushed to the hospital; officials said overnight that his condition is stable, but according to the *New York Times*, a Slovakian TV station has reported that his life remains in the balance and that hospital staffers' phones have been confiscated to curb leaks about his condition. As we've reported before, Fico, a press-bashing populist, was ousted from power following the 2018 assassination of the investigative journalist Ján Kuciak, but he returned as prime minister last year and has since sought to neuter the public broadcaster; a video that circulated of the alleged gunman yesterday suggested that he opposed Fico's media overhaul and other policies. Political allies of Fico's have in part blamed the liberal media for the shooting, with one warning that "there will be some changes to the media."

- Also yesterday, President Biden announced that he would not participate in the typical fall debate schedule organized by the Commission on Presidential Debates, but would be open to debates on individual networks. Surprisingly, within a few hours, Biden and Donald Trump had agreed to two debates—one on CNN in June; the other on ABC in

September—after those networks scrambled to set terms and box out competitors. (ABC will allow some competitors to simulcast its debate.) Trump and the Republican Party long ago soured on the commission that typically organizes the debates, and *Politico* reports that Biden and his allies have soured on it, too, pointing, among other areas of contention, to Trump being allowed to debate without testing for COVID in 2020.

- Jim Rutenberg and Michael M. Grynbaum, of the *Times*, report on tensions between MSNBC, the unapologetically liberal cable channel, and NBC News, which sits under the same corporate parent but strives to present itself as a straight news outfit. "NBC's traditional political journalists have cycled between rancor and resignation that the cable network's partisanship…will color perceptions of their straight news reporting," Rutenberg and Grynbaum report. "Local NBC stations between the coasts have demanded, again and again, that executives in New York do more to preserve NBC's nonpartisan brand, lest MSNBC's blue-state bent alienate their red-state viewers."

- *Slate* is out with "Sly as Fox," a series of articles about "the perils of underestimating Fox News in 2024." In one essay, Justin Peters pushes back on the "myth" that the network's power has waned at the hands of media-industry forces and Trump's takeover of the Republican Party and traditional conservatism. "Sure, Fox couldn't persuade right-wing voters to abandon Trump and vote for Ron DeSantis," Peters argues. But "Fox News has rarely been an instrument of direct electoral action. Its greatest power is flexed differently, and it is still

7/2/24, 4:23 PM
A professor is suing Facebook over its recommendation algorithms - Columbia Journalism Review
Case 3:24-cv-02596-JSC   Document 31-6   Filed 07/15/24   Page 10 of 11

capable of deploying that power toward malignant ends."

- And a court in Guatemala ordered that José Rubén Zamora, a veteran muckraking journalist and founder of the newspaper *elPeriódico*, be released from prison while he awaits a retrial on money-laundering charges against him that were overturned last year. Supporters of Zamora, who has been behind bars for nearly two years since his initial arrest, have suggested that the charges were brought in retribution for his critical coverage of former president Alejandro Giammattei. (We covered the case in January.)

---

Mathew Ingram is CJR's chief digital writer. Previously, he was a senior writer with *Fortune* magazine. He has written about the intersection between media and technology since the earliest days of the commercial internet. His writing has been published in the *Washington Post* and the *Financial Times* as well as by Reuters and Bloomberg.

The voice of journalism, since 1961

**About**

Mission

Masthead

Privacy Policy

Contact

## Support CJR

Become a Member

Donate

## Advertise

Contact Us

*Copyright 2024,
Columbia Journalism Review*