MAX SCHOENING #324643
Qureshi Law PC
700 Flower Street, Suite 1000
Los Angeles, CA 90017
T: (213) 600-6096
F: (213) 277-8989
max@qureshi.law

*Counsel for Plaintiff*

RAMYA KRISHNAN, *Pro Hac Vice*
ALEX ABDO, *Pro Hac Vice*
JENNIFER JONES, *Pro Hac Vice*
Knight First Amendment Institute
 at Columbia University
475 Riverside Drive, Suite 302
New York, NY 10115
T: (646) 745-8500
F: (646) 661-3361
ramya.krishnan@knightcolumbia.org

*Counsel for Plaintiff*

## UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF CALIFORNIA
### SAN FRANCISCO DIVISION

| | |
|---|---|
| ETHAN ZUCKERMAN,<br><br>Plaintiff,<br><br>v.<br><br>META PLATFORMS, INC.,<br><br>Defendant. | Case No. 3:24-cv-02596-JSC<br><br>**PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS AMENDED COMPLAINT**<br><br>Hearing Date: October 10, 2024<br>Time: 10:00 am<br>Ctrm: 8, 19th Floor<br>Judge: Hon. Jacqueline Scott Corley |

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# Table of Contents

Table of Authorities ............................................................................................................. iii

INTRODUCTION ...................................................................................................................1

STATEMENT OF FACTS ........................................................................................................2

ARGUMENT .............................................................................................................................3

I.   This case is ripe, and the Court should hear it. .............................................................3

    A.   This case presents an "actual controversy" because Prof. Zuckerman has a real and reasonable apprehension that Meta will take legal action against him if he releases Unfollow Everything 2.0. ....................................... 3

    B.   Meta's arguments to the contrary would require Prof. Zuckerman to "bet the farm," the very result against which the Declaratory Judgment Act is meant to protect. ...................................................................................... 6

    C.   The Court should exercise its jurisdiction to hear Prof. Zuckerman's claims. ............................................................................................................ 11

II.   Section 230(c)(2)(B) of the Communications Decency Act immunizes Prof. Zuckerman from civil liability in relation to Unfollow Everything 2.0. ....................12

    A.   As the developer of Unfollow Everything 2.0, Zuckerman qualifies as a "provider" of an "interactive computer service."........................................ 13

    B.   Unfollow Everything 2.0 gives users the "technical means" to restrict "access" to content that users (and Zuckerman) find "objectionable." .......... 16

    C.   Section 230(c)(2)(B)'s protection extends to the anticipated breach-of-contract claims. ....................................................................................... 16

III.   Prof. Zuckerman would not violate Meta's Terms of Service by releasing Unfollow Everything 2.0. ............................................................................................18

    A.   Meta's Terms apply only to a person's "use of Facebook," but Zuckerman will not use Facebook to operate Unfollow Everything 2.0—users of the tool will.................................................................................. 18

    B.   In any event, releasing the tool would not involve accessing or collecting data from Facebook, or facilitating the unauthorized collection of such data by other users. ......................................................... 20

IV.   To the extent Meta's Terms of Service prohibit the release of Unfollow Everything 2.0, they are void for public policy. .........................................................22

V.     Prof. Zuckerman has stated a claim that Unfollow Everything 2.0 would not violate the Computer Fraud and Abuse Act or the Computer Data Access and Fraud Act. ............................................................................................................24

Conclusion ..........................................................................................................................25

1

**Table of Authorities**

2

**Cases**

3

*3taps, Inc., v. LinkedIn Corp.*, 2022 WL 16953623 (N.D. Cal. Nov. 15, 2022) ................. 5, 7, 10

*A. Kemp Fisheries, Inc. v. Castle & Cooke, Inc., Bumble Bee Seafoods Div.*, 852
F.2d 493 (9th Cir. 1988) ................................................................................................. 21

*Am. Cas. Co. of Reading, Pa. v. Krieger*, 181 F.3d 1113 (9th Cir. 1999) ..................................... 12

*Amazon.com, Inc. v. Nat'l Ass'n of Coll. Stores, Inc.*, 826 F. Supp. 2d 1242 (W.D.
Wash. 2011) ................................................................................................................... 25

*Ashcroft v. ACLU*, 542 U.S. 656 (2004) ............................................................................ 22

*ASP Props. Grp., L.P. v. Fard, Inc.*, 133 Cal. App. 4th 1257 (2005) ........................................... 19

*Bank of Am., N.A. v. County of Maui*, 2020 WL 7700098 (D. Haw. Dec. 28, 2020) .................. 11

*Barnes v. Yahoo!, Inc.*, 570 F.3d 1096 (9th Cir. 2009) ................................................................. 17

*Batzel v. Smith*, 333 F. 3d 1018 (9th Cir. 2003) ........................................................................ 17

*Berenson v. Twitter*, 2022 WL 1289049 (N.D. Cal. Apr. 29, 2022) ............................................ 18

*Bova v. City of Medford*, 564 F.3d 1093 (9th Cir. 2009) .............................................................. 7

*Bovard v. Am. Horse Enters., Inc.*, 247 Cal. Rptr. 340 (Cal. Ct. App. 1988) ............................ 22

*Calise v. Meta Platforms, Inc.*, 103 F.4th 732 (9th Cir. 2024) ....................................... 16, 17, 18

*Caraccioli v. Facebook, Inc.*, 167 F. Supp. 3d 1056 (N.D. Cal. 2016), *aff'd*, 700 F.
App'x 588 (9th Cir. 2017) .............................................................................................. 16

*Cat Tech LLC v. TubeMaster, Inc.*, 528 F.3d 871 (Fed. Cir. 2008)............................................ 6, 9

*Chesebrough–Pond's, Inc. v. Faberge, Inc.*, 666 F.2d 393 (9th Cir. 1982) .............................. 6, 9

*Cisco Sys., Inc. v. Beccela's Etc., LLC*, 403 F. Supp. 3d 813 (N.D. Cal. 2019)......................... 25

*City of Aurora, Colo. ex rel. Aurora Water v. PS Sys., Inc.*, 2008 WL 4377505 (D.
Colo. Sept. 19, 2008) ....................................................................................................... 9

*Davies v. Grossmont Union High Sch. Dist.*, 930 F.2d 1390 (9th Cir. 1991)............................. 23

*Diamonds.net LLC v. Idex Online, Ltd.*, 590 F. Supp. 2d 593 (S.D.N.Y. 2008) ........................ 9

*E. & J. Gallo Winery v. Proximo Spirits, Inc.*, 583 F. App'x 632 (9th Cir. 2014) ...................... 9

*eBioScience Corp. v. Invitrogen Corp.*, 2009 WL 10671320 (S.D. Cal. Apr. 20,
2009) ............................................................................................................................... 9

*Enhanced Athlete Inc. v. Google LLC*, 479 F. Supp. 3d 824 (N.D. Cal. 2020) .......................... 17

*Enigma Software Grp. USA, LLC v. Malwarebytes, Inc.*, 946 F.3d 1040 (9th Cir. 2019) ................................................................................................................ 13

*Epic Games, Inc. v. Apple Inc.*, 559 F. Supp. 3d 898 (N.D. Cal. 2021), *aff'd in part, rev'd in part and remanded*, 67 F.4th 946 (9th Cir. 2023) ........................... 23

*Facebook Inc. v. BrandTotal Ltd.*, 499 F. Supp. 3d 720 (N.D. Cal. 2020) .................................. 24

*Facebook, Inc. v. Power Ventures, Inc.*, 844 F.3d 1058 (9th Cir. 2016) ................................. 5, 21

*FN Cellars, LLC v. Union Wine Co.*, 2015 WL 5138173 (N.D. Cal. Sept. 1, 2015).... 6, 10, 11, 24

*Gelmart Indus., Inc. v. Eveready Battery Co.*, 120 F. Supp. 4d 327 (S.D.N.Y. 2014) ................................................................................................................ 7

*Gov't Emps. Ins. Co. v. Dizol*, 133 F.3d 1220 (9th Cir. 1998) ................................................... 11

*Hicks v. PGA Tour, Inc.*, 897 F.3d 1109 (9th Cir. 2018) ............................................................ 21

*Hunt Wesson Foods, Inc. v. Supreme Oil Co.*, 817 F.2d 75 (9th Cir. 1987)................................. 18

*In re Zoom Video Commc'ns Inc. Priv. Litig.*, 525 F. Supp. 3d 1017 (N.D. Cal. 2021) ................................................................................................................ 15

*Interdynamics, Inc. v. Firma Wolf*, 698 F.2d 157 (3d Cir. 1982) ................................................. 6

*LifeScan Scotland, Ltd. v. Shasta Techs., LLC*, 2012 WL 2979028 (N.D. Cal. July 19, 2012) ................................................................................................................ 8

*McGowan v. Weinstein*, 505 F. Supp. 3d 1000 (C.D. Cal. 2020) ............................................... 25

*McKeever v. Block*, 932 F.2d 795 (9th Cir.1991) ...................................................................... 25

*MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118 (2007)................................................ 3, 4, 6, 10

*Meta Platforms, Inc. v. BrandTotal Ltd.*, 605 F. Supp. 3d 1218 (N.D. Cal. 2022) ............ 5, 19, 25

*Meta Platforms, Inc. v. Bright Data Ltd.*, 2024 WL 251406 (N.D. Cal. Jan. 23, 2024) ................................................................................................................ 5, 19, 21

*Meta Platforms, Inc. v. Voyager Labs Ltd.*, 2024 WL 2412419 (N.D. Cal. May 23, 2024) ................................................................................................................ 5

