KRISTIN A. LINSLEY, SBN 154148
  klinsley@gibsondunn.com
WESLEY SZE, SBN 306715
  wsze@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
One Embarcadero Center, Suite 2600
San Francisco, CA  94111
Telephone:     415.393.8200

JACOB T. SPENCER (*pro hac vice*)
  jspencer@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
1700 M Street, N.W.
Washington, DC  20036
Telephone:     202.955.8500

*Attorneys for Defendant*
*Meta Platforms, Inc.*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| ETHAN ZUCKERMAN,<br><br>              Plaintiff,<br><br>       v.<br><br>META PLATFORMS, INC.,<br><br>              Defendant. | Case No. 3:24-CV-02596-JSC<br><br>**REPLY MEMORANDUM OF DEFENDANT META PLATFORMS, INC. IN SUPPORT OF MOTION TO DISMISS AMENDED COMPLAINT**<br><br>**Hearing:**<br>Date:           November 7, 2024<br>Time:           10:00 a.m.<br>Courtroom:  8, 19th Floor<br>Judge:          Hon. Jacqueline Scott Corley |

## TABLE OF CONTENTS

Page

I.  INTRODUCTION...........................................................................................................................1

II.  ARGUMENT ................................................................................................................................2

    A.  This Action Should Be Dismissed For Lack Of Jurisdiction ..........................................2

        1.  Plaintiff's Hypothetical Dispute Is Not Ripe For Review .....................................2

        2.  Plaintiff's Claims Do Not Warrant Discretionary Review ................................6

    B.  The Amended Complaint Does Not State A Claim .........................................................7

        1.  Plaintiff's Tool, As Alleged, Would Breach Meta's Terms Of Service ............8

        2.  Public Policy Does Not Prohibit Enforcement Of Meta's Terms
            Against Plaintiff ...................................................................................................9

        3.  Plaintiff Has Not Alleged An Entitlement To Section 230(c)(2)(B)
            Immunity...........................................................................................................11

        4.  The Court Should Dismiss Plaintiff's Request For Declaratory Relief
            Regarding The CFAA And CDAFA.................................................................14

III.  CONCLUSION...........................................................................................................................15

Gibson, Dunn &
Crutcher LLP

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*3taps, Inc. v. LinkedIn Corp.*,
  2022 WL 16953623 (N.D. Cal. Nov. 15, 2022) .................................................................5

*Am. States Ins. Co. v. Kearns*,
  15 F.3d 142 (9th Cir. 1994) ...............................................................................................2

*Bank of Am., N.A. v. Cnty. of Maui*,
  2020 WL 7700098 (D. Haw. Dec. 28, 2020) .................................................................3, 6

*Barnes v. Yahoo!, Inc.*,
  570 F.3d 1096 (9th Cir. 2009) .........................................................................................11

*Batzel v. Smith*,
  333 F.3d 1018 (9th Cir. 2003) .........................................................................................12

*Berenson v. Twitter, Inc.*,
  2022 WL 1289049 (N.D. Cal. Apr. 29, 2022) .................................................................11

*Brillhart v. Excess Ins. Co.*,
  316 U.S. 491 (1942) ...........................................................................................................6

*Chesebrough-Pond's, Inc. v. Faberge, Inc.*,
  666 F.2d 393 (9th Cir. 1982) .............................................................................................4

*Delacruz v. State Bar of Cal.*,
  2017 WL 7310715 (N.D. Cal. June 21, 2017) ...................................................................7

*E.&J. Gallo Winery v. Proximo Spirits, Inc.*,
  583 F. App'x 632 (9th Cir. 2014) ......................................................................................5

*Eddy v. Citizenhawk, Inc.*,
  2013 WL 12114488 (S.D. Cal. Nov. 19, 2013) .................................................................5

*Enhanced Athlete Inc. v. Google LLC*,
  479 F. Supp. 3d 824 (N.D. Cal. 2020) .............................................................................11

*Facebook, Inc. v. BrandTotal Ltd.*,
  2021 WL 662168 (N.D. Cal. Feb. 19, 2021) .....................................................................8

*Facebook, Inc. v. Power Ventures, Inc.*,
  844 F.3d 1058 (9th Cir. 2016) .......................................................................................5, 9

*FN Cellars, LLC v. Union Wine Co.*,
  2015 WL 5138173 (N.D. Cal. Sept. 1, 2015) ...............................................................4, 14

*Gov't Emps. Ins. Co. v. Dizol*,
  133 F.3d 1220 (9th Cir. 1998) .......................................................................................6, 15

*Hillis v. Heineman*,
  626 F.3d 1014 (9th Cir. 2010) ...........................................................................................4

Gibson, Dunn &
Crutcher LLP

*Kurtin v. Elieff*,
   215 Cal. App. 4th 455 (2013) ...................................................................................................8

*LifeScan Scotland, Ltd. v. Shasta Techs., LLC*,
   2012 WL 2979028 (N.D. Cal. July 19, 2012) ..........................................................................4

*McGowan v. Weinstein*,
   505 F. Supp. 3d 1000 (C.D. Cal. 2020) ................................................................................15

*Meta Platforms, Inc. v. BrandTotal Ltd.*,
   605 F. Supp. 3d 1218 (N.D. Cal. 2022) ..................................................................1, 5, 9, 15

*Meta Platforms, Inc. v. Bright Data Ltd.*,
   2024 WL 251406 (N.D. Cal. Jan. 23, 2024) .......................................................................6, 8

*Meta Platforms, Inc. v. Voyager Labs Ltd.*,
   2024 WL 2412419 (N.D. Cal. May 23, 2024) .........................................................................6

*Montana Env. Info. Ctr. v. Stone-Manning*,
   766 F.3d 1184 (9th Cir. 2014) ................................................................................................2

*Moody v. NetChoice, LLC*,
   144 S. Ct. 2383 (2024) ..........................................................................................................10

*Multiven, Inc. v. Cisco Sys., Inc.*,
   725 F. Supp. 2d 887 (N.D. Cal. 2010) .................................................................................15

*Nat'l Basketball Ass'n v. SDC Basketball Club, Inc.*,
   815 F.2d 562 (9th Cir. 1987) ..................................................................................................4

