Pages 1 - 26

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Jacqueline Scott Corley, Judge

```
ETHAN ZUCKERMAN,            )
                            )
          Plaintiff,        )
                            )
  VS.                       )   NO. 3:24-CV-02596 JSC
                            )
META PLATFORMS, INC.,       )
                            )
          Defendant.        )
_____ )
```

San Francisco, California
Thursday, November 7, 2024

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

For Plaintiff:

                KNIGHT FIRST AMENDMENT INSTITUTE
                  AT COLUMBIA UNIVERSITY
                475 Riverside Drive, Suite 302
                New York, New York 10115
    BY:  **RAMYA KRISHNAN, ATTORNEY AT LAW**
         **ALEXANDER A. ABDO, ATTORNEY AT LAW**
         **JENNIFER C. JONES, ATTORNEY AT LAW**

For Defendant:

                GIBSON, DUNN & CRUTCHER LLP
                One Embarcadero Center, Suite 2600
                San Francisco, California 94111-3715
    BY:  **KRISTIN A. LINSLEY, ATTORNEY AT LAW**

**(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

REPORTED BY: Ana Dub, RMR, RDR, CRR, CCRR, CRG, CCG
              CSR No. 7445, Official United States Reporter

1    **APPEARANCES**:   (CONTINUED)

2    For Defendant:

3                                GIBSON, DUNN & CRUTCHER LLP
                                 310 University Avenue
                                 Palo Alto, California 94301-1744
4                        BY:  **WESLEY SZE, ATTORNEY AT LAW**

5

6    For Amici Electronic Frontier Foundation and Center for
     Democracy & Technology:
7                                AMERICAN CIVIL LIBERTIES UNION
                                   FOUNDATION OF NORTHERN CALIFORNIA
8                                39 Drumm Street
                                 San Francisco, California 94111
9                        BY:  **JACOB A. SNOW, ATTORNEY AT LAW**

10

11   Also Present:        **Ariel Ruiz**

12

13

14

15

16

17

18

19

20

21

22

23

24

25

<u>**Thursday - November 7, 2024**</u>                                    <u>**10:18 a.m.**</u>

<u>**P R O C E E D I N G S**</u>

**---o0o---**

**THE CLERK:**  Calling Civil Action C 24-2596, Zuckerman

vs. Meta Platforms.

**MS. KRISHNAN:**  Good morning, Your Honor.  Ramya

Krishnan for the plaintiff.

**THE COURT:**  Good morning.

I just need for Meta.

**MS. KRISHNAN:**  With me are my colleagues Alex Abdo and

Jennifer Jones, also from the Knight First Amendment Institute

at Columbia.

**THE COURT:**  Welcome.

**MS. KRISHNAN:**  Thank you.

**THE COURT:**  Welcome to California.

**MS. KRISHNAN:**  Thank you.

**MR. SNOW:**  I'm just going to appear for *Amici*.  Jacob

Snow for ACLU of Northern California, the Electronic Frontier

Foundation, and the Center for Democracy and Technology.

**THE COURT:**  Good morning.

**MR. SNOW:**  Thank you.

**MS. LINSLEY:**  Good morning, Your Honor.  Kristin

Linsley for defendant Meta.

**THE COURT:**  Good morning.

**MS. LINSLEY:**  Oh.  And with me are Wesley Sze, S-z-e,

1   also from Gibson Dunn, and then Ariel Ruiz from Meta.

2        **THE COURT:**  Okay.  Ms. Krishnan, so this lawsuit was

3   filed in May; and according to the complaint, the browser

4   extension could be built in six weeks.

5       So is it built?

6        **MS. KRISHNAN:**  It isn't yet built.  It would take

7   six weeks to complete the tool.  This is a significant amount

8   of work for Zuckerman and his engineering team, and there's no

9   reason to put them to this exercise because the Court already

10  has all of the facts it needs to adjudicate the tool's

11  legality.

12       **THE COURT:**  So how much would it cost to build it?