*Multiven, Inc. v. Cisco Sys., Inc.*, 725 F. Supp. 2d 887 (N.D. Cal. 2010) ................................. 25

*Namisnak v. Uber Techs., Inc.*, 971 F.3d 1088 (9th Cir. 2020) ................................................... 8

*Nat'l Abortion Fed'n v. Ctr. for Med. Progress*, 2016 WL 454082 (N.D. Cal. Feb. 5, 2016), *aff'd sub nom. Nat'l Abortion Fed'n, NAF v. Ctr. For Med. Progress*, 685 F. App'x 623 (9th Cir. 2017)........................................................... 23

*Nat'l Basketball Ass'n v. SDC Basketball Club, Inc.*, 815 F.2d 562 (9th Cir. 1987) .................... 4

*Neilmed Prod., Inc. v. Med-Sys., Inc.*, 472 F. Supp. 2d 1178 (N.D. Cal. 2007) ........................... 24

*Nelson v. PFS Corp.*, 2021 WL 3468145 (C.D. Cal May 10, 2021) ............................................. 7

*Paramount Pictures Corp. v. Axanar Prods., Inc.*, 2016 WL 2967959 (C.D. Cal. May 9, 2016) ................................................................................................................................. 7

*Pfizer Inc. v. McNeil-PPC, Inc.*, 2015 WL 13227648 (S.D.N.Y. Dec. 11, 2015) ....................... 8

*Prager Univ. v. Google LLC*, 85 Cal. App. 5th 1022 (2022) ....................................................... 17

*Principal Life Ins. Co. v. Robinson*, 394 F.3d 665 (9th Cir. 2005) ............................................. 3

*Rengo Co. v. Molins Mach. Co.*, 657 F.2d 535 (3d Cir. 1981) .................................................... 7

*Reno v. ACLU*, 521 U.S. 844 (1997) .......................................................................................... 22

*Republican Nat'l Comm. v. Google, Inc.*, 2023 WL 5487311 (E.D. Cal. Aug. 24, 2023) ..................................................................................................................................... 14

*Sandvig v. Sessions*, 315 F. Supp. 3d 1 (D.D.C. 2018) ................................................................ 23

*Smith v. Trusted Universal Standards in Elec. Transactions, Inc.*, 2011 WL 900096 (D.N.J. Mar. 15, 2011) ................................................................................................. 14

*Societe de Conditionnement en Aluminium v. Hunter Eng'g Co.*, 655 F.2d 938 (9th Cir. 1981) ......................................................................................................................... 4, 6, 9

*Stanley v. Georgia*, 394 U.S. 557 (1969) ..................................................................................... 22

*Stratton Oakmont v. Prodigy Services Co.*, 1995 WL 323710 (N.Y. Sup. Ct., May 24, 1995) ..................................................................................................................................... 12

*t'Bear v. Forman*, 2020 WL 703888 (N.D. Cal. Feb. 12, 2020) ................................................. 11

*United States v. Schlenker*, 24 F.4th 1301 (9th Cir. 2022) .......................................................... 4

*X Corp. v. Ctr. for Countering Digital Hate, Inc.*, 2024 WL 1246318 (N.D. Cal. Mar. 25, 2024) ................................................................................................................................ 23

*Xerox Corp. v. Apple Computer Inc.*, 734 F. Supp. 1542 (N.D. Cal. 1990) .............................. 10

*Zango, Inc. v. Kaspersky Lab*, 568 F.3d 1169 (9th Cir. 2009) ....................................... 13, 15, 16

**Statutes**

18 U.S.C. § 1030 ........................................................................................................................... 25

Cal. Civ. Code § 1667 .................................................................................................................. 23

Cal. Civ. Code § 1798 ........................................................................................... 22

Cal. Civ. Code § 2295 ........................................................................................... 20

Cal. Civ. Code. § 1638 .......................................................................................... 19

Cal. Code Regs. tit. 11, § 7004 ............................................................................. 22

Cal. Computer Data Access and Fraud Act, Cal. Penal Code § 502 ..................... 25

Cal. Privacy Rights Act § 3 .................................................................................. 22

Communications Decency Act, 47 U.S.C. § 230 ........................................... passim

**Other Authorities**

141 Cong. Rec. H8470 (daily ed. Aug. 4, 1995) (statement of Rep. Cox) ................. 13

141 Cong. Rec. H8470 (daily ed. Aug. 4, 1995) (statement of Rep. Wyden) ............ 13

Douglas E. Comer, *The World Wide Web: Browsers and Basics* in *The Internet Book: Everything You Need to Know About Computer Networking and How the Internet Works*, ch. 20 (5th ed. 2018) ................................................. 15

Erin Egan, *It's Time To Make Our Privacy Materials Easier To Find*, Meta Newsroom (Mar. 28, 2018), https://perma.cc/H5WN-88JG .............................. 21

Meta's Cross Mot. for Partial Summary Judgment, *Meta Platforms, Inc. v. Bright Data Ltd.*, 2024 WL 251406 (N.D. Cal. 2024) ......................................... 19

Pl.'s Opp'n to Appl. for TRO, *Facebook, Inc. v. BrandTotal Ltd.*, 2020 WL 8551872 (N.D. Cal. 2020) ............................................................................. 21

*Restrict*, *Webster's Third New International Dictionary* (Philip Babcock Gove ed., 1993) ............................................................................................. 16

*Use*, *Black's Law Dictionary* (11th ed. 2019) ................................................... 19

*Use*, *The Merriam Webster Dictionary* (1st ed. 2022) ....................................... 19

**INTRODUCTION**

Plaintiff Prof. Ethan Zuckerman seeks to release a browser extension that gives Facebook users more control over their Facebook experience. The tool, called Unfollow Everything 2.0, allows users to automatically unfollow their friends, groups, and pages, and, in doing so, effectively turn off the newsfeed—the endless scroll of posts that users see when they log into Facebook. Zuckerman has not released the tool, because when another developer released a functionally identical tool called Unfollow Everything, Defendant Meta threatened that developer with legal action. Zuckerman files this suit to obtain a judicial declaration that Unfollow Everything 2.0, as described in his Amended Complaint, is immunized from legal liability by Section 230 of the Communications Decency Act ("CDA"). In the alternative, he seeks a declaration that the tool does not violate Meta's Terms of Service, the Computer Fraud and Abuse Act ("CFAA"), or California's Computer Data Access and Fraud Act ("CDAFA").[1]

Contrary to Meta's contention, this case is ripe, and the Court should hear it. The case is ripe because Prof. Zuckerman has a real and reasonable apprehension that Meta will take legal action against him if he releases Unfollow Everything 2.0. Meta has made clear that it believes that the tool is unlawful; it said as much in threatening a developer who made a functionally identical tool, and it has repeated its arguments in this very lawsuit. Meta has a history of pursuing legal action against tools it believes to be unlawful. And it has not disclaimed an intent to sue Prof. Zuckerman if he releases his tool. These circumstances establish a reasonable fear of suit. This Court should hear the case because a declaration would clarify the legal relations at issue, and because there are no factors counseling in favor of abstention.

Meta also errs in contending that Prof. Zuckerman has failed to state a claim for declaratory relief against potential legal liability for releasing the tool. Zuckerman falls squarely within the safe harbor established by Section 230(c)(2)(B) of the CDA because he is the "provider" of an

---

[1] Prof. Zuckerman seeks relief only as to the tool, not the associated research study. *See* Am. Compl. at 35. Unlike the tool, the study does not involve automating any action on Facebook, and so does not independently risk legal liability. *See id.* ¶ 81 (noting that study data is collected only "from the [study participant]'s browser—not Meta's servers.").

1  "interactive computer service" (namely, Unfollow Everything 2.0), and the tool enables its users

2  to restrict access to material that they (and Zuckerman) deem "objectionable." Also, he would not

3  violate Meta's Terms by releasing the tool—first, because the Terms apply only to conduct on

4  Facebook, not to conduct that takes place off of it, second, because doing so would not involve

5  accessing or collecting data from Facebook, or facilitating the unauthorized collection of data by

6  other users, and, third, because enforcing the Terms against the tool would violate public policy.

7  Finally, Zuckerman would not violate the CFAA or CDAFA by releasing the tool because doing

8  so would not involve accessing Meta's computers without authorization.

9        The Court should deny Meta's Motion to Dismiss, ECF No. 30 ("MTD").

10                              **STATEMENT OF FACTS**

11        Unfollow Everything 2.0 is a browser extension that would increase users' control over

12  their Facebook experience by allowing them to effectively turn off their newsfeed. ECF No. 29

13  ("Am. Compl.") ¶¶ 1, 43. The tool will work by automating Facebook's unfollow function. *Id.*

14  ¶ 73. When a user logs into Facebook on their web browser and activates the extension, the tool

15  will cause the browser to retrieve the user's list of friends, groups and pages, and record whether

16  those friends, groups, and pages are followed or unfollowed. *Id.* The tool will then iterate through

17  the "followed" list, causing the browser to send a request to Meta's servers to unfollow each friend,

18  group, and page on the list. *Id.* At the end of this process, the tool will confirm that it has

19  successfully done so by communicating a "yes" or "no" to the Unfollow Everything 2.0 server. *Id.*

20        Unfollow Everything 2.0 is designed to prioritize user control and privacy. Users who

21  unfollow everything may select friends, groups, and pages to manually re-follow, or keep their

22  newsfeeds blank. *Id.* ¶ 74. The tool will encrypt a user's "followed" list before saving it locally on

23  their device to allow the user to automatically reverse the unfollowing process. *Id.* The "followed"

24  list will not be transmitted to Zuckerman or anyone else, and users may uninstall the tool at any

25  time. *Id.* The tool will also operate only from the user's account; it will not run if another person

26  accesses Facebook using a different account on the user's computer. *Id.* The tool will receive

27  updates via the Internet as necessary to ensure that it continues to operate as designed. *Id.* ¶ 77.