*Negrete v. City of Oakland*,
   46 F.4th 811 (9th Cir. 2022) ...................................................................................................6

*Neilmed Prods., Inc. v. Med-Sys., Inc.*,
   472 F. Supp. 2d 1178 (N.D. Cal. 2007) ...............................................................................14

*Paramount Pictures Corp. v. Axanar Prods., Inc.*,
   2016 WL 2967959 (C.D. Cal. May 9, 2016) ..........................................................................4

*Prager Univ. v. Google LLC*,
   85 Cal. App. 5th 1022 (2022) ...............................................................................................11

*Rengo Co. Ltd. v. Molins Mach. Co.*,
   657 F.2d 535 (3d Cir. 1981) ....................................................................................................4

*Sarmiento v. Marquez*,
   2022 WL 2918906 (N.D. Cal. July 25, 2022) ......................................................................15

*Societe de Conditionnement en Aluminium v. Hunter Eng'g, Co.*,
   655 F.2d 938 (9th Cir. 1981) ..........................................................................................3, 4, 5

*Stackla, Inc. v. Facebook Inc.*,
   2019 WL 4738288 (N.D. Cal. Sept. 27, 2019) ....................................................................10

*Xoxide, Inc. v. Ford Motor Co.*,
    448 F. Supp. 2d 1188 (C.D. Cal. 2006) ...................................................................................7

*Zango, Inc. v. Kaspersky Lab, Inc.*,
    568 F.3d 1169 (9th Cir. 2009) ..............................................................................................13

*In re Zoom Video Commc'ns Inc. Priv. Litig.*,
    525 F. Supp. 3d 1017 (N.D. Cal. 2021) ................................................................................13

**Statutes**

47 U.S.C. § 230(b)(2) ...............................................................................................................10

47 U.S.C. § 230(c)(2) ...............................................................................................11, 12, 13

47 U.S.C. § 230(c)(2)(A) ...........................................................................................................14

47 U.S.C. § 230(c)(2)(B) ...........................................................................................2, 11, 14

47 U.S.C. § 230(f)(2) ...............................................................................................12, 13

47 U.S.C. § 230(f)(4) ...............................................................................................12

47 U.S.C. § 230(f)(4)(C) ...........................................................................................................13

**Treatises**

Restatement (Second) of Contracts § 178 (1981) ..........................................................................9

5C Wright & Miller, Fed. Prac. & Proc. Civ. § 1397 (3d ed. 2024 update) ............................................4

10B Wright & Miller, Fed. Prac. & Proc. Civ. § 2761 (4th ed. 2024) ...............................................3

Gibson, Dunn &
Crutcher LLP

REPLY MEMORANDUM OF META PLATFORMS ISO MOTION TO DISMISS AMENDED COMPLAINT
CASE NO. 3:24-CV-02596-JSC

## I.      INTRODUCTION

Plaintiff's opposition confirms that this Court should not exercise discretionary jurisdiction over this theoretical dispute about a proposed browser extension, "Unfollow Everything 2.0," that does not yet exist.  Aside from conjecture about how Plaintiff *intends* his proposed extension to work, there are no facts that would enable this Court to adjudicate his declaratory relief requests, a process that would require technical details about how the hypothetical tool—if invented—would interact with users, computers, and data, as well as Facebook's own servers and systems.

Among the many reasons why the Court should decline Plaintiff's invitation, the most important is that his grievances are not ripe.  Until Plaintiff initiated this lawsuit, Meta had never taken any action toward him; there is no guarantee that his proposed browser extension (if and when released) would actually operate as he suggests; and, until the extension actually exists, Meta cannot determine how it might respond and the Court lacks sufficient information to resolve Plaintiff's claims for declaratory relief.  The patent and trademark cases Plaintiff cites are inapposite because they involve a different legal standard, and his allusion to the "core functionality" of his proposed extension does not supply the requisite technical facts to enable meaningful review.

Prudential considerations also weigh against exercising discretionary jurisdiction.  As shown by Plaintiff's media tour, he filed this lawsuit to "shape policy" about "user empowerment" on the Internet.  But it is not this Court's role to make Internet policy—and it is a doubly bad idea for the Court to do so through a case that it is not required to hear.  Adjudicating these claims would also require unnecessary rulings on hypothetical applications of California law—rulings that would be moot if, as is likely, the tool Plaintiff proposes inventing were to end up working differently than alleged or Meta's response to any such tool were different claims than Plaintiff predicts.

Even if the Court were inclined to address the merits of Plaintiff's allegations, they would fail to state a claim.  To the extent Plaintiff's allegations are discernable, his proposed tool apparently would use automated means to enter into a Facebook user's account to access and collect data from Facebook—conduct that would both compromise Meta's ability to protect user security and directly violate its Terms of Service.  Another court in this District, in *Meta Platforms, Inc. v. BrandTotal Ltd.*, 605 F. Supp. 3d 1218 (N.D. Cal. 2022), recognized that Meta's Terms are valid and enforceable and

REPLY MEMORANDUM OF META PLATFORMS ISO MOTION TO DISMISS AMENDED COMPLAINT
CASE NO. 3:24-CV-02596-JSC

Gibson, Dunn & Crutcher LLP

serve legitimate purposes.  Contrary to Plaintiff's and amici's policy arguments, Meta's Terms do not specifically bar the development of any tool that might help users control their experiences on the Internet, and Plaintiff is free to develop whatever tools he wishes to invent.  But he may not seek license to do so in a way that violates the Terms or applicable law.

Plaintiff's request for a declaration that he would be immunized by section 230(c)(2)(B) of the Communications Decency Act also should be denied.  Section 230(c)(2)(B) does not apply because the action at issue—using automated means to access and collect data from Facebook—is not one that "restrict[s] access to material."  47 U.S.C. § 230(c)(2)(B).  Plaintiff's opposition also does not show that he is a provider or user of an "interactive computer service," or that his proposed browser extension would "restrict access" to content in any event.

Finally, Plaintiff supplies no good reason for the Court to decide whether his proposed tool would violate the CFAA or CDAFA.  It is unclear whether Meta would assert such claims (even assuming it would respond to the release of his tool with a legal action), and the opposition provides no factual clarity to discern the putative CFAA or CDAFA claim for which he seeks declaratory relief.