13       **MS. KRISHNAN:**  I can't put a cost on the team's labor.

14       **THE COURT:**  Who would pay for it?

15       **MS. KRISHNAN:**  No one's paying for it.  Everyone's

16  working on this project *pro bono*.

17       **THE COURT:**  *Pro bono*.  Okay.  So this is not a

18  bet-the-farm case?

19       **MS. KRISHNAN:**  Well, it is a bet-the-farm case insofar

20  as releasing the tool would expose Professor Zuckerman to

21  serious legal liability.

22       **THE COURT:**  Like what?

23       **MS. KRISHNAN:**  So it's important to understand what

24  Professor Zuckerman is up against here.  You know, he is a

25  professor at a public university who was only able to bring

1  this case because he was able to connect with *pro bono* counsel.

2      Meanwhile, if he were to release the tool, which is a

3  non-commercial tool -- he doesn't stand to make any money from

4  it.  But if he were to release the tool, he would face a risk

5  of suit by one of the richest companies in the world.  And

6  defending --

7      THE COURT:  So he would get a cease and desist letter,

8  and like everything 1.0, he could just cease.

9      MS. KRISHNAN:  Well, he doesn't -- he doesn't want to

10  have to be in the position that Louis Barclay was in.  He knows

11  that most likely, he will --

12      THE COURT:  Wait a minute.  But you said to me he

13  would face these dire legal consequences.

14      MS. KRISHNAN:  Yes.

15      THE COURT:  So I'm just spinning that out a bit.

16      MS. KRISHNAN:  Right.

17      THE COURT:  So if he got the cease and desist letter,

18  which people get every day, he could cease, and then he

19  wouldn't face those consequences; right?

20      And then he could move for a preliminary injunction if

21  somehow -- I'm not quite sure what it would be -- he had some

22  irreparable harm that he would do that; right?  That's normally

23  what we use the preliminary injunction tool for.

24      MS. KRISHNAN:  Meta would, and has in these kinds of

25  cases against tools where it has pursued legal action, sought

damages.

In the *BrandTotal* case, for example, it sought $100,000 in compensatory damages just for investigating BrandTotal's conduct and building a case against it; and then it then sought nearly $2.8 million in attorney's fees under the California Computer Access -- Data Access and Fraud Act because it prevailed in the suit.

And so that is the kind of serious legal liability we're talking about here.

And you're right, Your Honor, that he would, if he released a cease -- if he -- sorry -- were to receive a cease and desist letter, would be in the position of having to choose between continuing to engage in potentially unlawful conduct and abandoning his rights, but that's precisely the dilemma he faces --

**THE COURT:**  Not abandoning.

**MS. KRISHNAN:**  -- right now.

**THE COURT:**  At that point, there'd be no question, would there, that there would be jurisdiction to hear the declaratory action?  Right?

**MS. KRISHNAN:**  We think that there's no question that the Court has jurisdiction now.  Under controlling Ninth Circuit precedent, all Professor Zuckerman needs to show is that he has a real and reasonable apprehension of being subject to legal liability.  And in our view, there's no

1  question that that test is satisfied here.

2       THE COURT:  What is your best case that I would look

3  at?  Because I couldn't find any cases in which -- (a) we're

4  just talking about a breach of contract action -- in which

5  nothing had been built and you'd had no communication with the

6  defendant, both things here.  So what is your best case?

7       MS. KRISHNAN:  Well, we rely on several cases.  There

8  are a number of cases where courts have held that where a

9  dispute is over a product's legality, you don't have to

10  complete manufacture before obtaining relief.  Meaningful

11  preparation is enough.

12      You see that in the Federal Circuit's decision in

13  *Cat Tech*, which involved a plaintiff who had only created basic

14  designs for their loading device, device configurations and

15  AutoCAD drawings, but they hadn't yet manufactured the tool.

16  And the Court held that there was jurisdiction, even though the

17  product would ultimately need to be customized to the

18  customer's dimensions.