28

Prof. Zuckerman has not released Unfollow Everything 2.0 because of the near certainty that Meta will pursue legal action against him for doing so. *Id.* ¶ 86. In July 2021, Meta sent a cease-and desist letter to the developer of the original Unfollow Everything threatening him with legal action unless he took down the tool, which he did. *Id.* ¶¶ 87–88. Meta has also threatened the developers of similar browser tools. *Id.* ¶¶ 90–91. Prof. Zuckerman brings this action to obtain a declaration of his rights because he does not wish to befall a similar fate. *Id.* ¶ 93.

## ARGUMENT

## I.     This case is ripe, and the Court should hear it.

The Ninth Circuit has established a two-part inquiry for determining whether a court has, and should exercise, jurisdiction over an action brought under the Declaratory Judgment Act ("DJA"). *Principal Life Ins. Co. v. Robinson*, 394 F.3d 665, 669 (9th Cir. 2005). First, the Court must determine whether the case presents an "actual case or controversy within its jurisdiction." *Id.* at 669. If the Court determines that it has jurisdiction, it must determine whether to exercise it. *Id.* Here, the answer to both parts of the inquiry is "yes." Prof. Zuckerman's case presents an "actual controversy" because he reasonably fears that Meta will take legal action against him if he releases Unfollow Everything 2.0; and the Court should exercise jurisdiction because a declaration would usefully clarify the parties' legal relations, and none of the other factors the Ninth Circuit considers in deciding whether to exercise jurisdiction over a declaratory action favors abstention.[2]

## A.     This case presents an "actual controversy" because Prof. Zuckerman has a real and reasonable apprehension that Meta will take legal action against him if he releases Unfollow Everything 2.0.

The Supreme Court has held that the DJA's "actual controversy" requirement is identical to Article III's "case or controversy" requirement, and that it is satisfied when "the facts alleged,

---

[2] Meta suggests that Prof. Zuckerman must independently satisfy prudential ripeness, MTD 5, but this is incorrect. As the Supreme Court recognized in *MedImmune*, "standing and ripeness boil down to the same question" where, as here, "the party seeking declaratory relief is himself preventing the complained-of injury from occurring." *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 128 n.8 (2007); *see also Principal Life Ins. Co.*, 394 F.3d at 670–71 (holding that prudential ripeness doctrine does not apply to disputes between private parties outside "the administrative context").

1  under all the circumstances, show that there is a substantial controversy, between parties having

2  adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory

3  judgment." *MedImmune*, 549 U.S. at 126–27 (cleaned up). The Ninth Circuit has made clear that

4  a plaintiff can meet this requirement by demonstrating "a real and reasonable apprehension that he

5  will be subject to liability." *United States v. Schlenker*, 24 F.4th 1301, 1306 (9th Cir. 2022)

6  (cleaned up); *see also* MTD 6. This test reflects the crucial purpose of the DJA, which is "to relieve

7  potential defendants from the Damoclean threat of impending litigation which a harassing

8  adversary might brandish, while initiating suit at his leisure or never." *Societe de Conditionnement*

9  *en Aluminium v. Hunter Eng'g Co.*, 655 F.2d 938, 943 (9th Cir. 1981).

10     This test is easily satisfied here. First, it is clear that Meta considers Unfollow Everything

11  2.0 to be unlawful. Meta's motion to dismiss claims that the tool "patently violate[s] [its] Terms."

12  MTD 15. The company points to its restrictions on "access[ing] or collect[ing]" data from

13  Facebook "using automated means" and "facilitat[ing] or support[ing] others" to engage in such

14  conduct. *Id.* (citing Spencer Decl., Ex. 1 ("Terms"), § 3.2). And it argues that Unfollow Everything

15  2.0 violates these restrictions by allowing users to automatically unfollow and re-follow friends,

16  groups, and pages on Facebook. *Id.* Straight from the horse's mouth, then, it is undeniable that if

17  Prof. Zuckerman releases his tool, Meta will consider him to be in breach of its Terms. *See Nat'l*

18  *Basketball Ass'n v. SDC Basketball Club, Inc.*, 815 F.2d 562, 566 (9th Cir. 1987) (NBA had a

19  reasonable apprehension of suit where the defendant had "asserted from the onset of the suit that

20  even the [NBA's] consideration [of a sanction against it] would violate the antitrust laws").

21     This is also clear from Meta's response to the original Unfollow Everything, a tool that

22  was functionally identical to (and, indeed, the inspiration for) Unfollow Everything 2.0. Am.

23  Compl. ¶¶ 63–65. In July 2021, Meta sent a cease-and-desist letter to Louis Barclay, the developer

24  of Unfollow Everything, asserting that the tool violated the Terms because it "facilitate[d]

25  unauthorized functionality on Facebook"—namely, the "automat[ion]" of "mass following and

26  unfollowing." Am. Compl. Ex. A at 1. The letter, sent through outside counsel, stated that Meta

27  would treat any further activity by Barclay on Facebook "as intentional and unauthorized access

28

to its protected computer networks." *Id.* at 2. The letter also demanded a response from Barclay within 48 hours confirming that he had removed the tool from distribution, and it threatened that, if he ignored the company's demands, it would "take whatever measures it believes are necessary to enforce its rights." *Id.* at 2–3. Fearing legal action, he immediately complied. Am. Compl. ¶ 88.[3]

In other cases, too, Meta has consistently treated the automation of actions on Facebook as unlawful. In cease-and-desist after cease-and-desist, lawsuit after lawsuit, the company has taken the position that third-party software violates its terms, the CFAA, and CDAFA when that software automatically interacts with Facebook. *See, e.g.* Am. Compl. ¶ 90 (cease-and-desist letter to developers of Friendly, a browser that allowed users to customize their Facebook experience, asserting violations of the Terms, CFAA, and CDAFA); *id.* ¶ 91 (same to makers of Ad Observer, a browser extension that allowed users to crowdsource ad-related information for research, asserting violations of the Terms); *Facebook, Inc. v. Power Ventures, Inc.*, 844 F.3d 1058, 1067 (9th Cir. 2016) (same to makers of social media aggregator that automatically accessed Facebook's servers, asserting violations of the Terms and federal and state law); *see also Meta Platforms, Inc. v. BrandTotal Ltd.*, 605 F. Supp. 3d 1218, 1232 (N.D. Cal. 2022) (claiming that browser extension that "automatically caused users' browsers to query Facebook's servers" violated the Terms, CFAA, and CDAFA); *Meta Platforms, Inc. v. Bright Data Ltd.*, 2024 WL 251406, at *3 (N.D. Cal. Jan. 23, 2024) (claiming that the logged-off scraping of publicly available data from Facebook violated the Terms); *Meta Platforms, Inc. v. Voyager Labs Ltd.*, 2024 WL 2412419, at *1 (N.D. Cal. May 23, 2024) (similar, but also asserting CFAA and CDAFA violations).

Second, Meta has confirmed through its "[p]rior litigious conduct" that it is willing to take legal action against developers who, it believes, are in violation of its Terms, the CFAA, or CDAFA. *3taps, Inc., v. LinkedIn Corp.*, 2022 WL 16953623, at *4–5 (N.D. Cal. Nov. 15, 2022) (quoting *Organic Seed Growers & Trade Ass'n v. Monsanto Co.*, 718 F.3d 1350, 1355 (Fed. Cir. 2013)). A declaratory defendant's pattern of threatening or taking legal action against a declaratory

---

[3] Meta's second letter to Barclay, sent more than seven months later, doubled down on its legal threat, demanding that Barclay never again create tools that interact with Facebook and reserving Meta's "rights and remedies in this matter." Am. Compl. Ex. B at 3.

plaintiff, or individuals similarly situated to them, may establish a real and reasonable apprehension of suit. In *3taps*, for example, a court in this district held that a declaratory plaintiff that wished to scrape publicly available information from LinkedIn's platform satisfied the "reasonable apprehension" test where LinkedIn was already litigating the legality of similar conduct against another company, and had argued in that litigation that the CFAA barred that conduct. 2022 WL 16953623 at *5. Here, there is a much stronger pattern of enforcement. As described above, Meta has routinely threatened and taken legal action against developers of tools that automate actions on Facebook, including the functionally identical Unfollow Everything.

Third, Meta's motion to dismiss conspicuously does not "disclaim" an intent to pursue legal action against Prof. Zuckerman if he releases Unfollow Everything 2.0. *Chesebrough–Pond's, Inc. v. Faberge, Inc.*, 666 F.2d 393, 397 (9th Cir. 1982). This omission "bolsters" Zuckerman's claim of a real and reasonable apprehension of suit. *Id.*; *see also Societe*, 655 F.2d at 945 (treating as relevant defendant's failure to "indicate[] that it will not sue [plaintiff]"); *FN Cellars, LLC v. Union Wine Co.*, 2015 WL 5138173, at *3 (N.D. Cal. Sept. 1, 2015) (similar).

**B.      Meta's arguments to the contrary would require Prof. Zuckerman to "bet the farm," the very result against which the Declaratory Judgment Act is meant to protect.**

Meta argues that this case is unripe for four reasons. None is persuasive, and all amount to an argument that Prof. Zuckerman must "bet the farm" before he can get a judicial declaration of his rights—the very result the DJA is meant to protect against. *MedImmune, Inc.*, 549 U.S. 134.