In short, there is no justiciable dispute, and Plaintiff has not stated any claim for relief.  The Court should dismiss this lawsuit.

## II.   ARGUMENT

### A.   This Action Should Be Dismissed For Lack Of Jurisdiction

Plaintiff's opposition confirms that (1) there is no ripe "case of actual controversy" within this Court's jurisdiction, and (2) it would be inappropriate, as a prudential matter, for the Court to exercise its discretionary jurisdiction.  *Am. States Ins. Co. v. Kearns*, 15 F.3d 142, 143 (9th Cir. 1994).

#### 1.   Plaintiff's Hypothetical Dispute Is Not Ripe For Review

Plaintiff's abstract "fears that Meta will take legal action against him if he releases" his yet-to-be-developed browser extension do not make this case ripe for review.  Dkt. 33 ("Opp.") 3.  Ripeness requires "a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment."  *Montana Env. Info. Ctr. v. Stone-Manning*, 766 F.3d 1184, 1888 (9th Cir. 2014).  There is no substantial, immediate, or real controversy, not least because "Unfollow Everything 2.0" is *hypothetical*.  Plaintiff's claims depend

upon his actually developing and releasing the tool he plans to invent *and* the tool working exactly as he predicts.  Opp. 8; Dkt. 30 ("Mem.") 5.  Even then, Meta would need to analyze how the proposed tool actually works to determine an appropriate response.

Plaintiff's efforts to sidestep those fundamental flaws fail.  Plaintiff first insists that he has identified the "core functionality" of his proposed invention—allowing the "automation of unfollowing and re-following"—and that all he is missing is the "actual computer code." Opp. 8.  But adjudicating whether Plaintiff's proposed tool would violate Meta's Terms of Service, the CFAA, or CDAFA depends on the details of how it would *accomplish* its "core functionality."  Both Meta's Terms and the computer fraud statutes focus on specific, technical conduct relating to the interaction between data, computers, and servers.  And even if Plaintiff could allege sufficient details about a nonexistent tool he plans to invent to allow an initial hypothetical adjudication, readjudication would be required if the tool were to operate differently than suggested.  Regardless of whether the tool could be completed in six weeks or in three years, it does not yet exist, and Plaintiff concedes that any changes to Facebook's services in the interim would "require corresponding changes to the tool."  Opp. 8–9.

Plaintiff next tries to dilute the ripeness standard by citing patent and trademark cases to suggest that his "immediate intention to code the tool," combined with his "significant, concrete steps" toward completing it, make this case ripe.  Opp. 6–7.  But the standard for intellectual property cases—where "declaratory action … is almost always justiciable"—does "not support" similar relief in non-intellectual property disputes. *Bank of Am., N.A. v. Cnty. of Maui*, 2020 WL 7700098, at *4 (D. Haw. Dec. 28, 2020).  Unlike other cases, intellectual property disputes involve suppression of competition through statutory monopolies that have the potential to inflict immediate harm to an alleged infringer's business, such that lowering the declaratory relief threshold for these cases serves the "policies underlying the patent laws" of promoting fair competition and judicial efficiency.  *Societe de Conditionnement en Aluminium v. Hunter Eng'g, Co.*, 655 F.2d 938, 943 (9th Cir. 1981); *see also* 10B Wright & Miller, Fed. Prac. & Proc. Civ. § 2761 (4th ed. 2024) (explaining unique role of declaratory judgment in patent and trademark context).  And, uniquely to intellectual property infringement cases, the "adverse legal positions of the parties are more crystallized" because courts can fully adjudicate the validity of a patent or mark without relying "on a set of hypothetical facts."  *Societe*, 655 F.2d at 944.

None of those considerations applies here, where Plaintiff's claims do not involve a statutory monopoly and would require the Court to rely on an empty record comprising only allegations about hypothetical facts regarding an invention that does not yet exist.[1]

Nor does Meta's *alternative* argument under Rule 12(b)(6) that Plaintiff's proposed browser extension (if developed) would "violate[] [its] Terms" (Opp. 4) somehow make this case ripe.  A defendant does not concede jurisdiction by alternatively seeking dismissal under Rule 12(b)(6).  *See* 5C Wright & Miller, Fed. Prac. & Proc. Civ. § 1397 (3d ed. 2024 update) (recognizing "practice of allowing a defendant in effect to plead alternatively … one or more threshold defenses" without waiving jurisdictional objections).  Were the rule otherwise, a defendant in a declaratory judgment case could never raise alternative arguments about the merits of the claims without waiving jurisdiction— contrary to the "important and constructive principle of our adversary system that parties may argue alternative positions without waiver." *Hillis v. Heineman*, 626 F.3d 1014, 1018–19 (9th Cir. 2010).

That Meta's motion does not "'disclaim' an intent to pursue legal action" against Plaintiff does not change the analysis.  Opp. 6.  This action is unripe *because* there are insufficient facts for Meta (and the Court) to evaluate Plaintiff's hypothetical browser extension, so it is unsurprising that Meta has not yet advanced a litigation position.[2]  The defendant in *Chesebrough-Pond's, Inc. v. Faberge, Inc.*, 666 F.2d 393 (9th Cir. 1982), by contrast, "responded to [the declaratory judgment action] with a counterclaim seeking damages for infringement." *Id.* at 396–97.[3]

---

[1] Plaintiff's intellectual property cases are distinguishable in any event because, unlike in those cases, Plaintiff has not yet invented his proposed tool and is not ready to release it imminently.  *See, e.g.*, *LifeScan Scotland, Ltd. v. Shasta Techs., LLC*, 2012 WL 2979028, at *1, *6 (N.D. Cal. July 19, 2012) (allegedly infringing products were produced and "stockpile[d]" for distribution); *Rengo Co. Ltd. v. Molins Mach. Co.*, 657 F.2d 535, 539 (3d Cir. 1981) (defendant took orders to sell a "possibly infringing device," which it had the ability to produce); *see also Paramount Pictures Corp. v. Axanar Prods., Inc.*, 2016 WL 2967959, at *6 (C.D. Cal. May 9, 2016) (defendant had "fully revised and locked" script and completed filming scene from allegedly infringing film).