19      You had the *Diamond.net* case where --

20      THE COURT:  So in *Cat Tech*, there was an infringement

21  claim.

22      MS. KRISHNAN:  Yes.  But we don't --

23      THE COURT:  So that --

24      MS. KRISHNAN:  I mean, Meta --

25      THE COURT:  So my question was where you have no

1   product and no communication with the defendant.

2       Now, if Meta had sued the plaintiff, maybe you'd have a

3   reasonable apprehension there.  But we've had no communication;

4   right?

5       There was an infringement claim there.

6       **MS. KRISHNAN:**  I mean, the Ninth Circuit has been very

7   clear in cases like *Societe* that the Court should take a

8   flexible approach that is focused on the reasonable perceptions

9   of the plaintiff, not the subjective intentions of the

10  defendant.

11      And here, where Meta has been clear that the tool is

12  unlawful, not only in its cease and desist letter to Louis

13  Barclay, which concerned a nearly identical tool, but in this

14  very lawsuit it has asserted --

15      **THE COURT:**  I don't know if the tool is identical

16  because it hasn't been built.

17      **MS. KRISHNAN:**  Well, our amended complaint explains at

18  length why these tools would work in essentially the same way.

19      And this tool has been taken to the precipice of

20  completion.  Professor Zuckerman has developed a detailed

21  blueprint in the form of pseudocode.  An academic cybersecurity

22  expert has vetted the design for the tool and confirmed that if

23  built to those specifications, it will perform as expected.

24      **THE COURT:**  If built.

25      **MS. KRISHNAN:**  Yes.  And he's ready and able and

1    willing to complete the tool, and that -- we do submit that

2    that is sufficient.

3        And there are a number of cases.  Yes, they're from the

4    patent context for the most part, although you also have the

5    *3Taps* case, which was not a patent case and, instead, involved

6    a plaintiff who wanted to engage in scraping that LinkedIn

7    alleged was a violation of the CFAA, and it applied the

8    meaningful preparation test.

9        But there is no separate justiciability test for patent

10   cases versus non-patent cases.  *MedImmune* is very clear on

11   this.  The question in each case is whether the facts alleged,

12   under all the circumstances, show a substantial controversy of

13   sufficient immediacy and reality.  And there's no question that

14   meaningful preparation of the kind that Professor Zuckerman has

15   engaged in here is obviously relevant to that inquiry, whether

16   or not infringement is the issue.

17       **THE COURT:**  So in a lot of the other cases -- for

18   example, I think in *Interdynamics*, they had already placed

19   orders in the next few weeks.  A patent case.  They were about

20   to go out of business.

21       I mean, here, now you tell me it's not even -- it's

22   *pro bono*.  Why not build it so I'm adjudicating actually a

23   concrete program that actually does something?

24       You see, here's my concern.  It's that I say something,

25   and then, "Oh, okay.  Well, I'll modify if I do it this way."

1    I mean, it seems to me it's just a classic advisory opinion.

2    This seems to be way on the edge.  That's why I asked you about

3    a case in which nothing has been built and no communication

4    with the defendant; right?  All that goes to reasonable

5    apprehension.  I don't know how you get there.

6        What Meta says is:  I don't know.  I don't know.  I don't

7    know what it does.  I don't know what it looks like.

8        You've shared nothing with them.  You've communicated

9    nothing.  It sounds, actually, like a good idea.  Meta, maybe

10   they'll let it go.  They didn't with the other.  I don't know.

11   I mean, it's so hypothetical.  It's so "if."

12           MS. KRISHNAN:  I mean, the whole point of the

13   Declaratory Judgment Act is to give potential defendants relief

14   from the Damoclean threat of liability.  So the Ninth Circuit

15   has made clear, you don't have to wait for an explicit threat

16   of suit.  You don't need to wait to be sued.  All you need is a

17   reasonable apprehension.