First, Meta contends that Prof. Zuckerman's claims are not ripe because it is uncertain whether Prof. Zuckerman will in fact complete and release Unfollow Everything 2.0. MTD 6. But there is no uncertainty here. Zuckerman has an immediate intention to code the tool, and his "considerable experience" in coding similar tools is proof of his ability to do so. *Interdynamics, Inc. v. Firma Wolf*, 698 F.2d 157, 172 (3d Cir. 1982); Am. Compl. ¶¶ 39–42. Indeed, he has already taken "significant, concrete steps" towards completing the tool. *Cat Tech LLC v. TubeMaster, Inc.*, 528 F.3d 871, 881–82 (Fed. Cir. 2008) (holding that device designs, configurations, and AutoCAD

drawings were sufficient preparation for declaratory judgment). He has developed a detailed blueprint for the tool in the form of pseudocode, obtained a security review, and assembled a team able to complete the tool within six weeks of a decision holding that it is lawful to proceed. Am. Compl. ¶ 85. In other words, he has taken his project to the precipice of completion—a course of action more than sufficient to satisfy the DJA's "actual controversy" requirement. *See Rengo Co. v. Molins Mach. Co.*, 657 F.2d 535, 539 (3d Cir. 1981) (holding that "the immediate intention and ability to practice the invention" is sufficient to maintain a declaratory action (quoting *Wembley, Inc. v. Superba Cravats, Inc.*, 315 F.2d 87, 90 (2d Cir. 1963)); *see also Paramount Pictures Corp. v. Axanar Prods., Inc.*, 2016 WL 2967959, at *6 (C.D. Cal. May 9, 2016) (same where there was a final shooting script but the film was not complete).[4]

Meta points to *Bova v. City of Medford*, 564 F.3d 1093, 1096–97 (9th Cir. 2009), and *Nelson v. PFS Corp.*, 2021 WL 3468145 (C.D. Cal May 10, 2021), MTD 6, 7–8, but those cases are inapposite because the challenged conduct was years away and wholly speculative. In *Bova*, the plaintiffs challenged their employer's retirement plan when they were three years from retirement. 564 F.3d at 1905. In *Nelson*, an employee alleged that his employer would be in breach of a deferred compensation agreement if the employer stopped making payments "more than a year" hence. 2021 WL 3468145 at *3. In both cases, the courts held that a lot could change before the feared breach. *Bova*, 564 F.3d at 1906–07 ("Plaintiffs could change jobs, be terminated, or die" before retiring); *id.* (the outcome in a related case could "force" the employer to change its policy); *Nelson*, 2021 WL 3468145 at *3 (the employer's position was not "entrenched"). Here, by contrast, Zuckerman "stands ready, willing, eager, and able" to complete his tool within weeks of a judicial determination that the tool is not unlawful. *3taps, Inc.*, 2022 WL 16953623, at *5. Courts have routinely held that declaratory plaintiffs who are able to start manufacture within a similar timeframe satisfy the "actual controversy" requirement. *See, e.g.*, *Gelmart Indus., Inc. v. Eveready Battery Co.*, 120 F. Supp. 3d 327, 332–33 (S.D.N.Y. 2014) (case ripe where the plaintiff was

---

[4] Although Prof. Zuckerman has submitted his research study for institutional review board approval, Am. Compl. ¶ 85, he may release the tool while approval of the study is pending, because board approval is necessary only for the latter.

1    "capable of commencing manufacture of products within weeks."); *see also LifeScan Scotland,*

2    *Ltd. v. Shasta Techs., LLC*, 2012 WL 2979028, at *6 (N.D. Cal. July 19, 2012) (same where the

3    "date of FDA approval [was] uncertain," and in any event more than two months away); *Pfizer*

4    *Inc. v. McNeil-PPC, Inc.*, 2015 WL 13227648, at *3 (S.D.N.Y. Dec. 11, 2015) (finding it

5    unnecessary for the plaintiff to "allege the exact date" on which the ads would run because they

6    were "await[ing] th[e] Court's decision on the legality of such an ad[]").

7        Second, and relatedly, Meta claims that this case is not ripe because there is uncertainty

8    about how precisely the tool works, and because those details may be relevant, MTD 6–7, but this

9    is wrong as both a factual and a legal matter. The Amended Complaint provides a significant

10   amount of detail about how the tool works, Am. Compl. ¶¶ 71–77, and that detail is more than

11   sufficient to adjudicate Zuckerman's claims. Unfollow Everything 2.0 works essentially

12   identically to the original Unfollow Everything, *id.* ¶¶ 64, 73, and, tellingly, Meta fails to identify

13   any details that are uncertain that could plausibly affect an analysis of the tool's legality. Although

14   it speculates that Zuckerman may not be able to build the tool as described, it provides no reason

15   to doubt his capacity to do so, and this court must accept his well-pleaded allegations as true on a

16   motion to dismiss. *See Namisnak v. Uber Techs., Inc.*, 971 F.3d 1088, 1092 (9th Cir. 2020).[5]

17       Meta's contention that the case is unripe because Zuckerman has not yet produced "actual

18   computer code," MTD 6, is also wrong as a legal matter. This dispute turns on the core

19   functionality of Unfollow Everything 2.0—that is, the tool's automation of unfollowing and re-

20   following. It was this functionality—not some technical detail of the code—that Meta alleged was

21   unlawful in its letter to Barclay about the original Unfollow Everything. Am. Compl. Ex. A, at 1.

22   Meta's suggestion that the case is unripe because it may change the sequence of steps users must

23   take to unfollow their friends, groups, and pages, MTD 6, is pure speculation. In any event, any

24   such updates would, at most, require corresponding changes to the tool, but they wouldn't affect

25

26       [5] Meta points to an alleged discrepancy between Unfollow Everything 2.0 and how Prof.
Zuckerman described the original Unfollow Everything in an op-ed. MTD 6. But Zuckerman's op-
27   ed was intended for a public audience, not a technical one. It is his well-pleaded allegations of the
technical details in the amended complaint that control.
28

the tool's core functionality, which is to automate unfollowing requests that Meta has allowed its users to send for years. *See Cat Tech*, 528 F.3d at 883 (case ripe where plaintiff could produce technology "without significant design change"); *City of Aurora, Colo. ex rel. Aurora Water v. PS Sys., Inc.*, 2008 WL 4377505, at *10 (D. Colo. Sept. 19, 2008) (same where plaintiff had finalized construction plans and begun construction); *Diamonds.net LLC v. Idex Online, Ltd.*, 590 F. Supp. 2d 593, 598–99 (S.D.N.Y. 2008) (same where plaintiff had submitted a declaration describing the operation of an online service, but development of the service was still "ongoing").

Third, Meta argues that it is unreasonable for Prof. Zuckerman to fear that the company will take legal action against him, MTD 7–8, but this blinks reality. As already explained, Zuckerman's fear of liability is reasonable because Meta has made clear that it considers the core functionality of his tool to be unlawful; Meta has a pattern of pursuing legal action against similar tools, including the nearly identical Unfollow Everything; and the company has not disavowed an intent to sue. Meta argues that the absence of any direct communication between the parties is fatal, MTD 7, but the Ninth Circuit has pointedly "declin[ed] to identify specific acts or intentions that would automatically constitute a threat of litigation," instead calling for "a flexible approach that is oriented to the reasonable perceptions of the plaintiff," based on all the circumstances known to it. *Chesebrough*, 666 F.2d at 396. Indeed, it has held that a mere threat of litigation against a third party *is* sufficient to create a reasonable apprehension of legal liability. *See Societe*, 655 F.2d at 944–45; *E. & J. Gallo Winery v. Proximo Spirits, Inc.*, 583 F. App'x 632, 635 (9th Cir. 2014). Here, Meta's actions against similarly situated developers, together with its response to this lawsuit—which confirms its view that Unfollow Everything 2.0 is unlawful, while refusing to take legal action off the table—establish a reasonable fear of suit.

Meta's attempts to sweep aside the company's history of litigious conduct against similar tools—including the original Unfollow Everything—fail to convince. MTD 8. The suggestion that actions against third parties cannot create a reasonable apprehension of legal liability simply does not reflect the law. *See supra* Part I at 5–6.[6] And its attempt to minimize its cease-and-desist letter

---

[6] The cases Meta relies on do not establish otherwise. *See eBioScience Corp. v. Invitrogen Corp.*, 2009 WL 10671320, at *3–4 (S.D. Cal. Apr. 20, 2009) (relying on a single legal action

to Barclay fares no better. *See* MTD 8–9. That letter was sent by outside counsel at a major law firm, asserted that Barclay had violated Meta's Terms, alluded to possible liability under CFAA and CDAFA, and demanded that Barclay take his tool down within 48 hours or face Meta's ire. Am. Compl., Ex. A at 3 ("Facebook will take whatever measures it believes are necessary"). While the letter did not threaten suit explicitly, the threat was obviously implied. Indeed, the letter was far more forceful than the one held to establish an "actual controversy" in *MedImmune*, which merely conveyed the defendant's belief that its patent covered the drug at issue and the defendant's expectation that the plaintiff would begin to pay royalties. 549 U.S. at 121–22; *see also, e.g.*, *FN Cellars, LLC*, 2015 WL 5138173 at *3 (letter need not "contain an express threat that defendant would sue, or any other formulaic words"); *3taps Inc.*, 2022 WL 16953623 at *4 (sufficient that LinkedIn made clear 3taps had no authorization to access LinkedIn's servers).