[2] Plaintiff's other cited cases are inapplicable, as they involved situations where the declaratory relief defendant had already threatened to "take every legal action available to them against" the plaintiff specifically, *Societe*, 655 F.2d at 941, 945, or had filed a cancellation action against the plaintiff, *FN Cellars, LLC v. Union Wine Co.*, 2015 WL 5138173, at *3 (N.D. Cal. Sept. 1, 2015).

[3] *National Basketball Ass'n v. SDC Basketball Club, Inc.*, 815 F.2d 562, 566 (9th Cir. 1987), is inapposite for the same reason.  There, the NBA sought declaratory judgment that its actions would not violate antitrust laws, and defendants counterclaimed for declaratory judgment that the NBA's actions "would violate the antitrust laws."  *Id.* at 565.  Because defendants filed a *counterclaim* on the same issue, defendants were "in direct conflict with the NBA" from "the onset of the suit." *Id.* at 566.

The cease-and-desist letter Meta sent to the creator of "Unfollow Everything 1.0" also does not establish a ripe controversy.  Although Plaintiff says Unfollow Everything 1.0 was "the inspiration for" his proposed browser extension and that he believes his tool would be "functionally identical," Opp. 4, neither the Amended Complaint nor the opposition explains how Unfollow Everything 1.0 interacted with users, data, and computer servers, or whether its technical operations would match those of Plaintiff's contemplated tool—a critical omission, as there may be many ways to achieve the same ultimate functionality of "mass following and unfollowing." *Id.*

In any event, that cease-and-desist letter did not threaten litigation, and Meta's reservation of its rights, standing alone, cannot establish an imminent threat to litigate.  *See Eddy v. Citizenhawk, Inc.*, 2013 WL 12114488, at *3 (S.D. Cal. Nov. 19, 2013).  Unlike in Plaintiff's cases, Meta has taken no action against Plaintiff (apart from responding to *his* lawsuit).  Nor is there privity between Plaintiff and Unfollow Everything 1.0's creator such that the letter was effectively a threat against Plaintiff.  *See Societe* at 944–45 (defendant's employee made phone call to client of the plaintiff threatening infringement suit if client purchased plaintiff's equipment); *E.&J. Gallo Winery v. Proximo Spirits, Inc.*, 583 F. App'x 632, 633–34 (9th Cir. 2014) (defendant's distributor sent plaintiff's distributor cease-and-desist letter threatening legal action for trade dress infringement).

Plaintiff's reliance on *3taps, Inc. v. LinkedIn Corp.*, 2022 WL 16953623 (N.D. Cal. Nov. 15, 2022), only underscores why *this* case is not ripe.  *See* Opp. 5–6.  There, LinkedIn was *already* engaged in adversarial litigation regarding identical conduct (*i.e.*, web scraping) and directly told 3taps that its scraping software was impermissible.  Here, by contrast, there is no pending litigation involving an identical issue and no prior contacts between Meta and Plaintiff.

Finally, Plaintiff's argument about Meta's purported "pattern" of enforcing its Terms against third-party developers, Opp. 5, proves nothing.  Those examples say nothing about how Meta may ultimately respond to Plaintiff's proposed browser extension.  The applications Plaintiff cites had already been developed and released, presenting actual facts about how they interacted with Meta's services.  *See id.* (citing Am. Compl. ¶¶ 90–91); *Facebook, Inc. v. Power Ventures, Inc.*, 844 F.3d 1058, 1062 (9th Cir. 2016) (defendant had "accessed Facebook users' data and initiated form e-mails"); *BrandTotal*, 605 F. Supp. 3d at 1232 (existing browser extension "log[ged] information that Facebook

transmits to the user"); *Meta Platforms, Inc. v. Bright Data Ltd.*, 2024 WL 251406, at *3 (N.D. Cal. Jan. 23, 2024) (defendant "developed and used unauthorized automation software to scrape data from Facebook and Instagram"); *Meta Platforms, Inc. v. Voyager Labs Ltd.*, 2024 WL 2412419, at *1 (N.D. Cal. May 23, 2024) (defendant operated "surveillance software that uses tens of thousands of fake accounts to scrape data from Facebook and Instagram"). These cherry-picked examples do not establish that legal action against Plaintiff is inevitable: Many third-party tools interact with Meta's services, and litigation against a few does not suggest litigation is certain against all.[4]

### 2.   Plaintiff's Claims Do Not Warrant Discretionary Review

Even if Plaintiff could establish that this case were ripe, that would not mean the Court must take it up—and there are good reasons not to. *Gov't Emps. Ins. Co. v. Dizol*, 133 F.3d 1220, 1225 n.5 (9th Cir. 1998) (citing *Brillhart v. Excess Ins. Co.*, 316 U.S. 491, 495 (1942)). The discretionary factors weigh in favor of dismissal, *see* Mem. 11–14, and Plaintiff offers no convincing arguments.

*First*, Plaintiff is incorrect that this case will not involve needless determination of state law. Although Plaintiff says "[t]he primary claim at issue is a federal one" (Opp. 12), his section 230 "claim" is not a claim at all: it is an *immunity* from suit, and asserting it is not ordinarily enough to create federal jurisdiction. *See Negrete v. City of Oakland*, 46 F.4th 811, 819 (9th Cir. 2022) ("A defense that raises a federal question is inadequate to confer federal jurisdiction."). Although Plaintiff seeks a ruling on one federal claim under the CFAA, it is not certain that Meta would assert that claim (or any of his state-law claims) even if Meta were to pursue a later action—making adjudication of state law claims by this Court "superfluous" at this stage. *Bank of Am.*, 2020 WL 7700098, at *6.

*Second*, Plaintiff does not address the possibility that resolution of this action presents a risk of duplicative litigation if the proposed browser extension does not work as intended or requires changes "corresponding" to any changes to Facebook's services. *See* Mem. 12. As Plaintiff acknowledges,

---

[4] Plaintiff also argues the prudential ripeness factors under Article III—fitness for judicial resolution and harm to the plaintiff—do not apply in actions between private parties. *See* Opp. 3 n.2. But whatever role these prudential factors may play in the constitutional ripeness analysis, Plaintiff cannot dispute that the Court's exercise of declaratory jurisdiction is always discretionary. And the key prudential factors—including the need to develop a technical record to allow efficient analysis of the claims; the minimal hardship to Plaintiff (which he characterizes as "potential loss of his Facebook account," and an unspecified "cost of coding the tool," Opp. 10); and the unfairness to Meta of defending an action based on nothing more than Plaintiff's claimed intentions—all counsel against exercising discretionary jurisdiction here. *See* Mem. 9–11.