18       And here, there's no question that Professor Zuckerman is

19   able to build the tool as described.  He has extensive

20   experience building similar tools, including considerably more

21   complex tools.  We've alleged that --

22           THE COURT:  Then why doesn't he build it?

23           MS. KRISHNAN:  -- in the complaint.

24       Because it is a significant -- I mean, yes, he is a

25   professor at a research university; and, yes, he can get people

1    to volunteer to work with him on this project; but their

2    time -- I mean, they engage in important research.  There is an

3    opportunity cost to building a tool that may prove to be

4    illegal versus, you know, being able to spend time on those

5    other worthy projects and waiting till he gets an assurance

6    from this Court that, in fact, he would not be engaging in

7    unlawful behavior were he to build the tool and release it to

8    the public.

9        **THE COURT:**  So why even do the pseudocode?  Why not

10   just file a lawsuit and say:  "Judge, if I were to build

11   something that could do this, would it violate the terms of

12   use?  Because I'm a busy professor, I have other things to do,

13   and I don't want to spend the time doing the pseudocode

14   either"?  Why do you draw the line there?

15       **MS. KRISHNAN:**  Well, I'm not drawing the line there.

16   I think the Courts have drawn the line by requiring meaningful

17   preparation; that is, significant concrete steps.  That's the

18   language that's used in a number of these cases.

19       And that's why he's taken significant concrete steps.

20   The detailed blueprint in the form of pseudocode that

21   addresses -- that's an immediate precursor to coding that

22   addresses key questions of function and architecture sufficient

23   for an academic cybersecurity expert to say:  If you build

24   this, it will perform as you say it will and it will protect

25   user privacy.

1          **THE COURT:**  What expert?  Who is this expert?

2          **MS. KRISHNAN:**  We haven't identified them by name, but

3     it is an academic cybersecurity expert at the university.

4          **THE COURT:**  Therefore, it can be built?

5          **MS. KRISHNAN:**  Yes.  I mean, pseudocode is a -- it is

6     a normal step taken by software designers in the course of

7     designing software; and it is, as I said, an immediate

8     precursor to coding.

9          But, you know, Professor Zuckerman has taken those

10    significant concrete steps to show that he is eager and willing

11    to pursue this project, but he already faces the kind of

12    dilemma that *MedImmune* says it is the point of the Declaratory

13    Judgment Act to address.

14         I would just add that, you know, on Meta's theory, we

15    would be in no better position if Zuckerman had already coded

16    the tool because they say:  Well, you have to release the tool;

17    we have to check that it works as you say it does; and then we

18    have to decide, you know, what step we want to take.

19         But the Declaratory Judgment Act does not require a

20    certainty of suit before the plaintiff is able to seek relief.

21         **THE COURT:**  What case has where the defendant has no

22    idea, has never even seen what it is?  You're not sharing the

23    pseudocode, nothing.  You've had no communications with the

24    defendant.  What case says that?

25         And this is constitutional.  This is an important question

1    because, should I agree with you and go forward, the whole

2    thing could be voided -- voided -- if I was wrong.  So this is

3    a critical, critical question where, by the way, the burden is

4    on you to prove jurisdiction.  And any doubts -- right? -- no

5    jurisdiction.

6        So what case says defendant's never seen this hypothetical

7    program, hasn't seen the pseudocode, hasn't had any

8    conversations, but yet you can hold, for Article III purposes,

9    that there is a controversy?  What case would I look at?

10        **MS. KRISHNAN:**  Well, you know, cases like *Cat Tech*,

11    *Diamond.net*, *Interdynamics*, these are all cases where the

12    product was not manufactured yet and so the defendant had not

13    yet been --

14        **THE COURT:**  But *Cat Tech*, they sued for infringement.

15    So clearly, under Rule 11, they had to have a good faith basis

16    for believing it infringed.  So they were aware of enough

17    information that they had that good faith basis.

18        So I'll ask -- just say -- if there isn't one, just say:

19    No, Judge, actually, we think you should do this, but there

20    isn't a case that does that.