Fourth, Meta argues that Prof. Zuckerman cannot establish burden under the prudential ripeness doctrine. MTD 10–11. As explained above, that doctrine does not apply in cases like this one, *see supra* Part I at 3 n.2, but in any event the burden to Prof. Zuckerman is clear. The dilemma Zuckerman faces—between "abandoning his rights" by not releasing his tool or "risking [suit]"— is the very hardship the DJA was enacted to address. *MedImmune*, 549 U.S. at 129 (citing *Abbott Lab. v. Gardener*, 387 U.S. 136, 152 (1967)); *see also id.* 133 n.12; Am. Compl. ¶¶ 86, 93. And here, releasing the tool entails not only the risk of legal liability, but also the cost of coding the tool and the potential loss of his Facebook account, which would implicate his ability to keep in touch with friends and family and to study the platform. Am. Compl. ¶¶ 45, 87, 91. Meta points to Zuckerman's statement that he is "willing to consider" releasing the tool if the Court denies him "a preemptive ruling." MTD 11 (quoting Spencer Decl. Ex. 6). But this is hardly a concession that he would not incur hardship if he were forced to "take his chances." *Id.* It merely recognizes his options should the Court dismiss the case as unripe. Meta's claim of hardship if the case were

---

against a third party, rather than a pattern of litigious conduct); *Xerox Corp. v. Apple Computer Inc.*, 734 F. Supp. 1542, 1546, 1547 n.8 (N.D. Cal. 1990) (relying on lawsuits brought against *potential* customers, rather than companies that had developed a similar product, or customers that had already licensed plaintiff's product).

allowed to proceed fares no better. Meta says that it would be deprived of a "full and fair opportunity to develop an adequate record," MTD 11 (cleaned up), but this simply isn't true. If further detail is necessary to litigate the case, it can always seek that detail during discovery.

### C.    The Court should exercise its jurisdiction to hear Prof. Zuckerman's claims.

The Court should exercise its jurisdiction to hear Prof. Zuckerman's claims because a declaration would "serve a useful purpose in clarifying the legal relations at issue," *Gov't Emps. Ins. Co. v. Dizol*, 133 F.3d 1220, 1225 n.5 (9th Cir. 1998), and because none of the other factors that the Ninth Circuit considers when deciding whether to exercise jurisdiction over declaratory actions favors abstention.

The declaration that Prof. Zuckerman seeks would serve the important purpose of relieving him of the "dilemma" he currently faces between abandoning his tool and releasing it under a cloud of legal liability. *FN Cellars, LLC*, 2015 WL 5138173 at \*4. Unlike the plaintiff in *Bank of America, N.A. v. County of Maui*, Zuckerman knows the claims the company is likely to bring against him, because it has brought such claims against other similarly situated developers. 2020 WL 7700098, at \*5 (D. Haw. Dec. 28, 2020); *cf.* MTD 13. A declaration would therefore quite obviously clarify the parties' legal relations. Meta's suggestion that the Court should decline jurisdiction because it *might* change its Terms is speculative. It also proves too much. If Meta were correct, no one could ever seek a declaratory judgment in relation to a website's terms of use, because website operators almost always reserve discretion to unilaterally change them.[7]

The other factors the Ninth Circuit considers in declaratory actions likewise do not "caution against the exercise of jurisdiction." *t'Bear v. Forman*, 2020 WL 703888, at \*16 (N.D. Cal. Feb. 12, 2020). As an initial matter, most of Meta's arguments with respect to these factors are repackaged versions of its earlier assertion that this suit is unripe, MTD 12–13, but that assertion is wrong for the reasons explained above. Meta's new arguments are also without merit.

---

[7] Meta's suggestion that a declaration would not "settle all aspects of the controversy," MTD 13 (quoting *Dizol*, 133 F.3d at 1225 n.5), also fails on close inspection. Although Meta speculates that it may have additional claims for trademark infringement, as it did in Barclay's case, *id.*, that allegation depended on Barclay's use of Facebook's mark. Am. Compl. Ex. A at 2. No such use has been pleaded in this case.

First, this case does not involve the "needless determination of state law." *See* MTD 12 (quoting *Dizol*, 133 F.3d at 1225). The primary claim at issue is a federal one; Zuckerman's state-law claims form part of the same case or controversy; and unlike in the primary context in which federal courts have found determinations of state law to be "needless," here there is no parallel state proceeding raising the same issues. *See Am. Cas. Co. of Reading, Pa. v. Krieger*, 181 F.3d 1113, 1118 (9th Cir. 1999).[8]

Second, this case does not involve forum shopping. *Cf.* MTD 13. Prof. Zuckerman filed this suit in Meta's preferred venue. *See* Am. Compl. ¶ 10. And this suit is not, contrary to Meta's bare assertion, *see* MTD 13, an impermissibly "reactive" one, in which a plaintiff files "a federal declaratory action to see if it might fare better in federal court at the same time as [it] is engaged in a state court action." *Krieger*, 181 F.3d at 1119.

Finally, Meta contends that it would be unfair to force it to litigate Prof. Zuckerman's claims before it knows "the full extent of [its] damages," MTD 14 (cleaned up), but it offers no explanation for why its damages are relevant to the adjudication of those claims. In any event, the tool does not harm Facebook, Am. Compl. ¶ 76; it simply automates a feature Meta chooses to provide, like the original Unfollow Everything. Ultimately, the unfairness is all on Zuckerman's side and it is precisely for that reason that the Court should exercise its jurisdiction.

## II.   Section 230(c)(2)(B) of the Communications Decency Act immunizes Prof. Zuckerman from civil liability in relation to Unfollow Everything 2.0.

Unfollow Everything 2.0 falls squarely within the heartland of tools that Congress sought to protect through section 230(c)(2)(B).

In lay terms, that section immunizes developers of tools that filter unwanted content online. Congress enacted the provision in the wake of *Stratton Oakmont v. Prodigy Services Co.*, 1995 WL 323710 (N.Y. Sup. Ct., May 24, 1995), a state-court decision that threatened liability for online

---

[8] There is also a strong federal interest in hearing Zuckerman's CFAA and public policy claims. The public policy claim hinges primarily on federal sources of public policy, namely, section 230 and the First Amendment, and as explained below, courts in the Ninth Circuit have generally analyzed CFAA and CDAFA claims together, holding that the latter rise or fall with the former.

services that engaged in filtering. *Enigma Software Grp. USA, LLC v. Malwarebytes, Inc.*, 946 F.3d 1040, 1046 (9th Cir. 2019). Concerned that the ruling was "deterring software companies from providing the filtering software and tools," Congress passed section 230 to overrule it. *Id.* Its goal, as set out expressly in the text of the bill, was "to encourage the development of technologies which maximize user control over what information is received by individuals, families, and schools," 47 U.S.C. § 230(b)(3), and "to remove disincentives for the development and utilization of blocking and filtering technologies," *id.* § 230(b)(4). The legislative history of the bill likewise emphasizes Congress's intent that users have available to them the latest filtering technologies, so that "everyone of us will be able to tailor what we see to our own tastes." 141 Cong. Rec. H8470 (daily ed. Aug. 4, 1995) (statement of Rep. Cox) (co-author of section 230); *see also id.* (statement of Rep. Wyden) (other co-author) ("[P]arents and families are better suited to guard the portals of cyberspace and protect our children than our Government bureaucrats.").

To that end, section 230(c)(2)(B) provides that "[n]o provider or user of an interactive computer service shall be held liable" "on account of" "any action taken to enable or make available to information content providers and others the technical means to restrict access to" "material that the provider or user considers to be" "objectionable."[9] 47 U.S.C. § 230(c)(2)(A)–(B). Prof. Zuckerman easily satisfies these requirements because he is a "provider" of an "interactive computer service" (namely, Unfollow Everything 2.0), and because Unfollow Everything 2.0 enables its users to restrict access to material that they (and Zuckerman) deem "objectionable." Meta makes three arguments to the contrary, but they are meritless.

## A. As the developer of Unfollow Everything 2.0, Zuckerman qualifies as a "provider" of an "interactive computer service."

Meta asserts that Prof. Zuckerman would not qualify as a "provider" of "an interactive computer service," but he clearly would. Section 230 defines "interactive computer service" to include an "access software provider that provides or enables computer access by multiple users

---

[9] As enacted, section 230(c)(2)(B) cross-references subsection (c)(1) instead of (c)(2)(A), 47 U.S.C. § 230(c)(2)(B), but that is uniformly treated as a scrivener's error, *Zango, Inc. v. Kaspersky Lab*, 568 F.3d 1169, 1173 n.5 (9th Cir. 2009).

to a computer server," § 230(f)(2), and it defines "access software provider" to include "a provider of software (including client or server software), or enabling tools" that "filter screen, allow, or disallow content," § 230(f)(4). Zuckerman would qualify as an "access software provider" because Unfollow Everything 2.0 enables its users to "filter, screen, allow, or disallow" content—namely, the Facebook newsfeed and the posts that would otherwise appear in it. 47 U.S.C. § 230(f)(4)(A). And he would "provide[] or enable[] computer access by multiple users to a computer server" by allowing users who download Unfollow Everything 2.0 to automatically unfollow and re-follow friends, groups, and pages, which involves communicating with Meta's servers, Am. Compl. ¶ 73; by verifying that users who run the tool have successfully unfollowed their friends, groups, and pages, which involves communicating with the Unfollow Everything 2.0 server, *id.*; and by offering online updates to the tool, which involves communications between users of the tool and Google's servers, Mozilla's servers, or the Unfollow Everything 2.0 server, *id.* ¶ 77.