Gibson, Dunn & Crutcher LLP

Facebook's services have "changed over time and will likely continue to change." Am. Compl. ¶ 53.

*Third*, on forum shopping, Plaintiff does not dispute that his goal is to gain a procedural advantage by having free rein to dictate the allegations (which rest on his claimed intentions, not concrete facts, about his proposed browser extension) and to select the specific claims he wants to litigate to further his own policy agenda (which may not even reflect the legal claims or theories, if any, that Meta might bring if Plaintiff ever invents and releases his proposed tool). *See* Mem. 13. To the extent Plaintiff suggests that his suit has been "triggered" by the cease-and-desist letters sent to a different creator of a separate tool, Unfollow Everything 1.0, "equity militates" in favor of permitting Meta to choose a forum. *See Xoxide, Inc. v. Ford Motor Co.*, 448 F. Supp. 2d 1188, 1193 (C.D. Cal. 2006) (declining to exercise jurisdiction over anticipatory declaratory judgment action in response to cease-and-desist letters as improper forum shopping).

*Fourth*, deciding this action before Plaintiff has actually followed through on his plan to invent a browser extension will not "usefully clarify the parties' legal relations." Opp. 3. Even if Meta might deem legal action appropriate after actually seeing the tool that Plaintiff may ultimately release, Meta may bring different claims from those posited by Plaintiff. *See* Mem. 13. Plaintiff's suggestion that no trademark claim could be asserted because "[n]o such use has been pleaded," Opp. 11 n.7, only highlights the problem with Plaintiff's selective pleading of allegations and claims, which fundamentally limits the utility of any declaratory ruling on the claims he has brought.

*Finally*, the fairness factor cuts against jurisdiction. *See* Mem. 14. Plaintiff argues that Meta's damages are irrelevant to his claims, Opp. 12, but damages are an element of the CFAA, *Delacruz v. State Bar of Cal.*, 2017 WL 7310715, at *7 (N.D. Cal. June 21, 2017), and the degree of harm will affect Meta's evaluation of the tool and its response. And although Plaintiff insists "the tool does not harm Facebook," Opp. 12, that would be incorrect even if the proposed browser extension works exactly as Plaintiff intends: Meta has obligations to protect the integrity of its services and to ensure consistent enforcement of Terms that protect user privacy.

## B.  The Amended Complaint Does Not State A Claim

The Court need not consider the merits of Plaintiff's claims because there is no basis to exercise jurisdiction. If the Court does so, it should dismiss because Plaintiff's allegations are insufficient to

allege a breach of contract or violation of the CFAA or CDAFA.

### 1.  <u>Plaintiff's Tool, As Alleged, Would Breach Meta's Terms Of Service</u>

Plaintiff's proposed tool would violate at least two provisions of Meta's Terms:  restrictions on "access[ing] or collect[ing] data from [Facebook] using automated means" and "enag[ing]," "facilitat[ing]," or "support[ing] others in doing so."  Dkt. 31-2 §§ 3.2, 3.2.3; *see* Mem. 14–17.  Plaintiff does not dispute that his proposed tool would "access or collect data … using automated means."  Rather, his primary argument appears to be that only "users" of his proposed tool—and not Plaintiff himself—would be subject to the Terms.  *See* Opp. 18–19.  This argument ignores Section 3.2, which explicitly bars any user from "facilitat[ing] or support[ing] others" in violating the Terms.  Dkt. 31-2 § 3.2.  That provision defeats Plaintiff's arguments that he is not personally using, access, or collecting data from Facebook (*see* Opp. 20), because he, as a user of Facebook (*see* Am. Compl. ¶ 45), also agreed not to help others violate the Terms.[5]  It is also no answer that Plaintiff's proposed browser extension would "use" Facebook as a user's "agent."  *See* Opp. 20.  Under California law, "agents are responsible for their *own* independent torts and breaches of contract in connection with acts in the course of their agency."  *Kurtin v. Elieff*, 215 Cal. App. 4th 455, 480 (2013).  Plaintiff's unsupported agency status gives him no license to breach Facebook's Terms, to which he is personally bound as a Facebook user (*see* Am. Compl. ¶ 45).

Plaintiff is also wrong that general policy statements and press releases about the rights of Facebook users to download their data somehow authorize him to access that data by means that violate the Terms.  *See* Opp. 21.  No Facebook "user could reasonably rely on broad statements regarding ownership of data as allowing the use of automated means to collect that data."  *Facebook, Inc. v. BrandTotal Ltd.*, 2021 WL 662168, at *11 (N.D. Cal. Feb. 19, 2021).  Meta's Terms prohibit "access or collect[ion of] data from [Facebook] using automated means," and there is no exception for data that a user may otherwise access or download through channels authorized by Meta.  Dkt. 30-2 § 3.2.3.

---

[5] Plaintiff also cites *Meta Platforms, Inc. v. Bright Data Ltd.*, 2024 WL 251406 (N.D. Cal. Jan. 23, 2024), to suggest that he can only be bound by the Terms for "actions taken while availing oneself of the platform."  Opp. 19.  But *Bright Data* involved "logged-off" scraping (where no one was using Facebook), whereas Plaintiff is facilitating a use of Facebook that violates the Terms.  And unlike the "logged-off" scraping in *Bright Data*, Plaintiff's hypothetical invention is engaged in "activities tied to or derivative of *logged-in access*," 2024 WL 251406, at *14 (emphasis added), a far more pernicious practice given the potential harm to user privacy and security.