21        Is there a case in which the defendant has not been

22    shown -- has had no communications with the plaintiff, hasn't

23    seen anything and, yet, the Court held that there was

24    Article III ripeness?

25        **MS. KRISHNAN:**  I can't think of a non-infringement

1   case.

2      But if I could just note that the cease and desist letter

3   that Meta sent Louis Barclay, it conspicuously did not object

4   to any aspect of the tool's code.  What it objected to was what

5   it called the tool's unauthorized functionality, which it

6   identified as automating, quote, mass following and

7   unfollowing.  And that is precisely the same functionality that

8   Zuckerman's tool would have.

9      And we have alleged in the amended complaint that,

10   you know, the tools work in essentially the same way.

11      But really, Meta's objection is at the level of the

12   functionality of the tool, the very fact that it automates any

13   action on Facebook.  And Your Honor knows that Zuckerman's tool

14   will do the same because we have alleged that in this

15   complaint.

16      **THE COURT:**  Okay.

17      **MS. LINSLEY:**  Good morning, Your Honor.

18      Just to answer Your Honor's question to my opposing

19   counsel, there is no case that we know of where a plaintiff was

20   able to come in and invoke federal jurisdiction under the

21   Declaratory Judgment Act to get an advance ruling of immunity

22   from any possible suit from a third-party app or other device

23   of any kind that we know of that did not yet exist at the time

24   of the lawsuit that would have rendered -- even if successful,

25   yielded an advisory opinion of a ruling that, depending on how

the facts actually played out, would probably be of no worth
whatsoever.

It's particularly problematic here, Your Honor, where the
plaintiff is seeking immunity, essentially, literally and
figuratively, from a subsequent lawsuit by Meta when Meta has
an obligation, as this Court -- as courts in this district have
recognized, to police third-party apps that access Facebook's
system, and to do so in real time, so that it can determine
whether its terms that are meant to protect not only -- meant
to protect user privacy, user security, and the integrity of
Meta's own systems are being -- whether they are being violated
or not.

Meta has to do that in real time and will have to do that.
Even if this case were to go to judgment, it would still have
to evaluate the app, once it comes out, to see not just how --
what the end result is.  That's not all it would have to do.
It would have to examine the functionality to see if the app
performs as represented, in which case it probably would
violate Meta's terms, but also to see if there are other
problems with it that are not as represented, such as whether
the app would communicate data outside the Facebook system and
beyond the user.

The plaintiff alleges in the complaint, "Oh, all the data
will stay on the user's hard drive," but then he says that the
app is still going to communicate back to his server for

1   purposes of updates and possibly otherwise.  So how do we know

2   until it's tested?  There's no way for Meta to know whether

3   data is being taken from the Facebook users and used somewhere

4   else and transmitted somewhere else.

5        There's also no way of knowing what promises will be made

6   to consumers and users about how the app will function

7   vis-à-vis their data.  And as courts have recognized in this

8   district, especially since *Cambridge Analytica*, that's

9   something that we need to be very mindful of.

10       And Judge Hamilton noted this in the *Stackla* case, and so

11  did Magistrate Judge Spero in the *BrandTotal* case, that it's

12  essential and, actually, a matter of important public policy

13  that Meta do that.

14       It can't do it in the abstract in advance based on

15  hypothetical facts.  It has to do it based on real facts and

16  how the app would actually function, running diagnostic tests

17  to see what data is being transmitted or not and making sure

18  that people's security is being safeguarded, including that

19  they're not being subjected to misleading claims about how the

20  app will handle their data.  So that is something Meta would

21  do.

22       So for this Court now to enter the decree that plaintiff

23  is asking for, which is quite remarkable in how he phrases

24  it -- he wants the Court to say, without any facts at all built

25  into the statement, that his app does not violate Meta's terms,

or Meta's terms are void for public policy, which I can get to separately.

The tool does not violate CAFA, the federal statute prohibiting unauthorized access or access that goes beyond what authorization was given.  So here, we literally don't know what that would look like factually.  The tool does not violate CDAFA either.

I mean, the Court, obviously, can't enter those rulings, which is what he's seeking in his demand.