Meta asserts that Unfollow Everything 2.0 does not "filter" content because it does not "block[] content from being loaded to a computer," MTD 22, but this is wrong in two ways. First, the tool *does* block Facebook's newsfeed from being loaded to its users' devices. *See* Am. Compl. ¶ 71. The newsfeed is distinct from the individual posts within it, because the sorting of the feed reflects Facebook's engagement-maximizing prioritization, which many users of Facebook wish to avoid. *Id.* ¶ 4, 26, 63. Blocking this feed is the tool's core functionality, but Meta simply ignores it. Second, and relatedly, the tool works by filtering out the individual posts that would otherwise appear in the newsfeed. This allows users who wish to curate their feed to do so by re-following only those friends whose posts they really want to see. *Id.* ¶ 74. Meta observes that users may still seek out posts that were filtered out outside of the feed, but that is irrelevant. Users of spam filters can likewise navigate to their spam folder to view the emails that were filtered out, but that doesn't mean the emails weren't filtered. *See, e.g.*, *Republican Nat'l Comm. v. Google, Inc.*, 2023 WL 5487311, at *4 (E.D. Cal. Aug. 24, 2023); *Smith v. Trusted Universal Standards in Elec. Transactions, Inc.*, 2011 WL 900096, at *7 (D.N.J. Mar. 15, 2011). Importantly, nothing in section 230's text requires that filtering be effectuated in any particular way. That is by design, because

1    Congress recognized that filtering tools and software were "rapidly developing," 47 U.S.C.

2    § 230(a)(1), and that users would be able to exercise "even greater control in the future as

3    technology develops," *id.* § 230(a)(2). The definition of "access software provider" is written

4    broadly to account for this technological advance, by using a variety of near-synonyms ("filter,

5    screen, allow, or disallow") to sweep in any tool that gives users control over the flow of

6    information they see.[10]

7         Meta also argues that Prof. Zuckerman's tool would not enable access by multiple users to

8    a server, MTD 22–23, but its argument is based on feigned technical ignorance about how users

9    and servers interact. Specifically, it suggests that it is users' browsers, rather than the users

10   themselves, that would interact with multiple servers. But the way that virtually all computer users

11   interact with servers is by using software—like a browser, or a browser extension, or an email

12   application—to do so for them.[11] That is why courts have routinely found that tools that enable

13   users to access a server via a browser or app satisfy the server access requirement. *See, e.g.*, *In re*

14   *Zoom Video Commc'ns Inc. Priv. Litig.*, 525 F. Supp. 3d 1017, 1029 (N.D. Cal. 2021) (requirement

15   satisfied because software "hosts a connection 'between [1] the Zoom app running on a user's

16   computer or phone and [2] Zoom's server'"); *Zango*, 568 F.3d at 1175 (same where software

17   "provid[ed] [the defendant's] customers with online access to its update servers"). Unfollow

18   Everything 2.0 is no different. At a user's behest, it interacts with multiple servers from the user's

19   computer. *See* Am. Compl. ¶¶ 73, 77, 81.

20        For these reasons, Prof. Zuckerman is a "provider" of an interactive computer service, but

21   he is also the "user" of an interactive computer service—namely, Facebook—which independently

22

23        [10] Prof. Zuckerman independently qualifies as an "access software provider" because the tool
     "transmit[s], receive[s], . . . forward[s], [and] cache[s]" content. 47 U.S.C. § 230(f)(4)(C). The tool

24   transmits, receives, and forwards content for the same reasons it satisfies the server access
     requirement. It caches content because it caches users' followed and unfollowed lists locally, to

25   enable users to reverse the unfollowing process at their convenience. Am. Compl. ¶ 74.

26        [11] *See, e.g.*, Douglas E. Comer, *The World Wide Web: Browsers and Basics* in *The Internet*
     *Book: Everything You Need to Know About Computer Networking and How the Internet Works*,

27   ch. 20 (5th ed. 2018) (explaining that browsers interact with web servers to retrieve and display

28   websites on a user's computer at the user's behest).

satisfies section 230(c)(2)(B). *Id.* ¶ 45; *see also Caraccioli v. Facebook, Inc.*, 167 F. Supp. 3d 1056, 1065 (N.D. Cal. 2016), *aff'd*, 700 F. App'x 588 (9th Cir. 2017); *Calise v. Meta Platforms, Inc.*, 103 F.4th 732, 738 (9th Cir. 2024).

**B.    Unfollow Everything 2.0 gives users the "technical means" to restrict "access" to content that users (and Zuckerman) find "objectionable."**

A provider of an interactive computer service is entitled to immunity under section 230(c)(2)(B) if they offer "the technical means to restrict access to material" that "the provider or user considers" "objectionable." Unfollow Everything 2.0 satisfies this test because it gives Facebook users the technical means to filter material that users (and Zuckerman) consider to be objectionable—namely, the newsfeed. Meta's motion takes issue with only one aspect of Prof. Zuckerman's satisfaction of this statutory requirement, arguing that the tool's elimination of the newsfeed does not amount to the restriction of "access," because users can still seek out the posts that would have appeared in the newsfeed. MTD 23–24. As noted above, this ignores the fact that the tool does in fact eliminate access to the newsfeed, which is distinct from the posts that would appear within it. But even on its own terms, the distinction that Meta draws between limiting and eliminating access is one that makes no statutory difference. Just like email spam filters, Unfollow Everything 2.0 may "*restrict* access" without *eliminating* it. *See Restrict*, *Webster's Third New International Dictionary* 850 (Philip Babcock Gove ed., 1993) ("to set bounds or limits to"); *see also Zango*, 568 F.3d at 1171 (holding that section 230(c)(2)(B) applied to software that allegedly gave users the option of "allow[ing] or reject[ing]" the download of potential malware).

**C.    Section 230(c)(2)(B)'s protection extends to the anticipated breach-of-contract claims.**

Meta next argues that section 230(c)(2)(B) does not provide immunity against breach-of-contract claims, but this argument is wrong as a matter of text, precedent, and purpose.

The textual problem with Meta's argument is that it relies on language specific to section 230(c)(1). That subsection states that "[n]o provider or user of an interactive computer service shall be *treated as the publisher or speaker* of any information provided by another information

content provider." (emphasis added). "Looking at th[is] text," the Ninth Circuit has held that subsection (c)(1) does not "declare[] a general immunity from liability deriving from third-party content," but rather provides immunity only against *certain kinds of claims*—namely, those where the "theory of liability would treat a defendant as a publisher or speaker of third-party content." *Barnes v. Yahoo!, Inc.*, 570 F.3d 1096, 1100–01 (9th Cir. 2009). Breach-of-contract claims, the court held, generally do not treat service providers as a publisher or speaker; instead, they treat them as contracting parties that voluntarily undertake legal obligations, irrespective of their status as a publisher or speaker. *Id.*; *see also Calise*, 103 F.4th at 742–43.

Section 230(c)(2), however, does not provide immunity against certain kinds of claims; it immunizes certain kinds of conduct. Specifically, subsection (c)(2)(B) states that "[n]o provider or user of an interactive computer service shall be held liable on account of" "any action taken to enable or make available" filtering functionality. The provision does not hinge immunity on the nature of the claim (i.e., whether the claim treats the provider as a "publisher or speaker"), but instead on the conduct at issue (i.e., whether it is an action taken to enable filtering). Some breach-of-contract claims might not be based on actions taken to enable filtering, of course, and those claims could proceed against a defendant that otherwise satisfied section 230(c)(2)(B). But the claims for which Prof. Zuckerman seeks declaratory relief undoubtedly would be based on actions taken to enable filtering, because all of the actions taken by his tool are taken for the purpose of enabling users to eliminate the newsfeed.

Based on the textual differences between subsections (c)(1) and (c)(2), it is unsurprising that the Ninth Circuit has said that subsection (c)(2) "insulates service providers from claims . . . such as breach of contract." *Batzel v. Smith*, 333 F. 3d 1018, 1030 n.14 (9th Cir. 2003). None of the cases Meta points to establish otherwise. *Prager University v. Google LLC* involved the application of subsection (c)(1), not (c)(2). 85 Cal. App. 5th 1022, 1043 n.9 (2022). *Enhanced Athlete Inc. v. Google LLC* refers to subsection (c)(2) in error in the sentence quoted by Meta; that sentence purports to summarize the holding of *Barnes*, a case about subsection (c)(1), not (c)(2). 479 F. Supp. 3d 824, 831 (N.D. Cal. 2020). *Berenson v. Twitter*, an unpublished opinion, also

1    appears to refer to section 230(c)(2) in error. In that case, the court relied on *Barnes* to conclude

2    that section 230(c)(2)(A) did not bar the plaintiff's contract-based claims, 2022 WL 1289049 (N.D.

3    Cal. Apr. 29, 2022), but Twitter raised subsection (c)(1)—not (c)(2)(A)—as a defense to those

4    claims, and, as already noted, *Barnes* involved subsection (c)(1), not (c)(2).[12]

5         Even if Meta's argument were faithful to text and precedent, accepting it would entirely

6    undermine section 230(c)(2)(B)'s purpose. If the providers of filtering technology were not

7    immune from breach-of-contract claims, then section 230(c)(2)(B) would be a dead letter, because

8    technology companies could always modify their terms of service to prohibit the use or

9    development of filtering tools. Plainly, Congress would not have handed technology companies a

10   veto over legal immunity meant to "maximize user control" and "remove disincentives for the

11   development and utilization of blocking and filtering technologies." 47 U.S.C. § 230(b)(3), (4).