Gibson, Dunn &
Crutcher LLP

Plaintiff also overreads *Power Ventures* by suggesting the Ninth Circuit "concluded" that a social media aggregator had "implied permission to automatically collect user data from Meta's servers." Opp. 21.  The court merely noted that the aggregator "reasonably could have thought" that it had "at least arguable permission to access Facebook's computers" based on user consent, but the court did not address the restrictions in Meta's Terms about how that data may be accessed from Meta's servers even if users consented to such access.  *Power Ventures*, 844 F.3d at 1067.

Finally, Plaintiff posits that Facebook's Terms might one day change in a way that allows users to download their data using automated means.  Opp. 21.  But this argument only highlights why this dispute is not ripe.  If Plaintiff thinks Meta might at some point in the future change its Terms to allow his hypothetical invention, there is no need for the Court to grant a declaratory ruling now.

## 2. <u>Public Policy Does Not Prohibit Enforcement Of Meta's Terms Against Plaintiff</u>

Plaintiff's public policy voidness arguments also fail.  He alludes to general "sources of law" reflecting a "public policy favoring user control online, and filtering technologies in particular, as a means of achieving that control," Opp. 22, but this hand waving cannot meet the heavy burden for voiding a contract on public policy grounds.  As Meta showed, courts invalidate a contract term only where "the interest in its enforcement is *clearly outweighed* in the circumstances by a public policy against the enforcement of such terms."  Restatement (Second) of Contracts § 178 (1981) (emphasis added).  Plaintiff cites not a single example where a court has invalidated a contractual prohibition akin to the prohibition on automated access to user data in Meta's Terms.

In fact, the published decision by another judge in this District in *BrandTotal* decisively *rejected* essentially identical public policy challenges based on generalized interests in consumer privacy and free speech to the same Terms.  "[A] basic sense of what is in the public interest is not sufficient … to invalidate" Meta's Terms, as any policy arguments must be tied to "particular constitutional and statutory policies."  605 F. Supp. 3d at 1245.  Plaintiff has not identified a sufficiently particular constitutional or statutory policy here.  As in *BrandTotal*, he offers only "scattershot citations to the CCPA that failed to tie that law's actual requirements to the conduct at issue in this case."  *Id.* at 1245.  And his First Amendment arguments fail because the contractual terms at issue—which concern automated access to Meta's servers—merely restrict the means by which a user can access information.

He does not contend there is a First Amendment principle requiring all users to have automated access to online servers, much less a value that is enforceable against private parties such as Meta. Plaintiff's arguments related to section 230 are also misguided—they rest entirely on the general policy recitations in that statute, which *also* expresses strong policies favoring the free functioning of the Internet "unfettered by Federal or State regulation." 47 U.S.C. § 230(b)(2).

Plaintiff also misconstrues Meta's countervailing public policy interests. Courts have recognized that Meta has "a pressing public interest" in "polic[ing] the integrity of its platforms." *Stackla, Inc. v. Facebook Inc.*, 2019 WL 4738288, at *6 (N.D. Cal. Sept. 27, 2019). This Court should not "handicap Facebook's ability to decisively police" its services, *id.*, just because Plaintiff asserts (without actually knowing) that the proposed tool could never "interfere with the normal operation of Facebook"—despite acknowledging that "[t]he process for unfollowing has changed over time *and will likely to continue to change.*" Am. Compl. ¶¶ 53, 76 (emphasis added). And Plaintiff's contention that he is "merely ask[ing] the court to apply well-settled principles of state contract law" is belied by the fact that he does not cite a single case invalidating a company's terms based on a "public policy favoring user control online." Opp. 22, 24. As Meta explained, the most analogous case was *BrandTotal*, which rejected policy arguments like Plaintiff's and upheld Meta's Terms. There is no reason for this Court to break with *BrandTotal*, or to undertake a novel application of state contract law. Contrary to Plaintiff's characterization, *BrandTotal* did not focus only on the "risks" posed by BrandTotal's software or how "closely align[ed]" the software was with public policy goals. Opp. 24 n.16. Rather, the court assessed BrandTotal's asserted policy interests (which were largely identical to what Plaintiff asserts here) and held that they did not invalidate unrelated terms restricting use of automated means to access data on Facebook's servers.

Finally, the public policy interest in Meta's free speech rights is far from "mystifying." Opp. 23 n.15. Rather, it is a straightforward application of the Supreme Court's decision in *Moody v. NetChoice, LLC*, which recognized the First Amendment protections that online services have in deciding how content will be organized and displayed. 144 S. Ct. 2383, 2405 (2024). By contrast, the generalized nature of Plaintiff's public policy interests is too vague to carry his heavy burden of showing that the Terms should be voided on public policy grounds.

### 3.   Plaintiff Has Not Alleged An Entitlement To Section 230(c)(2)(B) Immunity

The Amended Complaint also does not, and cannot, plead that Plaintiff is entitled to a declaration of immunity under section 230(c)(2)(B) of the Communications Decency Act.

#### a.   Section 230(c)(2)(B) Does Not Immunize Plaintiff From Breaching Terms That Prohibit Using Automated Means To Access Or Collect Data

The Court should reject Plaintiff's argument that section 230(c)(2)(B) would free him from his voluntary contractual obligations under Meta's Terms.   Most fundamentally, section 230(c)(2)(B) would not apply because the relevant Terms relate to prohibitions on using "automated means" to "collect" or "access" data from Facebook.   Dkt. 31-2 § 3.2.3.   Any potential enforcement of these Terms would *not* seek to hold Plaintiff "liable on account of" enabling or making available "the technical means to restrict access to material."   47 U.S.C. § 230(c)(2).   As Plaintiff acknowledges, "[s]ome breach-of-contract claims might not be based on actions taken to enable filtering," and he *agrees* that "those claims could proceed."   Opp. 17.   This concession is dispositive.   The only restriction at issue here relates to "automated access," which is not implicated by section 230(c)(2).   More generally, as explained in *Berenson v. Twitter, Inc.*, 2022 WL 1289049 (N.D. Cal. Apr. 29, 2022), and *Enhanced Athlete Inc. v. Google LLC*, 479 F. Supp. 3d 824 (N.D. Cal. 2020), holding someone to their contractual promises does not make them "liable on account of" the acts described in section 230(c)(2).[6]