So necessarily, if the Court were to do this, it would have to build in all these hypothetical facts, like if the app does -- only if the app, you know, only automates the user's request for lists of his or her friends, groups, and pages; and if it automates unfollow and maybe automates follow if the user decides to do that later; and it doesn't do these other things. It doesn't transfer data to someone else.  It doesn't overburden Meta's system with hundreds or thousands of people doing mass unfollow requests at the same time, because that's also one of the terms of Meta's engagement with users.  And then another term is that it won't change the way Meta's presentation or system appears or operates.  So you'd have to build in all of those things; it wouldn't do any of these things.

And then, also, the proposed decree doesn't even cover the stuff that's in the cease and desist letter to the other

1    developer.  It doesn't cover intellectual property violations

2    because we just don't know.  And the CAFA/CDAFA stuff wasn't in

3    the cease and desist letter.

4        A lot of the enforcement action plaintiff relies on that

5    Meta did bring against third-party apps involve other causes of

6    action too, like interference and other types of torts that may

7    be applicable, depending on the facts.  And the existence of

8    those cases, far from being a reasonable threat to this

9    plaintiff, prove up our point, which is, these enforcement

10   actions are done on the basis of a real app that's actually

11   issued that can then be the subject of testing and analysis,

12   that the facts can then be presented to the Court.

13       Like in Judge Chen's anti-scraping cases, okay, we knew

14   exactly what was going on.  It was logged-off activity.  It

15   wasn't logged on.

16       Here, we have logged-on activity.  The app would actually

17   enter Facebook through a user's logged-on status and be able to

18   act just like the user in that context, at least according to

19   the complaint.

20       Other cases involved -- like, you know, *BrandTotal*,

21   the Court had the app operating, knew exactly how it operated

22   and was able to rule.

23       So, you know, there's just no justiciable dispute here.

24       I do want to make one point about the legal precedence

25   we're talking about.  It is not just a reasonable apprehension

1  of a suit that is the Article III test.  That is not what

2  *MedImmune* said.  That's part of the test.  But what *MedImmune*

3  said is you need to have a concrete set of facts that would

4  give rise to a decree that can be enforced between the parties

5  that would not be based on a hypothetical set of facts.  You

6  need to have concrete facts.

7      In *MedImmune* itself, you had a license agreement, and

8  there was a patent supporting the license agreement, the

9  application for which was pending.  The Court said -- and so

10 the patent -- the licensee wanted a declaration that the patent

11 was invalid because (a) he didn't think he should have to pay

12 royalties under an invalid patent; and (b) there were issues --

13 there were other issues about infringement that he didn't want

14 to incur.

15     So for both of those reasons, it was a concrete dispute

16 that was an actual patent that could be adjudicated, and there

17 was actual activity that he was carrying out under the existing

18 license agreement that would be the basis of a determination by

19 the Court, once it took the case up, as to whether there was

20 infringement or whether -- whether the patent -- whether his

21 activity would infringe the patent.  You needed that factual

22 basis.  That was there in that case.

23     Likewise, in *Societe*, which is kind of the keystone case

24 for this kind of reasonable-apprehension-of-suit test -- and

25 that was a case from 1982.  It predates *MedImmune*, but the

courts are still following it in this circuit -- the Court made

clear at page 944 of the opinion the same thing, that there

were concrete facts.

In *Societe*, it was an aluminum -- two manufacturers of

aluminum rolling equipment, both of which were trying to get

contracts with Reynolds, Reynolds Wrap, and both of them were

already carrying out their practices.  There was an existing

patent that was alleged to have been violated, and there was

existing infringing activity already happening.

The Court says at 944 (as read):

        "In a case like the one before us, in which the

        plaintiff is engaged in," quote, "the ongoing

        manufacture of the alleged patented item, the showing

        of real and substantial apprehension beyond the

        manufacture of the patented item need not be

        substantial."