**III.    Prof. Zuckerman would not violate Meta's Terms of Service by releasing Unfollow Everything 2.0.**

      **A.    Meta's Terms apply only to a person's "use of Facebook," but Zuckerman will not use Facebook to operate Unfollow Everything 2.0—users of the tool will.**

16         Meta claims that releasing Unfollow Everything 2.0 would violate the company's Terms,

17   MTD 14–17, but its argument fails at the threshold, because the Terms apply only to the "use" of

18   Facebook, and not to conduct that takes place off of the platform.

19         This is confirmed throughout the text of the Terms. The preamble states that the Terms

20   govern the "use" of Facebook. Terms, Preamble. Section 3.1 addresses "[w]ho can *use* Facebook";

21   section 3.2 addresses "[w]hat you can share and do *on* Meta products"; and section 3.2.3 provides

22   that "[y]ou may not *use* our Products" to violate the Terms. *See id.* §§ 3.1, 3.2, 3.2.3 (emphasis

23   added). Meta's Terms do not provide any special definition of the word "use," and so its normal

24   meaning applies. *See Hunt Wesson Foods, Inc. v. Supreme Oil Co.*, 817 F.2d 75, 77 (9th Cir. 1987).

---

26      [12] Indeed, it is curious that Meta argues for a categorical carve-out for breach-of-contract claims

27   here, given it has vigorously contested such a carve-out in (c)(1) cases. *See, e.g.*, *Calise*, 103 F.4th at 742 ("Meta asks us to apply a 'but for' test," i.e., whether "Plaintiffs' claims hinge on publishing-related activity").

The normal meaning of "use" is to "to employ for the accomplishment of a purpose." *Use*, *Black's Law Dictionary* (11th ed. 2019); *see also Use*, *The Merriam Webster Dictionary* (1st ed. 2022) ("to put into action or service"). Based on this definition, it is clear that Meta's Terms apply only to actions taken while availing oneself of the platform, as Meta appears to have conceded in other litigation. *See* Meta's Cross Mot. for Partial Summary Judgment 17, *Bright Data*, 2024 WL 251406 (contending that defendant used Facebook by "us[ing] Facebook's physical infrastructure"). Indeed, a court in this district recently went even further, holding that Meta's Terms apply only to actions taken by account holders while they are logged in, and so do not apply to the "logged-off scraping of publicly viewable data." *Bright Data Ltd*., 2024 WL 251406, at *17.

Accordingly, Prof. Zuckerman would not violate Meta's Terms by releasing Unfollow Everything 2.0 because he will not operate the tool and thereby "use" Facebook—rather, the tool's users will. *See* Am. Compl. ¶¶ 72–73.

Meta's argument to the contrary, *see* MTD 16, relies entirely on *Meta Platforms, Inc. v. BrandTotal Ltd.*, 605 F. Supp. 3d 1218 (N.D. Cal. 2022), but that decision never addressed the question this case poses, because the defendant waived any argument that it hadn't violated Meta's Terms. *Id.* at 1258. Moreover, reading the Terms to reach off-platform conduct would "lead to absurd conclusions," which courts have an obligation to avoid. *ASP Props. Grp., L.P. v. Fard, Inc.*, 133 Cal. App. 4th 1257, 1269 (2005); *see also* Cal. Civ. Code. § 1638. If Meta's Terms applied to software developers based on the downstream use of their tools, then all manner of widely used tools would have to be shut down, including: password managers that, like 1Password, automatically log users into websites; accessibility tools that automate certain website interactions to improve the experiences of those with visual impairments; and ad blockers that automatically scan web content to filter out advertisements. The makers of these tools do not "use" Facebook to operate them, but Facebook users may do so when they visit the platform. Subjecting the makers to the Terms, however, would unjustifiably and unexpectedly extend the reach of the company's rules to conduct that takes place off of its services.[13]

---

[13] Meta claims that Zuckerman has "conceded that his proposed tool would violate Meta's Terms by publicly stating that '[t]he most popular networks [including] Facebook . . . prohibit

**B.**    **In any event, releasing the tool would not involve accessing or collecting data from Facebook, or facilitating the unauthorized collection of such data by other users.**

Meta contends that Unfollow Everything 2.0 would violate its restrictions on "access[ing] or collect[ing] data from [Facebook] using automated means (without our prior permission)" and "facilitat[ing] or support[ing] others in doing so." MTD 15 (citing Terms, §§ 3.2.3 & 3.2). But even assuming these restrictions applied to Prof. Zuckerman's release of the tool (and they do not for the reasons explained above), he would not violate them.

First, Prof. Zuckerman will not access or collect any data from Facebook through the tool—users will. The tool is run by users only on users' computers; and it communicates with Meta's servers only at the explicit direction of its users. The tool doesn't send Prof. Zuckerman any data *from Facebook*. Although the tool downloads a user's followed list to the user's device, it stores this list only locally (for the purposes of unfollowing and refollowing). The tool does not transmit this list to Zuckerman or to anyone else. Am. Compl. ¶ 74. Further, even if Zuckerman could be said to be accessing or collecting data from Facebook through the tool, he would be doing so as users' "agent," Cal. Civ. Code § 2295, a fact that Meta does not dispute.

Second, Prof. Zuckerman will not facilitate or support the unauthorized collection of data by his tool's users, because the tool accesses only users' own data, and users have Meta's "prior permission" to access and collect this data. Terms, § 3.2.3. To start, Meta's Terms provide that users "retain ownership" of any "content [they] create and share on Facebook," and that users are "free to share [their] content with anyone else, wherever [they] want." *Id.* § 3.3.1; *see also id.* Preamble (referring to the "data" users share with Meta as users' "personal data"); *id.* § 2 (describing "information about [users'] activity and interests" in the same way). Meta's account-information page confirms that users own the specific data Unfollow Everything 2.0 would collect, namely, their followed and unfollowed lists. Am. Compl. ¶ 75. Meta has also repeatedly stated

tools like [his].'" MTD 15. But this statement merely reflects his credible fear that Meta will take the position that his tool violates its Terms, which is why he has brought this suit. *See* Part I.A.

publicly, including in prior litigation, that "users own the data they share with Facebook, and are permitted to download this information and take it to another platform." *Id.*; *see* Pl.'s Opp'n to Appl. for TRO 19, *Facebook, Inc. v. BrandTotal Ltd.*, 2020 WL 8551872 (N.D. Cal. 2020) (conceding that its Terms "do not bar individual users from collecting their own data.").[14] To the extent there is any ambiguity in the Terms' language, this ambiguity must be construed against Meta, *ASP Props.*, 133 Cal. App. 4th at 1269, particularly since the Terms are a contract of adhesion, *Bright Data Ltd.*, 2024 WL 251406, at *11.

Meta claims that "the clear text of the Terms" bars users from accessing even their own data via automated means. MTD 16. But this simply isn't true. Indeed, in *Power Ventures*, the Ninth Circuit concluded that Power, a social media aggregator, had "implied permission" to automatically collect user data from Meta's servers—until Meta explicitly revoked that authorization by sending an individualized cease-and-desist letter—because users had consented to the collection. 844 F.3d at 1067. The premise of the court's conclusion was that users own their data, and so may, as a general matter, deal with it as they wish. The meaning of the Terms is clear on this point, but the Court would have to deny Meta's motion to dismiss Zuckerman's breach-of-contract claims even if the Terms were ambiguous. *See Hicks v. PGA Tour, Inc.*, 897 F.3d 1109, 1118 (9th Cir. 2018) (holding that the resolution of contractual claims on a motion to dismiss is "inappropriate" where the "contract is ambiguous"); *see also A. Kemp Fisheries, Inc. v. Castle & Cooke, Inc., Bumble Bee Seafoods Div.*, 852 F.2d 493, 497 n.2 (9th Cir. 1988) ("[C]ourts may not dismiss on the pleadings when one party claims that extrinsic evidence [such as public statements] renders the contract ambiguous.").

Third, even if Meta has not already granted its users permission to download their own data using automated means, the relevant term expressly contemplates that it might do so, *see* Terms, § 3.23, and so the mere release of Unfollow Everything 2.0 could not on its own violate, or facilitate a violation of, its Terms.

---

[14] *See also, e.g.*, Erin Egan, *It's Time To Make Our Privacy Materials Easier To Find*, Meta Newsroom (Mar. 28, 2018), https://perma.cc/H5WN-88JG ("We're also making it easier to download the data you've shared with Facebook – it's *your* data, after all." (emphasis added))

**IV.     To the extent Meta's Terms of Service prohibit the release of Unfollow Everything 2.0, they are void for public policy.**

Under general principles of California contract law, a contract will be unenforceable on public policy grounds if "the interest in its enforcement is clearly outweighed in the circumstances by a public policy against [its] enforcement." *Bovard v. Am. Horse Enters., Inc.*, 247 Cal. Rptr. 340, 344 (Cal. Ct. App. 1988) (quoting from Rest.2d Contracts, § 178(1)). Here, Meta's interest in enforcing its Terms against Unfollow Everything 2.0 is clearly outweighed by the public policy favoring user control over one's online experience. Am. Compl. ¶¶ 8–13.

That public policy is established by several provisions of federal and state law. First, Section 230 declares that "It is the policy of the United States" "to encourage the development of technologies which maximize user control" over what they see online, and "to remove disincentives for the development and utilization of blocking and filtering technologies." 47 U.S.C. § 230(b)(3), (4); *see also id.* § 230(c)(2)(B). Second, the First Amendment, which protects Americans' right to receive information and ideas of their choosing, *Stanley v. Georgia*, 394 U.S. 557, 563 (1969), has been interpreted by the Supreme Court to favor user control as a less-restrictive alternative to direct government regulation of online content, *see, e.g.*, *Ashcroft v. ACLU*, 542 U.S. 656, 666–70 (2004) (rejecting such regulation based in part on the availability of filtering technology); *Reno v. ACLU*, 521 U.S. 844, 876–77 (1997) (similar). Third, the California Consumer Privacy Act ("CCPA"), as amended by the California Privacy Rights Act ("CPRA"), and its implementing regulations, reflect a recognition that users should have control over how their personal information is "collected, used, and disclosed," CPRA § 3(A)(2); that users and their "authorized agents" should be able to exercise this control "through easily accessible self-serve tools" such as browser extensions, *id.* § 3(A)(4); and that platforms should not be able to "subvert[] or impair[]" control through design features such as dark patterns, Cal. Code Regs. tit. 11, § 7004(c); *see also* Cal. Civ. Code § 1798.140(h).