Plaintiff's policy argument that Congress enacted section 230(c)(2) to ensure developers could make tools that "maximize user control over what information is received by individuals, families, and schools" is beside the point.   Opp. 13; Dkt. 36-1 ("Amici Br.") at 1.   Meta is not arguing that Plaintiff's purported tool would violate the Terms because it would supposedly give users control over their Feed. Meta's Terms do not specifically prohibit all user empowerment tools as such, and neither Plaintiff nor

---

[6] Although Plaintiff is correct to note that *Prager University v. Google LLC*, 85 Cal. App. 5th 1022 (2022), applied subsection 230(c)(1), Opp. 17, *Prager*'s reasoning—that "the CDA may permit a state law claim concerning … activity based on a specific contractual promise, section 230 notwithstanding"—applies equally here, as exemplified by Judge Alsup's ruling in *Berenson*. Similarly, *Barnes v. Yahoo!, Inc.*, 570 F.3d 1096 (9th Cir. 2009), reasoned that section 230(c)(1) does not preclude liability for claims where "the duty the defendant allegedly violated springs from a contract—an enforceable promise—not from any non-contractual conduct … of the defendant."  *Id.* at 1107.  *Barnes*'s recognition that contractual claims arise from "an enforceable promise," rather than "any non-contractual conduct," *id.*, also holds for section 230(c)(2) because contractual claims do not seek to hold a defendant "liable on account of … restrict[ing] access to or availability of material," 47 U.S.C. § 230(c)(2), but on account of breaking the defendant's promise.

Gibson, Dunn & Crutcher LLP

amici consider other ways in which third-party tools might accomplish the same purpose *without* violating contractual prohibitions on using automated means to access data.

To the extent Plaintiff and amici argue there is no per se exception from section 230(c)(2) for all contractual claims, they misunderstand Meta's point. *See* Opp. 17; Amici Br. 13. This Court need not decide whether section 230(c)(2) *ever* immunizes a party from breaching a contract that prohibits them from "restrict[ing] access to content," because the relevant Terms here prohibit using automated means to access content; they do not restrict access to content. Plaintiff's reliance on *Batzel v. Smith*, 333 F.3d 1018 (9th Cir. 2003), is inapposite. Opp. 17; Amici Br. 14. There, the Ninth Circuit suggested that section 230(c)(2) might "insulate[] service providers from claims premised on the taking down of a customer's posting such as breach of contract"—referring to potential claims that the party requesting the takedown might face for removing (*i.e.*, "restrict[ing] access to") content that the service provider contractually agreed to display for a user. *Id.* at 1030 n.14. But Plaintiff's request for declaratory relief here has nothing to do with immunity for causing Meta to take down users' content.

### b.    The Amended Complaint Does Not Establish That Plaintiff Is A "Provider" Of An "Interactive Computer Service"

Plaintiff also fails to establish that he or his unfinished tool would qualify as a provider or user of an "interactive computer service," meaning (1) an "access software provider" that (2) "provides or enables computer access by multiple users to a computer server." 47 U.S.C. § 230(f)(2); Mem. 22–24.

As to the first element, Plaintiff argues he would be an "access software provider" because his proposed tool would "enable[] its users to 'filter, screen, allow, or disallow' content—namely, the Facebook newsfeed and the posts that would otherwise appear in it." Opp. 14 (quoting 47 U.S.C. § 230(f)(4)). Plaintiff does not allege or argue that his tool would "screen," "allow," or "disallow" content, leaving only his contention that it would "filter" content. But Plaintiff does not allege that Unfollow Everything 2.0 would actually "filter" the Feed. To the contrary, he claims it would work by "caus[ing] the user's browser to send a request to Meta's servers." Am. Compl. ¶ 73. At most, this might help a user "unfollow" certain friends, pages, and groups (which might "empty out" the Feed, *id.* ¶ 71), but it would not filter out the Feed itself from being displayed. *See* Mem. 22.

Plaintiff's attempt to analogize his proposed tool to "spam filters" only proves Meta's point.

Opp. 14.  Unlike spam filters (which do not control who sends spam but instead filter spam after it is sent), Unfollow Everything 2.0 allegedly would theoretically change the friends, pages, and groups that a user follows, which would "empty out" the Feed from adjusting the inputs.  Am. Compl. ¶ 71.  Plaintiff concedes, however, the Feed would still be visible.  He also acknowledges that content from friends, pages, and groups would still be available to users by "navigating to the profiles and pages they want to see"—confirming that the proposed tool would not actually filter that content.  Am. Compl. ¶¶ 60–61.  Unfollowing friends, pages, and groups so they are not included in the Feed is not the same as filtering out content that is included in the Feed.  Although amici observe that the "practical effect" might be the same (*i.e.*, to "empty out users' newsfeeds"), Amici Br. 10, that is not enough because section 230(c)(2) focuses on the "action" of the provider or user claiming immunity—and not just the *effect* of those actions.[7]

As to the second element, Plaintiff argues that his proposed tool would "enable[] computer access by multiple users to a computer server."  Opp. 15 (citing 47 U.S.C. § 230(f)(2)).  But he does not cite any specific factual allegations identifying the putative "users" and "computer server" to meet this definition.  Instead, he cites cases that analyze other technologies (such as the Zoom app and a malware scanning software) and therefore do not shed light on the proposed tool at issue here.  Opp. 15 (citing *In re Zoom Video Commc'ns Inc. Priv. Litig.*, 525 F. Supp. 3d 1017, 1029 (N.D. Cal. 2021); *Zango, Inc. v. Kaspersky Lab, Inc.*, 568 F.3d 1169, 1175 (9th Cir. 2009)).

Were there any doubt about whether Plaintiff's proposed extension would "filter" content or "provide or enable computer access by multiple users to a computer server," that is because there are limits to what Plaintiff can allege about a tool that does not exist.  And any such doubt certainly counsels against exercising discretionary jurisdiction to rule on questions of statutory immunity that hinge on unpled technical details.

---

[7] Plaintiff also argues that he "independently qualifies as an 'access software provider'" because his tool would apparently "'transmit, receive, … forward, [and] cache' content."  Opp. 15 n.10 (citing 47 U.S.C. § 230(f)(4)(C)).  But in that provision, "content" refers to the underlying content that is filtered out, and there is no allegation that Plaintiff's proposed tool would "transmit," "receive," "forward," or "cache" a copy of the content that would otherwise have appeared in the Feed.