Because in that case, the Court again said it's an actual

manufacturer of a product that may infringe the patent owned by

another, in which case the adverse legal interests of the

parties are crystallized, thereby obviating the concern that

there be an advisory opinion based on a hypothetical set of

facts.

And, likewise, with the other infringement cases, there's

concrete matter that the Court can actually adjudicate,

including the existence of a patent and whether the plaintiff's

1    activities constitute infringement.  So those concrete points

2    always have to be there, and then you still need to have a

3    reasonable anticipation that someone is going to sue you.

4        And I think Your Honor has covered that last point.

5    There's been no communication whatsoever between Meta and this

6    plaintiff.  The fact that he has a cease and desist letter

7    going to someone else, we don't even know how that someone

8    else's app -- it's not laid out in the claim -- how that

9    operated.  But we certainly don't know how his will operate.

10   So we can't take on faith that it would be just like the other

11   one.

12       It doesn't -- and, likewise, would the enforcement actions

13   the courts -- court after court, in the declaratory judgment

14   context, have made clear that just because you sue someone else

15   doesn't mean that's a reasonable apprehension for a different

16   plaintiff who is now coming in and saying, you know, "I might

17   be sued."

18       So I think if Your Honor has questions about

19   justiciability, that's sort of where we are.  I can also

20   address the merits.

21       **THE COURT:**  I don't think we need to go to the merits.

22       I mean, what about that is, like, there may be all sorts

23   of ways it violates the terms of use.  Some, there may be good

24   affirmative defenses to; some not.  But until the app is built

25   and launched, anything I would say would just be advisory.

1    **MS. KRISHNAN:** I mean, I think it's -- I think it's --

2    it's conspicuous that Meta -- Meta essentially concedes that it

3    would not be enough to code the tool; that it would require

4    Professor Zuckerman to actually release the tool before he

5    could come into court. But that is precisely what *MedImmune*

6    says that declaratory plaintiffs don't need to do, which is to

7    run the gauntlet and run the risk of legal liability. And

8    it --

9    **THE COURT:** *MedImmune* was a patent case.

10    **MS. KRISHNAN:** It was a patent case, but I don't think

11    that -- the courts --

12    **THE COURT:** Well, then stop.

13    And it was about patent invalidity; right? Am I right?

14    **MS. KRISHNAN:** It involved -- it was about patent

15    invalidity. There was also a breach of contract claim in the

16    sense of there was a question of whether the license agreement

17    had been violated.

18    **THE COURT:** But if the patent was invalid, then

19    that -- that was the question, was the patent invalidity. And

20    patent invalidity is really a question of law, in large part,

21    based on, you have the patent and invalidity. So, it's

22    concrete.

23    But this is a completely different context. This is just

24    a completely different context.

25    In any event, this is -- this would be new law. This

would be new law in terms of ripeness and Article III out
there.  This would be -- this is way, way, way on the edge.
And to say, well, you know -- this would be:  I want to build a
product and I have all my design, but I need some investors.

But the investors say, "I'm a little concerned about this
patent out there, so I don't want to give any money until I
know if it's going to be good, if it will get past this."  So I
file a dec relief action.

And the Court will say, "If it's built, as this looks" --
nothing's been built.  I have no prototype or anything.  But
"If it's built along with these things, no, it wouldn't
infringe for this reason."

So they build something else.

I mean, we would have nothing else to do but give advisory
opinions because everyone would want them because they could be
so helpful for investing.  I understand.  But that's not what
the Constitution requires.

And here is really no different.  Here, it's the
investment of six weeks of engineering time.  That's really
what you're talking about.  I don't find persuasive the legal
consequences because there, you put it up, you cease and
desist, you stop, or you get your preliminary injunction.

**MS. KRISHNAN:**  I mean, there's no guarantee here that
Meta would send a cease and desist.  I mean, it hasn't
disclaimed an intent to sue immediately.  And if it were to sue

immediately, they could seek damages, very significant damages,

and they could also seek attorney's fees, as they did in the

*BrandTotal* case when they prevailed.  And that is the kind of

serious legal liability that *MedImmune* says the courts --

        **THE COURT:**  That's not enough.

        **MS. KRISHNAN:**  -- care about.

        **THE COURT:**  But that's not enough.  In *MedImmune*, it

was concrete.