These sources of law all establish a public policy favoring user control online, and filtering technologies in particular, as a means of achieving that control. Meta does not seriously dispute

1    the existence of this policy. It says that section 230 offers no protection beyond the specific

2    immunities granted by section 230(c), MTD 20, and that the CCPA and its implementing

3    regulations do not specifically protect tools like Unfollow Everything 2.0, *id.* 18. But that of course

4    is not the test for whether a contract violates public policy. The doctrine is, instead, built around

5    the recognition that "[a] contract need not be contrary to a statute for it to be deemed contrary to

6    public policy." *Epic Games, Inc. v. Apple Inc.*, 559 F. Supp. 3d 898, 1060 (N.D. Cal. 2021), *aff'd*

7    *in part, rev'd in part and remanded*, 67 F.4th 946 (9th Cir. 2023); *see also* Cal. Civ. Code

8    § 1667(2). Meta also argues that the First Amendment has no bearing because this suit is between

9    private parties, MTD 19, but "private speech prohibitions can still implicate the First Amendment

10   when given the imprimatur of state protection through civil . . . law." *Sandvig v. Sessions*, 315 F.

11   Supp. 3d 1, 17 (D.D.C. 2018). Indeed, courts, including in this district, have weighed First

12   Amendment interests in deciding whether to enforce private agreements. *See, e.g.*, *Nat'l Abortion*

13   *Fed'n v. Ctr. for Med. Progress*, 2016 WL 454082, at *18 (N.D. Cal. Feb. 5, 2016) (nondisclosure

14   agreement), *aff'd sub nom. Nat'l Abortion Fed'n, NAF v. Ctr. For Med. Progress*, 685 F. App'x

15   623 (9th Cir. 2017); *see also Davies v. Grossmont Union High Sch. Dist.*, 930 F.2d 1390, 1399

16   (9th Cir. 1991) (agreement not to run for public office).[15]

17        Meta's principal argument is, instead, that enforcing its prohibition on automated collection

18   serves the important interest of protecting user privacy, MTD 18–20, but this argument answers

19   the wrong question. Meta undoubtedly has an interest in protecting the privacy of its users, but the

20   company fails to explain how enforcing its Terms *against Unfollow Everything 2.0* would serve

21   that interest. As noted above, and as the Amended Complaint explains at length, the tool has been

22   designed to rigorously protect user privacy. Am. Compl. ¶ 74. And users can choose to uninstall

23   the tool at any time. *Id.*; *cf. X Corp. v. Ctr. for Countering Digital Hate, Inc.*, 2024 WL 1246318,

24   at *20 (N.D. Cal. Mar. 25, 2024) (CCDH's scraping of public tweets did not implicate "users'

25

26        [15] Meta's suggestion that declining to enforce its Terms against Unfollow Everything 2.0 would
     somehow intrude on *its* First Amendment rights is mystifying. MTD 20. The tool does not interfere
27   with its right to decide which "content the Feed will display, or how the display will be ordered."
     *Id.* (cleaned up). It merely enables users to automate a feature that Meta itself chooses to provide.
28

1  security interests" where "[n]o private user information was involved"). The tool also does not

2  impair the integrity of Facebook in any way; it merely makes existing Facebook functionality more

3  convenient. Am. Compl. ¶ 76. Meta's interests in enforcing its Terms against the tool are, at best,

4  minimal, and they are substantially outweighed by the public policy disfavoring enforcement.[16]

5      Meta also contends that federal courts are reticent to adopt "novel and unprecedented

6  extension[s] of state law," MTD 19, but Zuckerman merely asks the court to apply well-settled

7  principles of state contract law, and relies mainly on federal sources of public policy.

8  **V.  Prof. Zuckerman has stated a claim that Unfollow Everything 2.0 would not violate**

9      **the Computer Fraud and Abuse Act or the Computer Data Access and Fraud Act.**

10     Meta advances three arguments why Zuckerman has not stated a claim under the CFAA

11 and the CDAFA. All are meritless. First, Meta attempts to repackage its ripeness objections,

12 claiming that Zuckerman hasn't alleged facts suggesting a likelihood that Meta would sue him

13 under the statutes. MTD 24. But for the reasons already discussed in Part I, this is incorrect. Meta

14 argues that its cease-and-desist letter to Barclay did not explicitly mention the CFAA or CDAFA,

15 but the letter's reference to "unauthorized access" was an obvious allusion to the statutes. Am.

16 Compl., Ex. A at 2; *see also Neilmed Prod., Inc. v. Med-Sys., Inc.*, 472 F. Supp. 2d 1178, 1181

17 (N.D. Cal. 2007) (finding that "invo[cation of] the language of trademark infringement" created

18 reasonable apprehension of legal liability, even absent threat of suit); *FN Cellars, LLC*, 2015 WL

19 5138173 at *3 (similar). And Meta spills considerable ink analogizing Zuckerman's tool to the one

20 at issue in *BrandTotal*, a case in which the company brought CFAA and CDAFA claims.

21     Second, Meta questions why the Amended Complaint cites only one provision of the

22 CFAA and argues that a declaratory judgment ruling as to this provision would be "too narrow to

23 be useful." MTD 24. But section 1030(a)(2)(C) is the only provision Meta could conceivably rely

24 on in an action against Zuckerman in relation to his tool. The other provisions involve entirely

25

---

26     [16] Again, Meta points to *Facebook Inc. v. BrandTotal Ltd.*, but that case is distinguishable not
   only because BrandTotal's products did "pose[] risks to privacy," 499 F. Supp. 3d 720, 741 (N.D.
27 Cal. 2020), but also because the sources of public policy Zuckerman points to more closely align
   with Unfollow Everything 2.0's functionality, *see* Am. Compl. at Count III, ¶ 12.

28

irrelevant conduct, such as such cyber espionage, accessing government computers, computer fraud, damaging a computer, password trafficking, and threats and extortion. *See* 18 U.S.C. § 1030(a)(1), (3)–(7). In any event, courts do not require a plaintiff to seek immunity from all potential claims to obtain a declaratory judgment on the specific claim they have brought. *See*, *e.g.*, *Amazon.com, Inc. v. Nat'l Ass'n of Coll. Stores, Inc.*, 826 F. Supp. 2d 1242, 1249 (W.D. Wash. 2011) (allowing plaintiff to seek declaratory judgment as to single provision of the Lanham Act); *Cisco Sys., Inc. v. Beccela's Etc., LLC*, 403 F. Supp. 3d 813, 824 (N.D. Cal. 2019) (similar).

Third, Meta argues that Prof. Zuckerman's CDAFA claim "does not meet the minimal notice pleading requirements of Rule 8(a)(2)." MTD 25. Not so. Rule 8(a)(2) requires only "sufficient allegations to put defendants fairly on notice of the claims against them." *McKeever v. Block*, 932 F.2d 795, 798 (9th Cir.1991). The Amended Complaint more than satisfies this requirement by alleging that Zuckerman would not violate the CDAFA for the same reasons he would not violate the CFAA. This is a clear reference to the provisions of the CDAFA that, like the CFAA, proscribe unauthorized access to Meta's computers—namely, § 502 (c)(1), (c)(2), (c)(3), (c)(4), and (c)(7). Meta cites *McGowan v. Weinstein*, 505 F. Supp. 3d 1000 (C.D. Cal. 2020), but that case is inapposite. There, the court considered the plaintiff's CDAFA claim under section 502(c)(1), but not subsections (c)(2) and (c)(7), because the complaint explicitly cited only subsection (c)(1), the plaintiff's briefing did not identify allegations supporting her claim under the other subsections, and the court was unable to discern any on its own review. *Id.* at 1020 n.13. Here, to the extent there is any doubt about the specific provisions relied upon by Zuckerman— and there shouldn't be—this opposition should dispel it.[17]

## Conclusion

The Court should deny Meta's motion to dismiss.

---

[17] Indeed, Meta itself has argued that "conduct that violates the CFAA also necessarily violates the CDAFA," *see, e.g.*, Pl.'s Mot. Summ. J. 22, *BrandTotal*, 605 F. Supp. 3d at 1218, echoing the longstanding view of courts in the Ninth Circuit that "CDAFA claims generally rise or fall with" CFAA ones, *see BrandTotal*, 605 F. Supp. 3d at 1260 (cleaned up); *see also, e.g.*, *Multiven, Inc. v. Cisco Sys., Inc.*, 725 F. Supp. 2d 887, 895 (N.D. Cal. 2010) ("[T]he necessary elements of Section 502 do not differ materially from the necessary elements of the CFAA.").

Dated: August 29, 2024

Max Schoening #324643
Qureshi Law PC
700 Flower Street, Suite 1000
Los Angeles, CA 90017
T: (213) 600-6096
F: (213) 277-8989
max@qureshi.law

*Counsel for Plaintiff*

Respectfully submitted,

/s/ Ramya Krishnan
Ramya Krishnan, *Pro Hac Vice*
Alex Abdo, *Pro Hac Vice*
Jennifer Jones, *Pro Hac Vice*
Knight First Amendment
  Institute at Columbia University
475 Riverside Drive, Suite 302
New York, NY 10115
T: (646) 745-8500
F: (646) 661-3361
ramya.krishnan@knightcolumbia.org

*Counsel for Plaintiff*