Gibson, Dunn &
Crutcher LLP

c.      **The Amended Complaint Does Not Establish That Plaintiff's Proposed Browser Extension Would Restrict "Access" To Objectionable Content**

Similar problems plague Plaintiff's argument that his proposed tool would restrict "access" to objectionable content under section 230(c)(2)(B).  He says that his proposed tool will restrict access by "eliminat[ing] the newsfeed," Opp. 16, but this argument is inconsistent with his allegations, which state that users who engage the proposed tool could still access the Feed; the Feed would just be "empty."  Am. Compl. ¶ 71.  Plaintiff concedes that the content that would otherwise have been displayed on a user's Feed would still be displayed and accessible to that user on Facebook, meaning the tool would not actually "restrict access" to content.  *See* Mem. 23–24.

Plaintiff and amici argue in the alternative that a mechanism can "restrict access" to content by changing how users view content, even if it does not "eliminat[e]" the content altogether.  Opp. 16; Amici Br. 11.  But changing how easy it is to view content is, in essence, changing the "availability" of content—a concept that, as Meta has explained, is different under the statutory language.  *See* Mem. 23–24 (comparing 47 U.S.C. § 230(c)(2)(A) with § (c)(2)(B)).

4.      **The Court Should Dismiss Plaintiff's Request For Declaratory Relief Regarding The CFAA And CDAFA**

The Court should decline Plaintiff's request for a declaratory ruling on the CFAA and CDAFA, as the jurisdictional defects are especially acute for those claims.  *See* Mem. 24.  Plaintiff argues that the lone mention of "unauthorized access" in the cease-and-desist letter Meta sent to a different creator about a different, actually released tool was an "obvious allusion to the statutes."  Opp. 24.  But even apart from the fact that this letter does not create a ripe dispute, *see supra*, p. 5, its reference to "unauthorized access" could just as likely refer to uses of Facebook that violate the Terms, which were summarized directly before the paragraph Plaintiff cites from the letter.  *See* Dkt. 29-2 at 1–2.[8]

Plaintiff also has no convincing response to Meta's argument that a declaratory ruling on the CFAA—which would be limited to just one subsection of the statute, section 1030(a)(2)(C)—would be too narrow to be useful.  *See* Mem. 24.  He asserts that section 1030(a)(2)(C) is the "only provision

---

[8] *Neilmed Products, Inc. v. Med-Systems, Inc.*, 472 F. Supp. 2d 1178 (N.D. Cal. 2007), and *FN Cellars*, 2015 WL 5138173, which involved invocations of "the language of trademark infringement," do not help Plaintiff.  *See* Opp. 24.  As noted above, a different standard applies to declaratory relief in trademark cases.  *See supra*, pp. 3–4.  And in both cases, the defendants had issued formal legal filings with the USPTO that unambiguously proved their intent to bring trademark infringement claims.

Gibson, Dunn & Crutcher LLP

Meta could conceivably rely on," Opp. 24–25, but his view is not dispositive—especially given that Meta cannot know how it would respond unless and until there is something concrete for Meta to evaluate. Plaintiff's argument that "courts do not require a plaintiff to seek immunity from all potential claims to obtain a declaratory judgment on the specific claim they have brought," Opp. 25, is also contrary to the Ninth Circuit's instruction that courts should evaluate whether ruling on the declaratory relief claims would "settle all aspects of the controversy," *Gov't Emps. Ins. Co.*, 133 F.3d at 1225 n.5.

Finally, Plaintiff cannot seriously contend that his one sentence, conclusory allegation suffices to state a CDAFA claim. Plaintiff argues that he "would not violate the CDAFA for the same reasons he would not violate the CFAA," but he concedes that the statutes have different subsections that cover different types of conduct. Opp. 25.[9] Although Plaintiff now identifies provisions of the CDAFA for which he purports to seek a declaratory ruling—"(c)(1), (c)(2), (c)(4), and (c)(7)," Opp. 25—simply listing these provisions in his brief does not cure his pleading deficiency, meaning the absence of underlying *factual allegations* explaining the basis for the elements of each claim. It is Plaintiff's burden to plead allegations that establish a "nexus between the multitude of facts and the particular causes of action asserted," and the Amended Complaint must identify "which allegations support" the CDAFA claims. *Sarmiento v. Marquez*, 2022 WL 2918906, at *4 (N.D. Cal. July 25, 2022). He has not done that here, and his general references to the CDAFA in the Amended Complaint fail to meet the "notice pleading requirements of Rule 8(a)(2)." *McGowan v. Weinstein*, 505 F. Supp. 3d 1000, 1020 n.13 (C.D. Cal. 2020). In short, neither Meta nor the Court should have to speculate about the contours of the hypothetical CDAFA claim that Plaintiff seeks to eliminate.

### III.   CONCLUSION

The Court should dismiss because there is no justiciable dispute or basis to exercise discretionary jurisdiction based on a hypothetical browser extension that he has not yet invented, and because the allegations do not establish a claim for declaratory relief.

---

[9] Contrary to Plaintiff's suggestion, *see* Opp. 25 n.17, *BrandTotal* and *Multiven, Inc. v. Cisco Systems, Inc.*, 725 F. Supp. 2d 887 (N.D. Cal. 2010), do not establish a blanket rule that the CFAA and CDAFA are coextensive. Rather, the extent of overlap depends on the specific legal provisions and factual theories at issue. *See BrandTotal*, 605 F. Supp. 3d at 1260 (claims "coextensive for the purpose of the present motions"); *Multiven*, 725 F. Supp. 2d at 895 ("necessary elements" did not differ materially … for purposes of this action"). The CDAFA allegation in the Amended Complaint is so thinly pled that neither Meta nor the Court can discern whether it overlaps with the CFAA claim in this case.

Gibson, Dunn &
Crutcher LLP

1   Dated: September 23, 2024                    GIBSON, DUNN & CRUTCHER LLP

2
                                                 By: _/s/ Kristin A. Linsley_____
3                                                        Kristin A. Linsley

4                                                *Attorneys for Defendant Meta Platforms, Inc.*

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28