    It's just not concrete.  I don't know that those people

can actually code it that way.  I don't know how it's going to

work.  If it was automatic, we wouldn't need the coders.  You

could just push a button and there, the code would appear;

right?  They actually have to do something.  And maybe it can

be done and maybe it can't be done, and maybe it'll work and

maybe it won't work.  But --

        **MS. KRISHNAN:**  If I could draw Your Honor's attention

to one more case, which is the *Paramount Pictures vs. Axanar*

case, where there was a shooting script, yes, but only one

scene had been filmed.  And yet -- I mean, I hear what

Your Honor is saying about cases involving the question of

patent validity; but many of these cases, such as the *Axanar*

case, also involved a claim of infringement, which meant that

the Court had to compare the unfinished product with the

defendant's patent and ask whether there was substantial

similarity.

1    And we think that that's sort of analogous to what's at

2    stake in this case.

3        **THE COURT:**  The *Paramount* -- the Court explained that

4    because it wasn't -- first of all, there was a

5    locked-and-loaded script which apparently the defendant had

6    seen; right?  So you actually had communication between the

7    plaintiff and the defendant, which we don't have here.

8        **MS. KRISHNAN:**  There was no communication between the

9    plaintiff and defendant in the *Societe* case.  What --

10       **THE COURT:**  I'm addressing *Paramount* --

11       **MS. KRISHNAN:**  Right.

12       **THE COURT:**  -- which you said you wanted to bring up

13   one more case, so I'm addressing that case.

14       And the judge explained that the substantial similarity

15   was based on a long franchise of films, and it was more about

16   whether the character, that whole -- would be the similarity.

17   So it didn't matter that the whole film hadn't been completed

18   that he thought he could do the substantial similarity

19   analysis.

20       What I'm telling you is, I haven't been persuaded that I

21   can do the analysis, which is not substantial similarity, which

22   is whether this browser extension, which has not been built nor

23   uploaded, violates Meta's terms of use.  I can't do it.  I

24   can't do it in a concrete way that would not be advisory.  So I

25   don't think there's Article III subject-matter jurisdiction.

1    And second, declaratory relief is discretionary, and I

2 wouldn't do it anyway.  I think it would be bad judicial policy

3 to create this new law -- and I think you're asking for new

4 law -- that it would open up the courts to doing advisory

5 opinions because people don't want to invest time or money.  I

6 just don't think that's a good use of declaratory judgment.

7 It's just not concrete.

8    When it is concrete, I'm happy to do it.  It's a very

9 interesting case.  It's a very interesting case.  But I think

10 it needs to be built so I actually have something in front of

11 me, like I do when I have a patent; right?

12    When I have a patent, there's something in front of me.

13 There's prior art.  There's all the representations that were

14 made to the PTO.  That's what's being adjudicated.

15    Here, as counsel said, it would be if the browser

16 extension does this, if it does this, if it does this.  That's

17 just classic advisory opinion.

18    So I'm going to grant the motion to dismiss without

19 prejudice, of course, and I'll issue a written order.

20    Thank you for your excellent argument, both of you.

21        **MS. KRISHNAN:**  Thank you.

22        **MS. LINSLEY:**  Thank you, Your Honor.

23            (Proceedings adjourned at 10:51 a.m.)

24                    ---o0o---

25

1

2                    <u>**CERTIFICATE OF REPORTER**</u>

3          I certify that the foregoing is a correct transcript

4    from the record of proceedings in the above-entitled matter.

5

6    DATE:  Friday, November 29, 2024

7

8

9

10

11    _____

12          Ana Dub, RDR, RMR, CRR, CCRR, CRG, CCG

13          CSR No. 7445, Official United States Reporter

14

15

16

17

18

19

20

21

22

23

24

25